Filed 1/26/15  P. v. Goodwin CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL FRANK GOODWIN,<br><br>        Defendant and Appellant. | B197574<br><br>(Los Angeles County<br>Super. Ct. No. GA052683) |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. Teri Schwartz, Judge.  Affirmed.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

In the early morning of March 16, 1988, Mickey and Trudy Thompson were shot and killed in the driveway of their Bradbury Estates home, as they were leaving for work, by two gunmen who left the scene on bicycles and were never apprehended. More than 13 years later, defendant Michael Frank Goodwin was arrested in Orange County for the murders. After the Orange County prosecution was dismissed for improper venue, defendant was prosecuted in Los Angeles County, and in January 2007, a jury convicted him of the first degree murder of both victims, and found true special allegations of multiple murders and that the murders were committed by means of lying in wait.

The prosecution adduced evidence of bitter lawsuits between defendant and Mr. Thompson over business matters in the three years preceding the murders, lawsuits that ended badly for defendant. Many witnesses testified to defendant's expressed hatred of Mr. Thompson and defendant's numerous threats, repeated to many witnesses over a lengthy period of time, that he intended to kill Mr. Thompson and hurt his family. There was eyewitness testimony placing defendant, with binoculars, in a car (with another unidentified man) parked in the Thompson neighborhood a few days before the murders. And there was evidence defendant and his wife liquidated assets and left the country on a newly purchased yacht five months after the murders.

The defense case challenged the eyewitness identification of the man in the parked car and tried to prove the murders were the result of a robbery gone wrong rather than a contract "hit," and that investigators made numerous errors and improperly focused their efforts on defendant rather than undertaking an unbiased search for the truth.

Defendant challenges his convictions on many grounds. He contends the case should have been dismissed, or the Los Angeles District Attorney's office should have been recused, or the two prosecutors should have been removed, because of the seizure, retention and review of attorney-client privileged documents.

He contends the evidence was insufficient for conviction, claiming the eyewitness identification of defendant as the man in the parked car was not credible evidence of a

connection between defendant and the killers or of any agreement to murder the Thompsons.

He contends the long delay in prosecuting him was unjustified and prejudicial, violating his state and federal constitutional rights to due process of law.

He asserts a possible *Pitchess*[1] violation.

He asserts error in the admission of expert testimony on financial transactions that occurred after Mickey Thompson won a large judgment against defendant.

He asserts the trial court improperly admitted evidence that Mr. Thompson expressed fear of defendant, evidence of defendant's bad character, and evidence of Mr. Thompson's good character.

He contends the trial court erred in excluding evidence, including evidence of potential third party culpability; evidence that Mickey Thompson had purchased a large quantity of gold just before the murders; and evidence that another individual had failed three polygraph examinations but nevertheless investigators failed to pursue him as a suspect.

He asserts error in giving a conspiracy instruction; error in instructing the jury it could consider a witness's level of certainty when evaluating eyewitness identification; and error in instructing the jury it could consider defendant's departure from the country on a yacht five months after the murders as evidence of flight and consciousness of guilt.

He asserts multiple forms of prosecutorial misconduct.

He contends dismissal is required because of outrageous government conduct "from the beginning of the investigation to verdict," claiming among other things that Mickey Thompson's sister, Collene Campbell, improperly influenced the investigation through her personal connections with the Orange County District Attorney.

And he asserts reversal is required based on the cumulative effect of multiple errors in the case.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

Our review of the record discloses no prejudicial error, and we affirm the judgment.

## FACTS

### 1. Background

Mickey Thompson was a well-known race car driver who set a land speed record in his youth. By the 1980's, Mr. Thompson was running a successful sports promotion company that sponsored indoor stadium races, principally with off-road, four-wheeled vehicles. Defendant ran a similar business, Stadium Motor Sports Corporation, promoting stadium motorcycle racing. In 1984, the two men entered into a business venture together to promote stadium motor sports events. The deal involved a stock transfer agreement with the parties combining their businesses and sharing profits and losses, 70 percent to defendant and 30 percent to Mr. Thompson.

Within months, the business relationship deteriorated. Defendant refused to advance monies for an event according to the 70/30 formula, and then claimed Mr. Thompson had defaulted, entitling him (defendant) to take over Mr. Thompson's company.[2] Mr. Thompson sued defendant and his company in October 1984. In February 1986, the trial court entered judgment for Mr. Thompson totaling over $790,000 in damages, prejudgment interest and attorney fees.

In the years after the litigation began, Mr. Thompson continued to successfully promote motor sports events in various arenas, while defendant's business suffered. Defendant had originated the idea of staging motorcycle events at the stadium in Anaheim, and had done so successfully for years. But after 1987, Gregory Smith, the

---

[2] Charles Stewart Linkletter, who worked for defendant in 1984 while the business venture with Mr. Thompson was being negotiated, overheard a conversation between defendant and another executive of defendant's company while driving them to defendant's Laguna office. Mr. Linkletter described the conversation as a 45-minute diatribe by defendant to the effect that "he was going to screw Mickey out of his business" and "rip him off." Then defendant told Mr. Linkletter, "Stew, if you ever say a word about this conversation to anybody, I will fucking kill you." A few days or weeks later, Mr. Linkletter drove from Laguna to the Thompson residence to get Mr. Thompson's signature on a contract.

4

Anaheim Stadium executive director, stopped doing business with defendant and hired Mr. Thompson and another company to produce all of Anaheim's motor sports events, including the event defendant previously produced. (One of several reasons for the change was that defendant's company was in bankruptcy.) Defendant was very upset when he received the news that his proposal for those events had been rejected in favor of Mr. Thompson. Anaheim Stadium executives announced the change at a press conference in August 1987, and the events held in January 1988 were very successful.

Defendant had held an exclusive contract for motor sports events at the Rose Bowl in 1985 and 1986, but the Pasadena City Council selected Mr. Thompson's company to hold an event in May 1987, which also made defendant very angry. Mr. Thompson was also selected to run an event in the summer of 1988, but the murders prevented that.

Meanwhile, Mr. Thompson's vigorous attempts to collect on his judgment against defendant were largely unsuccessful. Mr. Thompson's lawyers prevented defendant from using private sureties to satisfy the appellate bond requirement, but were not able to find any assets, which appeared to have been transferred. In September 1986, defendant changed the name of his company and filed for bankruptcy protection. In November 1986, defendant filed for personal bankruptcy.

Mr. Thompson's lawyer, Philip Bartinetti, described the litigation as one of "the most vigorously contested I've ever been involved in." Another of Mr. Thompson's lawyers, who was responsible for attempting to collect the judgment, described the litigation as "absolutely beyond a doubt the most bitter and contentiously fought lawsuit I've ever been involved in."

The judgment for Mr. Thompson was affirmed on appeal and the Supreme Court denied review on January 29, 1988, a few months before the murders. In another lawsuit defendant filed in Orange County against Mr. Thompson and his company, the court ordered summary judgment in favor Mr. Thompson on March 2, 1988, about two weeks before the murders.

After the bankruptcy filings in September and November 1986, Mr. Thompson had wanted to settle the matter, and there were extensive settlement negotiations.

5

Apparent deals were reached a dozen times, but then defendant "would change something at the last minute and it would fall apart." Mr. Thompson's lawyer concluded defendant was not negotiating in good faith.

After the bankruptcy filing of defendant's company, now named Entertainment Specialties, Inc. (ESI), the bankruptcy examiner recommended appointment of a trustee for ESI. Jeffrey Coyne was appointed trustee in late June 1987. He discovered "there was no operating company to run," as "the operating part of the company had been sold by E.S.I." to a company named Supercross, Inc. (SXI), a company owned and operated by defendant's wife and a man named Charles Clayton. When he examined the books and the transfer to SXI, Mr. Coyne found "lots of gaping holes" and determined that much of what he saw in ESI and the transfer to SXI "was all done for the purpose of moving the business without paying the creditors," the most vocal and the most interested of whom was Mr. Thompson. Mr. Coyne discovered that SXI was in default on payments to ESI for assets transferred to SXI, and believed the activity of defendant, his wife, ESI and SXI to be fraud affecting Mr. Thompson's rights as a creditor, as ESI's primary assets had been shifted away.

Mr. Coyne took steps to recover the assets, and SXI eventually paid $385,000 of the outstanding $500,000 owed. Mr. Coyne pursued recovery of the remaining amount and refused to acquiesce in defendant's efforts to have various bankruptcy estate assets paid to his wife and parents. At a meeting a few weeks before the murders, defendant, trembling and in a "black rage," approached within inches of Mr. Coyne's face and said, "You better lighten up or things will get bad," and "If you fuck up my life, I'll fuck up yours." Describing his experience with the ESI bankruptcy, Mr. Coyne said it was "the highest level I had ever seen of acrimony, anger, intensity, resentment and rage."

## 2. Defendant's Threats Against Mr. Thompson

We summarize now the evidence of the multiple occasions on which defendant expressed his hatred of Mr. Thompson and his intent to kill him during the years preceding the murders.

### a. William and Nina Wilson

In January or February 1988, William and Nina Wilson hosted dinner at their home for defendant and his wife. (Mr. Wilson was general manager of Jack Murphy Stadium in San Diego, and had also managed the Rose Bowl; he had worked with both Mr. Thompson and defendant on various motor sports promotions.) When Mr. Wilson asked defendant how he was doing, defendant replied, "Terrible." Defendant was angry and said: "Fucking Thompson is killing me. He's taking everything I've got. He's destroying me. I'm going to take him out." When Mr. Wilson responded, "Nobody wins that one. Mickey's dead and you're in prison," defendant replied, "Oh, no," and "I'm too smart for that. They'll never catch me." Nina Wilson heard the conversation and corroborated her husband's account, saying that defendant said, "I just hate him," and repeated, "I'm going to take him out." Both the Wilsons believed defendant was serious. Mr. Wilson was "very upset" and Ms. Wilson was "shock[ed]." When he saw how shocked the Wilsons were, defendant said, "Well, you know I'm just kidding. I could never do anything like that."

### b. Gregory Smith

Mr. Smith, the Anaheim Stadium executive, was subpoenaed to testify at a bankruptcy court hearing in 1987. This was at a time when decisions were being made or had recently been made about the award of the Anaheim motorcycle event to Mr. Thompson. Mr. Smith was sitting at the back of the courtroom before the hearing when defendant sat down behind him and said, "You don't know what you're doing to me. You'll be sorry for this. I'll be back." Mr. Smith considered defendant's statement threatening. He had had several conversations with defendant before, and in every one, defendant was "unhappy" and "mad that we would consider not having him come back and put on the supercross event." Defendant was "confrontational and very, very upset," but the courtroom conversation "was the first where I considered it threatening when I was being told that I would regret this decision."

7

### c. Scott Hernandez

Scott Hernandez worked for defendant's company from the spring of 1985 to late 1987, when defendant closed the office. The office walls were thin, and the offices of defendant and Mr. Hernandez shared a wall, so Mr. Hernandez could overhear discussions in defendant's adjoining office. In late 1987, Mickey Thompson's name came up frequently and was a source of tension in the office. "When Mickey Thompson was brought up by [defendant], it was usually in a rageful manner. Not geared towards the office personnel, but him expressing his anger and frustration . . . ."

On one occasion, Mr. Hernandez heard defendant on the telephone with his attorneys in the Thompson case, and then heard a ruckus that "sounded like books flying, hitting the wall, and [defendant] going into a rage." Mr. Hernandez heard defendant say, "I'll kill that mother fucker. I'll kill that mother fucker." Mr. Hernandez described defendant's voice level as "in anger, just livid anger." (In 2002, Mr. Hernandez told a detective that this incident occurred in February or March 1987, rather than late 1987.)

### d. Cheryl Sarantis

Cheryl Sarantis was an employee of defendant's company in 1986 and 1987, until the office closed, working on advertising and marketing. She heard defendant "ranting and raving" about Mr. Thompson on a regular basis, every day that defendant was in the office. On one occasion, she heard lamps crashing against the wall of the conference room, followed by defendant's ranting and raving about Mr. Thompson. She also recalled defendant saying that he "was going to destroy Mickey Thompson." (When police interviewed Ms. Sarantis, she said the word "destroy" was her characterization of what defendant said, and not a direct quote from defendant.)

### e. Kathy Weese

Kathy Weese, who was then known as Kathy Johnson, worked for defendant for six to eight months as a secretary in 1986. She often answered the telephone when Mickey Thompson called. Defendant and Mr. Thompson "were always talking about the money situation." On one occasion, Mr. Thompson phoned defendant, and Ms. Weese overheard defendant say, twice, "I'm going to take you out." The two continued to

8

argue, and Ms. Weese heard defendant say, "It would cost me $500 and a motor vehicle to have you taken out and I will take you out."  (Ms. Weese did not tell police about that statement when she was interviewed in 1997, but the detective who interviewed her heard Ms. Weese testify to the same effect at a preliminary hearing in Orange County in 2002.)[3]

### f.  Barron Wehinger

Barron Wehinger, 16 years old in the fall of 1984, lived with his stepfather, Tom Villelli, in Durango, Colorado.  Defendant visited the Durango residence, and discussed with Mr. Villelli his "court battle" with Mr. Thompson.  Mr. Wehinger heard defendant tell his stepfather, "I'll kill him."  According to Mr. Wehinger, defendant said he was going to kill Mr. Thompson "[i]f he [defendant] lost his power to run the superbowl of motorcross, his million-dollar-a-year income."  Mr. Wehinger heard defendant say, "I can get it done for 50 grand."  Mr. Villelli replied, "I could get it done for 20 grand," and defendant said, "I don't want to get you involved, Tom."  Mr. Wehinger explained all this was vivid in his memory because, around the same time, defendant had visited and offered to help Mr. Wehinger and his brother with their motocross careers, and "[w]hen somebody offers you a chance to ride superbowl of motorcross, you listen to every word they say, and when I heard that, I'll never forget it."

Mr. Wehinger did not mention anything about the $50,000 when he testified at the preliminary hearing in this case, and he never mentioned anything about a hit man to the police or to the prosecutor.  In his previous testimony, Mr. Wehinger said that the only thing he heard defendant say was "he [(defendant)] would have him [(Mr. Thompson)]

---

**3**    Ms. Weese had a criminal history.  She used aliases and had several theft-related convictions.  She had walked away from a Colorado halfway house (because she was beaten and her daughter was attacked) to come to Los Angeles.  Defendant had Ms. Weese arrested, claiming she embezzled money.  She was acquitted of that charge, but spent eight months in custody awaiting trial and later was sent back to Colorado to complete her sentence there.  She told police, "If I can help you get this guy, I'll do anything," and referred to defendant as a "son of a bitch."

taken care of if he lost." In 2003, Mr. Wehinger told police he heard defendant talking in late 1987, or perhaps 60 or 90 days before the murders, rather than in 1984.

### g. Penn Weldon

In November or December 1987, Penn Weldon, a private investigator, met defendant to discuss possible investigative work for defendant. Defendant was "very upset and angry" during the hour-long meeting, and said he had been "fucked royally" by Mickey Thompson; that he was so angry he had recently thrown a chair through the window of his house; and "that Mickey had ruined his life and he wanted to get even with him." Defendant wanted Mr. Weldon to investigate Mr. Thompson's attorney, Philip Bartinetti, and place listening devices in Mr. Bartinetti's home and cars. Mr. Weldon refused to do that, but agreed to and did perform other investigative actions relating to Mr. Bartinetti.

### h. Karen Dragutin

In the months preceding the murders, Karen Dragutin was at a Laguna Beach restaurant with a man who knew defendant very well, and they were joined by defendant and his wife. Defendant's jovial attitude changed when the conversation turned to lawyers and lawsuits and Mickey Thompson. Defendant became angry, said he "was getting screwed by the lawyers"; "[t]he only way to get out of the mess was to take care of Mickey Thompson"; and "the only way he was going to get out of it is if Mickey Thompson died." Ms. Dragutin also testified defendant "was talking about a boat and going to Bermuda. And it was still in the context of that conversation. So my conclusion was he was going away." Defendant's statement about the boat and going to Bermuda "was in the same part of the conversation as the taking care of this mess and Mickey had to die . . . ."

### i. Gregory Keay

Gregory Keay was defendant's cousin. At a family gathering two or three months before the murders, defendant said that "Mickey was out to get all of his money and before that would happen, he would have him wasted." (When police interviewed Mr. Keay in 1997, Mr. Keay did not use the term "wasted"; he told the detective that

10

defendant said, "That partner of mine is rubbing me the wrong way, he won't be rubbing me much longer.")

### j. Dale Newman

In the fall of 1987, Dale Newman and a friend flew to Mexico to go diving, and met defendant, who sent a 60-foot boat to the beach to pick them up. That evening, they were on the bridge deck with defendant and his wife. Mr. Newman overheard defendant and his wife commiserating over a legal matter. Mr. Newman did not recall his exact words, but defendant told his wife, in a threatening tone, in effect "that nothing bad was going to happen because he was going to take care of the party involved."

### k. John Williams

John Williams was a deputy marshal in Orange County from 1986 through 1988. He was assigned to levy on defendant's Mercedes automobile in connection with litigation involving Mickey Thompson. He went to defendant's residence and, in the course of the removal of the Mercedes, defendant said, "Mickey Thompson is fucking dead. He doesn't know who he's fucking with." Both defendant and his wife used an extraordinary amount of "vicious language" about Mr. Thompson, and both repeated that Mr. Thompson "was going to have something happen to him." Mr. Williams reported the incident to his supervisor, and telephoned Mr. Thompson's attorney to report the successful levy and the threatening comments.

Mr. Williams testified that the incident occurred about three months before the Thompson murders, but documentation showed a writ to levy was issued on June 4, 1986; a levy worksheet was dated June 11, 1986; and a receipt for the towing service used for the defendant's car was dated August 14, 1986. Mr. Williams, when shown these documents, continued to insist the incident did not occur in August 1986. (After the bankruptcies were filed in September and November 1986, Mr. Thompson would have been unable to levy on the Mercedes, and in January 1988, defendant surrendered his Mercedes to a representative of the bankruptcy trustee without incident.)

11

### l. Nancy Lucia

Nancy Lucia (formerly Wilkinson) worked for the Thompsons on weekends for several years and was a personal friend of Trudy Thompson's. Ms. Lucia came to the Thompsons' home in the fall of 1987 to show Trudy Thompson her wedding photographs. While they were in an upstairs room looking at the photographs, Mickey Thompson came upstairs, out of breath and frantic. He was "almost kind of yelling, saying '[c]lose the window. Close the drapes. [Defendant] could have a sniper out there right now." The drapes were open at the time.

### m. Joel Weissler

Joel Weissler was the Thompsons' nephew. He met defendant in 1984 or 1985, at a race promoted by his uncle, where the Thompsons introduced defendant as their "new partner." Mr. Weissler talked with defendant for about five minutes, and remained in his company for the four-hour racing event. Mr. Weissler also spoke briefly to defendant at a later event.

In late 1987 or early 1988, Mr. Weissler overheard defendant on the telephone. Mr. Weissler was talking on the telephone with Trudy Thompson, and could hear Mickey Thompson in the background, speaking with defendant on another phone line. Mr. Weissler heard defendant say, in a loud, threatening tone, "You will never see a cent of it. I'm going to hurt you and your family." Mr. Thompson responded, "Leave my family out of it."

About a month later, Mr. Weissler was visiting the Thompsons' home. He saw Mickey Thompson and heard defendant's voice on the speakerphone, saying: "You and your family won't see a penny of this. I'll get you. I'm going to hurt you," and "I'm going to hurt your family." Mr. Thompson was very agitated and repeatedly said, "You stay away from me. You stay away from my family."

At the time of the Thompsons' funeral, Mr. Weissler told a detective he had heard defendant make threats, but he was not asked for any details about the threats. In August 1991, he and an uncle went to a police station in Los Angeles and met with the police to find out what was going on with the investigation, as they were "impatient for something

12

to happen." When Mr. Weissler was asked whether he mentioned the phone conversations he had heard to the police at the August 1991 meeting, he said he did not recall and he thought what he had to say was very redundant.

### n. Lance Johnson

Lance Johnson was a friend and neighbor of the Thompsons. Years after the murders, he was at the Santa Ana federal courthouse with Mickey Thompson's sister, Collene Campbell. Defendant walked by, and Mr. Johnson heard him whisper to Ms. Campbell, "You're going to get yours, bitch."[4]

## 3. The Setting for the Murders and Other Pre-murder Facts

The Thompsons lived on Woodlyn Lane in a hilly neighborhood in "horse country," with an irregular network of streets and private lanes or roads where "people get lost all the time." Several driveways led out of the Thompson property, one of them to Woodlyn Lane, which was electronically gated. There was a locked gate between Woodlyn Lane and Royal Oaks, and a bike path below Royal Oaks. The home was also accessible via Mt. Olive Drive.

Ronald and Tonyia Stevens lived on Mt. Olive Drive. Several days before the murders, near midday, as Mr. Stevens drove past the horse corral next to his home, he noticed a car parked on the wrong side of the street. The person in the driver's seat was looking through binoculars in the direction of the nearby grammar school. Mr. Stevens pulled into his driveway at the far end of the corral. His wife and daughter were there, and they told him the people in the car had been there for five or ten minutes. Mr. Stevens asked his wife to call the police and walked through the corral to investigate. He approached from behind the car, a blue-green, rusted and dirty 1970's Chevy station wagon with Arizona plates.

---

**4**    At defendant's trial, the prosecutor asked Mr. Johnson if he recalled telling the police that the words he heard defendant say were, "I'm going to get you, too." Mr. Johnson said it was "a very threatening remark to Collene Campbell," but he did not recall stating those words to the police.

From a distance of eight feet, Mr. Stevens saw two men in the car. The one in the driver's seat, a large man with "light-ish reddish hair," wearing a cap on the back portion of his head, was holding binoculars. Mr. Stevens looked at the driver's face for about a minute, mostly from his left profile; he "wanted to see who it was," because "the person didn't belong there looking towards the school." As Mr. Stevens approached, the driver turned around and looked directly at him, and then drove away. Mr. Stevens made a mental note of the driver's face and tried to remember it. He also wrote down the license plate of the car on a business card. (Mr. Stevens told police that he was only able to view the driver from the side; at trial he was asked if he remembered telling the detective that he had only gotten within 15 or 20 feet of the driver, but he did not recall saying that. He also did not remember telling the detective he was not sure which man had the binoculars.)

Tonyia Stevens also saw the men in the car, "an old clunker station wagon with Arizona plates," two or three days before the murder, between noon and 3:00 p.m. She was driving her daughter home from school, and turned left into her driveway. As she passed the car, she looked directly at the men and got a face-on view of the driver, who was just putting down binoculars. She and her daughter went into the house and talked about whether to call the police, because that type of car was out of place in the area, and she was concerned about child abduction. Then her husband arrived, told Ms. Stevens to call the police, and went back outside. Ms. Stevens followed him through the corral toward the car. She came within 10 or 15 feet of the car, and saw the driver's face when he looked in her direction. After the driver sped away, Ms. Stevens called the sheriff's department from a telephone in the garage to report the suspicious-looking car; she wanted the police to know "in case anything happens that we have information."

Mr. Stevens said that, even with binoculars, the Thompson residence and Woodlyn Lane would not have been visible from the car's location.

Kathy Weese later testified that while she was working for defendant's company, on one occasion she saw a station wagon in the parking lot, an older station wagon with

14

out-of-state plates, that had never been in the parking lot before and that she never saw again.

## 4. The Murders

The prosecution sought to show that Mickey Thompson was executed after watching in horror as the same gunman first put a bullet through his wife's head, and that this was exactly how defendant wanted it to happen. The evidence was as follows.

### a. Allison Triarsi – the witness to the murders

Fourteen-year-old Allison Triarsi witnessed the murders. The Thompson home was across the street from and down the hill below the Triarsi residence. At 6:00 a.m. on the day of the murders, Miss Triarsi was taking a shower and heard "horrible shrieks and a lot of screaming" from a high-pitched voice. She also heard multiple gunshots. Her mother came in, grabbed her, and pushed her to the floor of the dining room. It had floor to ceiling windows, so she could see everything that happened in front of the Thompson home.

Miss Triarsi saw Mickey Thompson toward the top of the Thompson driveway, by the garage door. The Thompson minivan was in the driveway with the doors open. Trudy Thompson was towards the bottom of the downward sloping driveway. There was a man with Mr. Thompson who "had a gun and was directing him and making him go in certain directions." Miss Triarsi heard Mr. Thompson say, over and over, "Please don't kill my wife," a statement that was directed to another man "at the bottom of the driveway who had a gun and coming towards Trudy." Mr. Thompson "was extremely agitated in his actions. He was moving in an agitated way. He was pleading for Trudy's life. He was very upset. The man was holding the gun directing the gun at him." Mr. Thompson was limping and "holding his body in different locations at different times," "trying to stand, but he was struggling to do that." It appeared Mr. Thompson was trying to go to his wife, and the gunman was "hold[ing] him at bay with an outstretched hand with the gun in his hand."

While Mickey Thompson was pleading with the gunman, Trudy Thompson was on her knees at the bottom of the driveway with her hands "up and out to try to protect

15

herself." She said, "Please, please don't kill me." The gunman closest to Trudy Thompson walked up close to her and was standing over her. Up to this point, Miss Triarsi had not seen anyone shoot a gun. The gunman near Trudy then shot her in the head. She fell to the ground and did not move. Miss Triarsi did not remember what the gunman who shot Trudy did next, "because the next thing I remember Mickey is getting shot."

Miss Triarsi saw Mr. Thompson trying to move toward his wife, "extremely upset; screaming; crying," and "[h]e ended up getting shot several times next." "He was shot in the direction of his torso/chest. I remember him grabbing his leg." Miss Triarsi ran outside down the driveway, because she thought Trudy might still be alive. Miss Triarsi ran to her, but Trudy Thompson never moved and had blood all over her head. Miss Triarsi wanted to go to Mickey Thompson, but then she "started to hear more gunshots." She was "very scared," and hopped over a stone wall, ducked and waited there. Her mother realized where she had gone and was halfway down the driveway, running towards her, when the gunshots rang out. When the police arrived, "we were still hiding." Miss Triarsi never went up to the top of the driveway where Mr. Thompson was lying. She did not see either of the gunmen escaping, but she heard a clicking noise, like a 10-speed bike with thin wheels. The sound came from the direction of the back way out of the Thompson property, and grew fainter and fainter.

### b. Lance Johnson – the witness to the escape

A neighbor of the Thompsons, Lance Johnson, was wakened by five or six gunshots. He ran to the window, and after 15 to 20 seconds of silence, he heard Mickey Thompson loudly screaming, several times, "Please do not hurt my wife." Then, he heard another series of gunshots, followed by silence. He got out his gun, went to one of his front windows, and saw two African-American males riding bicycles (English racer bikes) down one of several driveways leading out of the Thompson property, this one leading to the Thompsons' barn and Woodlyn Lane. As they started down Woodlyn Lane in front of his home, he yelled for them to stop, but they did not look in his direction. He then fired a shot at them, but they just pedaled faster. One of them had a

small bag (about 12 inches long and 4 inches wide) that "went up to a drawstring, . . . more or less pear-shaped," slung over his shoulder.

### c. Other witnesses to the escape

Wilma Johnson was driving eastbound along Royal Oaks Drive North, at about 6:00 a.m., and saw two men with bicycles run in front of her van near the intersection with Woodlyn Lane, causing her to brake suddenly. She saw one of them very clearly, a "tallish" black man wearing a hooded sweatshirt. They were on foot, pushing 10-speed bikes that looked new and shiny, and running diagonally across the street. They disappeared through a break in the fence toward the bicycle path that ran parallel to Royal Oaks on the other side of the fence.

Claudette Freidinger was driving through Bradbury, "around 6:00-ish" in the morning, on her way home from taking her son to work. She stopped at an intersection on Royal Oaks. She saw two black men on good bicycles headed toward her, one with a hood and one without, "really, really barreling through the intersection" without stopping at the four-way stop. One of them looked in her direction. They were headed southbound, toward the freeway. (When police interviewed her, Ms. Freidinger said her son began work at 7:00 a.m., and expressed doubt about the involvement of the person she saw based on the timing.)

### d. The escape route

The escape route down the back side of the Thompson property to Woodlyn Lane was "a very narrow declining paved road" that "curved and kind of wound" downhill, leading to an electronically controlled gate at Woodlyn Lane, and then to Royal Oaks. A bicycle would be the perfect vehicle for that road, because "two cars passing each other would have great difficulty." The gate was electronic, but could be easily opened manually by applying pressure to one of the supporting arms. From there, at Woodlyn and Royal Oaks, a bicyclist would be able to pass through a break in the wooden fence bordering Royal Oaks, to the running and bike path below. The bike path intersected Mt. Olive, a few blocks from access to the freeway.

17

### e. The murder scene and initial investigation

When the police arrived at the crime scene, they found Trudy Thompson's body at the base of the steep, downward sloping driveway, and Mickey Thompson's body toward the top of the driveway, close to the garage door. Both had fatal gunshot wounds to the head, as well as gunshot wounds to their bodies. Trudy Thompson would have been visible to and within speaking distance of Mickey Thompson. A van appeared to have reversed into a retaining wall; its door was open, shattered glass from the driver's door was on the ground, and there was a bullet hole in the windshield.

When criminalist Elizabeth Devine arrived a few hours later, she saw money and jewelry in plain view on the van's seat. She found shoe prints in several locations, some of them from an area where miniature orange trees were planted; she also found freshly cut orange peels in the same area. Deputy Sheriff Linda Arthur photographed a stun gun that was in the driveway.[5]

There was a wallet in Mickey Thompson's pocket with hundreds of dollars in cash. Trudy Thompson was wearing high-value gold and diamond jewelry, and there was $3,700 in cash inside her purse in the van. There was no indication of any attempt to remove property from either of the Thompsons, no sign of forced entry to the house, and the house alarm was armed and had not been set off. The garage door was closed. There was a safe inside the garage, but no indication it had been tampered with.

Detective Reynold Verdugo found expended bullet projectiles and casings at various locations at the scene, as well as two live rounds. Criminalist Manuel Munoz determined that all of the expended cartridge casings from the scene were 9-millimeter Luger caliber, and two firearms were used. Four expended casings and two live rounds were from the same weapon; the other four expended casings were from a second weapon. Two expended bullets removed from Trudy Thompson's body, one removed from the van's passenger door, and one found under Mickey Thompson's head, were

---

[5] Kathy Weese later testified that she saw a stun gun in a box in a storage area of defendant's Laguna Beach residence while she was house-sitting there in 1986.

18

fired from the same weapon. The others, found inside the garage, near the garage, to the left of Mickey Thompson's body and inside the van on the driver's side, were from the second weapon.

Mickey Thompson suffered seven gunshot wounds, three to his stomach, one to his hip, two to the back of his hand, and one to his head, behind his right ear. Trudy Thompson suffered two gunshot wounds, one to her lower stomach, likely inflicted first, which could have occurred while she was sitting in the van, and one to the back of her head.

## 5. Defendant's Actions Before and After the Murders: the Yacht and the Gold

In December 1987, Diane Goodwin, defendant's wife, indicated to a bank representative that she was in the process of deciding on the purchase of a yacht. In January 1988, Ms. Goodwin entered into a purchase agreement with Fraser Yachts for a $400,000 yacht, and wrote a check serving as an earnest money deposit for the purchase. A boat loan for Ms. Goodwin was approved on March 9, 1988. A seller's closing statement for the yacht was dated April 28, 1988, and a certificate of ownership dated May 3, 1988, showed Ms. Goodwin as the owner of the yacht, named "Believe," with a mortgage of $200,000 encumbering the yacht.

In May 1988, a coin dealer engaged in two transactions he said were with defendant. He believed his initial contact with defendant was by telephone. He sold, in the two transactions, almost $350,000 in gold coins, paid for by cashier's checks signed by defendant's wife.

On June 27, 1988, defendant brought the 57-foot yacht named Believe to a marina in South Carolina, managed by Victor Utsey, for installation of bilge pumps and radio equipment. The yacht was in the marina for about six weeks. After that outfitting, the yacht would have been capable of sailing offshore, such as to the Turks and Caicos Islands, or to the Bahamas and South America. The yacht was large enough for transatlantic sail or anywhere in the world, if defendant had the capacity to produce potable water, and it was small enough to sail into small waterways and inlets. Two people could live on the boat for an extended period of time. On the second or third

day of August, defendant unexpectedly asked Mr. Utsey to expedite the work. Mr. Utsey did so, and defendant sailed away from the marina.

In May 1991, a boat surveyor named Frank Magee was retained by Maryland National Bank to repossess defendant's yacht. He spent three to four weeks in Guatemala searching for it. During that time, he had a phone conversation with defendant, who told him "he would never find his boat." Mr. Magee located the yacht and defendant on the Dulce River in Guatemala, and repossessed the yacht for the bank.

## 6. The Investigation and Arrest

Detective Michael Griggs of the Los Angeles County Sheriff's Department was initially in charge of the murder investigation. He retired in January 1992. (One of defendant's claims is that Detective Griggs's investigation was "derailed" by interference from Mickey Thompson's sister.) Sergeant John Yarborough of the "unsolved" unit led the investigation after Detective Griggs retired, and in 1995, Detective Mark Lillienfeld was assigned to take over the investigation.

In 1997, Detective Lillienfeld participated in the production of an "America's Most Wanted" show, hoping to identify the two actual perpetrators of the murders. (The detective was also aware that an "Unsolved Mysteries" episode about the murders had aired in 1988 and several times since then.) At various times in his investigation of defendant, Detective Lillienfeld sought assistance from the DEA, the FBI, Customs, and other law enforcement agencies; sought and received authorization for a wiretap of defendant's telephones; and put defendant under physical surveillance.

In 1998, Detective Lillienfeld attended a meeting with the sheriff and the then-district attorney, Gil Garcetti. Mr. Garcetti rejected the case against defendant as having insufficient evidence for a successful prosecution. (*Goodwin v. Superior Court* (Apr. 23, 2004, G031285) [nonpub. opn.].)

In 1999, defendant had a conversation with Randy Garell, the owner of a store specializing in firearms and outdoor apparel and equipment. The two men knew each other from an earlier business relationship. Defendant came to Mr. Garell's shop, and wanted to know how guns were traced; Mr. Garell told him. (Defendant told Mr. Garell

20

he was trying to investigate the Thompson case because he was a suspect, and defendant "may have" also said that the detective (presumably Detective Lillienfeld) "was saying some things that were not true about weapons [defendant] may have owned.") Then, in early 2000, defendant came to the store again and asked if stun guns were traceable. Mr. Garell said stun guns were not traceable, and did not fall under the same restrictions as guns.

Detective Lillienfeld also interviewed Gail Moreau-Hunter in March 1999. Ms. Moreau-Hunter lived with defendant in Colorado in 1991 and 1992. Ms. Moreau-Hunter told Detective Lillienfeld "she was privy to a conversation in which [defendant] took responsibility for the murders," but subsequently told the detective that defendant "never actually took credit for the crime but merely left that impression with her." (*Goodwin v. Superior Court, supra*, G031285, at p. 9.) (Ms. Moreau-Hunter testified at the preliminary hearing in Los Angeles – but not at trial – that sometime in 1992, defendant showed her a tape of an "Unsolved Mysteries" episode reenacting the Thompson murders and said, "Look what I've done and I got away with it," and "I hired two black teenagers to carry out the assassinations.")

In early 2001, Detective Lillienfeld interviewed Ronald and Tonyia Stevens for the first time. They gave the detective the information about the man with binoculars parked in front of their house a few days before the murders, as described in part 3, *ante*. (Mr. Stevens had called the police several times, not long after the murders, saying he thought he had some information about the Thompson murders; he was told a detective would call him back, but no one ever did.)

In March 2001, Mr. Stevens viewed a photographic lineup, or "six-pack." He had described the man with binoculars as "a big man with reddish colored hair and a ruddy complexion." He later testified that he saw the person who had been in the car in front of his house in the six-pack. He and his wife were asked to view a live lineup, separately, and both of them identified the defendant.

In December 2001, Detective Lillienfeld obtained a search warrant for defendant's home, seizing thousands of documents. Defendant was arrested and charged by the

Orange County District Attorney with the 1988 murders and with conspiracy to commit murder.

On April 23, 2004, the Court of Appeal issued a writ ordering the trial court to dismiss the case for lack of venue.[6] The court "emphasize[d] that any new evidence, not previously considered by the Los Angeles District Attorney prior to its rejection of the case, can – and should be – given to the Los Angeles District Attorney for reconsideration of that decision, or to the Office of the Attorney General for its review and consideration." (*Goodwin v. Superior Court, supra*, G031285, at p. 34.)

The Los Angeles District Attorney charged defendant with the murders, and after a six-day preliminary hearing in October 2004, defendant was held to answer and arraigned on October 28, 2004.

## 7. The Trial

The trial court denied successive motions to dismiss the case, to recuse the Los Angeles District Attorney's office, and to remove the two prosecutors handling the case – as delineated in detail *post* in connection with defendant's contention these rulings were erroneous. Trial began in October 2006.

In addition to the facts already described, other evidence was adduced as follows.

### a. Karen Stephens-Kingdon's testimony on financial records

Karen Stephens-Kingdon was a certified public accountant, an investigative auditor for the Orange County District Attorney's office, and a certified fraud examiner and internal auditor. She had previously testified as an expert forensic accountant or investigative auditor. In early 1992, she was asked to look at the financial records of defendant and his wife to determine "the source of assets and funds and the ultimate

---

**6**    Defendant had previously sought a writ, after denial of his motion to recuse the Orange County District Attorney, alleging a conflict of interest due to that official's personal relationship with Mickey Thompson's sister. The Court of Appeal denied that petition, allowing defendant "to pursue his assertion that Orange County lacked any *disinterested* purpose in prosecution." (*Goodwin v. Superior Court, supra,* G031285, at pp. 2-3.)

disposition of those assets and funds." She examined thousands of documents from 1986, 1987 and 1988, and found evidence that funds that had been in defendant's name "ended up in Diane Goodwin's name."

Ms. Stephens-Kingdon testified that while the yacht Diane Goodwin purchased was in her name, it was "purchased with funds that had been commingled for so many years that this boat purchase was for both Mr. and Mrs. Goodwin." The Goodwins' residence in Laguna Beach, which they purchased and lived in together, appeared to have been purchased with commingled assets, and was liquidated (converted into cash or other liquid assets) in 1988.

Ms. Stephens-Kingdon testified in particular about two investments – JGA Whitehawk and Desert Investors – that were in the name of Diane Goodwin in 1988. Ms. Goodwin put what Ms. Stephens-Kingdon considered to be "commingled funds" of both the Goodwins into those investments in her own name. Then, there was a distribution from JGA Whitehawk to Diane Goodwin for $365,000 on May 6, 1988, and a few days later, a portion of those funds was used to purchase $275,000 in gold coins, and $10,000 was wired offshore. Similarly, $215,000 was distributed from Desert Investors to Diane Goodwin in May 1988; she transferred $140,000 to an account offshore and purchased $75,000 in gold coins.

In short, "funds that were originally commingled and invested end[ed] up going offshore or to purchase gold coins, cash or traveler's checks." Ms. Stephens-Kingdon's opinion was based on early tax returns, the home in both the Goodwins' names that was liquidated in 1988, and financial and banking records "that were in both of their names and then the records show that it all funnels into Diane Goodwin's name and then . . . the funds go offshore." She also based her opinion in part on correspondence purporting to be from defendant. One of the letters stated defendant "was handling the entire [Desert Investors] transaction and not to discuss it with Diane because he was handling it" (even though the entirety of the Desert Investors account was in Diane Goodwin's name); another said certain items should be put in Diane Goodwin's name because of the

Thompson issue. (This testimony was admitted only to show the basis for Ms. Stephens-Kingdon's opinion.)

Ms. Stephens-Kingdon also reviewed bank statements showing that on or about March 16, 1988 (the date of the murders), there was a $20,000 withdrawal from Diane Goodwin's account, likely as a cashier's check or cash as there was no personal check. Ms. Stephens-Kingdon was unable to trace that money; the bank "had no supporting documents for their record."

### b. Evidence of a robbery motive for the murders

The defense adduced evidence intended to suggest a robbery motive for the murders. Eric Miller, a friend of Mickey Thompson's, was with Mr. Thompson the night before the murders. Mr. Thompson was talking to Lee Haslam about investments. Sheriff's Detective Rene Laporte interviewed Mr. Miller about a month after the murders, and took notes of the interview. According to those notes (Detective Laporte had no independent recollection of the interview), Mr. Miller told the deputy that "he heard Mickey Thompson say he had taken possession of a valuable item and named . . . a specific dollar amount." Counsel asked if Mr. Miller "actually use[d] the words 'taken possession,' " and Detective Laporte said, "Yes." (On cross-examination, he testified his notes were a paraphrasing of the conversation with Mr. Miller.) The notes became part of a report that was given to Detective Griggs, who was then managing the investigation. Detective Laporte did not, and was not directed to, look into Mr. Thompson's financial records to see if he could match up the dollar amount specified with any sort of deposit or outgoing notation in those records.

Sandra Johnson (Lance Johnson's wife) saw the two "very dark" men riding racing bikes down Woodlyn Lane, and told police that one of them "was carrying a white canvas bag, shopping bag size." At trial, Ms. Johnson described the bag as "[a] small like drawstring bag," "10, 12 inches," "not a great big backpack, but something smaller." Robert Wiborg, a coin dealer, testified that coins shipped via Brinks come in sealed canvas bags, generally white, that look like a regular bank bag and usually have a metal seal on the top.

24

A few weeks after the murders, Detective Gerald Jansen met Mickey Thompson's sister, Collene Campbell, and a locksmith at the Thompson home. Ms. Campbell had asked Detective Jansen to accompany her while she had a locksmith break into the safes in the Thompson home, so that the deputy could note what was in the safes. The detective's notes referred to damage to the safe in the garage; he wrote: " 'bolt bar bent. Fresh marks on the locking wheel. Safe empty.' " His notes did not indicate whether the locksmith created the damage or pointed it out to Detective Jansen, but he testified that "to the best of my recollection, it was after he had opened the safe, that's the way the safe looked." He said that if the damage he noted had been there when he arrived, he would not have had the safe opened, and "would have called somebody out to look at it." Detective Jansen would make such notes "[s]o that if somebody says we damaged it more than we actually did to open it, I could say how much we damaged it." The safe in the bedroom closet contained jewelry and two envelopes of money.

### c. The expert on eyewitness identifications

The defense presented testimony from an expert on eyewitness identification, Dr. Kathy Pezdek. She described the factors that influence the accuracy of eyewitness identifications. Dr. Pezdek opined that a 13-year delay between seeing an individual and identifying him "alone would render such an identification extremely dubious," and indeed that the probability of correctly identifying a person, seen one time very briefly, after 11 months (much less 13 years) is zero. Dr. Pezdek also testified about suggestive lineup and identification procedures, as well as the relationship between the accuracy of an identification and the confidence of the witness in making it.

### d. The defense's firearms expert

The firearms expert for the defense, Jacobus Swanepoel, examined the ballistics evidence and visited the crime scene. He determined the expended casings came from two different firearms, but could not make that determination with respect to the fired bullets. Based on the placement of expended cartridge cases in relation to expended bullets, Mr. Swanepoel opined that both guns were fired at both victims, and Mickey Thompson likely received his fatal head wound while he was lying down.

25

### e. Investigation deficiencies and inconsistencies

The defense produced evidence purporting to show deficiencies in the investigation of the murders, as well as evidence of inconsistencies between the testimony witnesses gave in court and their previous statements to police investigators.

#### i. *Investigative deficiencies*

Detective Griggs, the lead investigator until January 1992, obtained defendant's telephone records and set up a database, but did not do the same thing for Mickey Thompson's telephones (and neither did Detective Lillienfeld). Detective Griggs did no financial investigation into defendant or Mickey Thompson or any Thompson family member or employee. Detective Lillienfeld did not attempt to get financial or telephone records of individuals employed in the Thompson home.

There were notes in the original investigation about Arizona license plates on a car related to a suspect other than defendant. Even after Ronald and Tonyia Stevens told him about the Arizona license plate on the car in front of their house, Detective Lillienfeld did not run the Arizona license plate noted in the investigative file through the computer system, to find out if that license plate number was associated with a station wagon.

Over the years, Detective Lillienfeld was privy to clues involving black men as suspected shooters, but he never showed any photographs of African-American men to any witnesses in the case. A hair was removed from the stun gun found at the crime scene, but Detective Lillienfeld did not ask for DNA testing on it, nor did he submit the fingernail clippings and scrapings taken from the Thompsons for testing. (The defense eventually tested these items.)

#### ii. *Witness inconsistencies*

In addition to inconsistencies already noted, there were others.

When Detective Lillienfeld first interviewed Allison Triarsi in 1997, she told him that she thought the shooter could have been a white man; that she believed her recollection was influenced by her mother; that it was possible Trudy Thompson was shot while she (Allison) was running down her driveway; and that she had talked to a school psychologist about the incident.

When Detective Lillienfeld first interviewed Tonyia Stevens in 2001, she said she could not recall whether or not the car she saw parked in front of her home a few days before the murders was occupied. She did not tell him that the person she saw in the car reminded her of a childhood friend (as she did when she testified in court), and his report of her interview took up "maybe two paragraphs."

Deputy Sheriff John Rodriguez, the first officer to arrive on the scene, interviewed Lance Johnson (who saw the two black men leaving the scene) an hour or so after the murders. Mr. Johnson told him he was awakened by gunshots and "about the same time" heard Mickey Thompson screaming to the effect of " '[d]on't hurt his wife,' or 'help,' screaming for help." Mr. Johnson told Deputy Rodriguez that the shooting stopped and then a few moments later there were several more shots, after which he went outside and saw the bicyclists escaping. Detective Laporte interviewed Mr. Johnson that day, and stated in his notes that Mr. Johnson "said he wasn't sure whether he heard the gunshots first or the yelling first."

## 8. The Verdicts

The jury convicted defendant of both counts of first degree murder on January 7, 2007, also finding the lying in wait and multiple murder allegations true. The trial court imposed consecutive terms of life without the possibility of parole, and made other orders not at issue on this appeal.

## DISCUSSION

We address the issues in the order presented in defendant's opening brief.[7]

---

**7** After filing his opening brief, defendant requested judicial notice be taken of (1) the transcript of the preliminary hearing held in Orange County in 2002; (2) the docket and unpublished decision in *Goodwin v. Superior Court*, *supra*, G031285; (3) the docket in *People v. Dimascio* (case No. G005903) (a case in which Mickey Thompson testified (see pt. 9, *post*)); and (4) the grand jury testimony of Detective Lillienfeld. We take judicial notice of item (2), the docket and unpublished opinion in *Goodwin v. Superior Court*, as the trial court expressly referred to it in denying defendant's request for dismissal based on the delay in prosecuting defendant. We otherwise deny defendant's request. As to item (3), there is no dispute over the fact that Mickey Thompson testified in the case, so judicial notice accomplishes nothing. As for the grand

27

## 1. The Dismissal and Recusal Claims

Defendant first contends the trial court erred in refusing to dismiss the case, to recuse the district attorney's office, and to remove the individual prosecutors. These contentions are grounded on the seizure, retention and review of hundreds of attorney-client privileged documents. We find no error in the trial court's rulings.

### a. The factual and procedural background

On December 13, 2001, police executed a search warrant for defendant's home in Orange County, seizing thousands of documents filling more than 120 bankers boxes. On December 26, 2001, defendant's then-attorney, Jeffrey Benice, wrote to the Orange County prosecutor telling him the boxes of documents and computers seized contained attorney-client privileged documents, and demanding appointment of a special master to protect defendant's privilege. The prosecutor declined, observing a special master was required only when a search warrant sought documents in the possession or control of an

---

jury and preliminary hearing transcripts, defendant contends they "are relevant to the issues of prosecutorial and police misconduct, . . . presentation of false evidence manufactured by Detective Lillienfeld, and violation of [defendant's] Sixth Amendment right to counsel and attorney-client privilege by both the [Orange County District Attorney] and the [Los Angeles District Attorney]," and "contain admissions by Detective Lillienfeld, testimony contradicting his trial testimony and testimony contradicting the positions taken by the [Los Angeles District Attorney] at trial." (See pts. 1 & 16, *post.*) If indeed they are relevant, they should have been presented to the trial court in the first instance, and they were not. Defendant's contention that the trial court "examined and considered" the grand jury and preliminary hearing transcripts "and made rulings, thus taking judicial notice of them" is not supported by the record. There is nothing in the record to show the trial court "examined" these transcripts; there are merely occasional arguments by counsel or testimony referring to the preliminary hearing, or to testimony given at that hearing. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; *People v. Preslie* (1977) 70 Cal.App.3d 486, 492 ["as a general rule the court should not take such notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance"].) That is the case here.

28

attorney. According to defendant, the documents were held by the Orange County prosecutors for several months, copied and then most of them were returned to defendant.

More than two years later, after the Court of Appeal found venue was improper in Orange County, the copies of the seized documents were forwarded to the Los Angeles District Attorney's office. Defendant's former counsel did not inform his trial counsel of the attorney-client privilege issue, and his trial counsel did not discover it until she reviewed the seized documents provided to her in discovery.

The documents seized (copies of which were later reviewed by a special master appointed by the trial court, as described *post*) included some 475 pages (by the prosecution's count) that were ultimately found to be attorney-client privileged documents. The trial court agreed the material was privileged: "It is information communicated to and from [defendant's] lawyers; it's information [defendant] has communicated to his lawyers in letters back. It does involve his strategies and his potential defenses to the charges."

Defendant made a series of motions seeking a remedy for the invasion of defendant's attorney-client privilege.

### i. *The first motion to dismiss*

On December 9, 2004, defendant moved to dismiss the case, claiming intentional violation of defendant's attorney client privilege and citing the power of the court arising from the due process clause to dismiss a case for outrageous conduct. Defendant claimed that "[f]ew, if any" of the thousands of documents seized were named in the search warrant, and submitted a sampling under seal of 35 documents that were obviously privileged.

The motion asserted the authorities were aware when they executed the search warrant that many of the documents in defendant's home office were privileged documents. (Defendant told Detective Lillienfeld so when the detective served him with a grand jury subpoena in March 2001, and defendant posted signs on his office door.) The motion also asserted that Detective Lillienfeld procured the services of Thurston Michael (Butch) Jones, who was working as an office assistant for defendant and later for

29

attorney Benice, to provide daily updates "on activities relating to [defendant's] preparation of his defense," including "reporting on issues he had learned during attorney/client conferences."

At the hearing on March 17, 2005, the court stated, as to the 35 samples submitted, "I can't find any evidentiary value to those documents," and noted that no evidence presented at the preliminary hearing came from those documents. The court posed the pertinent question as whether the Los Angeles District Attorney had evidence that came from potentially privileged information. The prosecutor made no objection to a court order precluding the prosecutor from presenting any evidence derived from potentially privileged communications.

Defendant orally requested recusal of the prosecutor as an alternative to dismissal, arguing that the first time the Los Angeles prosecutors saw an obviously privileged document, they were obliged to "close the book and to give it to the court, all 40,000 pages," and seek appointment of a special master. The court rejected this notion, observing that "the Orange County D.A.'s office probably should have [done something] and they didn't," but the Los Angeles prosecutor was not made aware of the objections that had been made in Orange County after the seizure, and had no obligation "three or four years after the fact to then bring to the court's attention the fact that there might be some privileged material."

The court thus denied the motion to dismiss and the recusal request. But, since there were hundreds of other privileged documents, the court ruled the defense could present those to the court under seal, for review by the court or a special master. This would ultimately provide the court with a means of enforcing its tentative remedy: that no evidence derived from potentially privileged documents could be used. The court also concluded a hearing would be necessary on the claim that Detective Lillienfeld had interfered with attorney-client privilege by using Butch Jones to report on information obtained in attorney-client conferences.

30

## ii. The second set of motions

On April 7, 2005, defendant filed motions under seal, including a motion to dismiss for egregious governmental misconduct; a motion to recuse the district attorney's office based on due process, "the inherent conflict of interest created by the review of" attorney-client privileged documents, and violation of defendant's Fourth, Fourteenth, Fifth and Sixth Amendment rights; and a motion for the return of illegally seized documents under Penal Code section 1538.5. The court held numerous hearings, with the following results.

On April 27 and May 16, 2005, the court took testimony from Detective Lillienfeld, Michael (Butch) Jones, and Attorney Jeffrey Benice with respect to defendant's claim that the case should be dismissed because Detective Lillienfeld used Mr. Jones to obtain attorney-client privileged information. The trial court denied that basis for defendant's motion to dismiss, finding based on the testimony "no intentional interference with the attorney/client privilege . . . ." Mr. Jones "did some running for Mr. Benice; he did some copying for Mr. Benice and [defendant]. He may have looked at some files and obtained some information." But the court declined to categorize the relationship "as one that is covered by the attorney/client relationship," and saw no "intentional act on the part of law enforcement to interfere with the attorney/client privilege or to obtain privileged material." "I agree that perhaps there was a question that could have been asked or should have been asked. But that in no way causes me concern such that I should find the sanction an appropriate remedy, particularly a dismissal."

On May 26, 2005, the Attorney General filed its opposition to defendant's motion to recuse the district attorney's office, including a declaration from prosecutor Alan Jackson. Mr. Jackson stated he was the only current employee of the district attorney's office who had reviewed the material obtained through the search warrant. He stated that, to the extent any document he reviewed was protected by attorney-client privilege, he had not disclosed it to anyone else, nor would he do so in the future. He further stated no decisions were made, influenced, affected or impacted by the office's possession of any privileged document; the office had not and would not use any privileged

31

information; all evidence introduced at trial would be derived from independent sources; all pretrial and trial strategy had been and would be based on independent sources; "and nothing obtained has had or will have any effect whatsoever on the decisions about the scope and nature of the investigation and prosecution, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case-in-chief, and about what to save for possible rebuttal."

On June 2, 2005, the court denied defendant's motion for recusal of the district attorney's office and prosecutors Alan Jackson and Pat Dixon. (The recusal motion was based on the district attorney having seen both privileged documents and documents asserted to be beyond the scope of the search warrant.) The court denied the motion without prejudice, finding no showing of a conflict that would deprive defendant of a fair trial. "The only thing I can say is that the People are in possession of privileged material, that they have agreed . . . not to use . . . in any way and not to use any evidence obtained as a result of that material in the trial." The court said that "if circumstances change, or if other facts are developed . . . I'm sure [the defense will] renew that motion and possibly even [the] motion to dismiss, but at this point I'm going to deny the [Penal Code section 1424 (section 1424)] recusal motion." (Under section 1424, a motion to disqualify a district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.") The court also observed, as to the section 1538.5 motion for return of property, that the defense had shown there were some materials that were "technically outside the scope of the warrant," shifting the burden to the prosecution. The court decided to appoint a special master to determine which documents were privileged and which were beyond the scope of the warrant.

On January 25, 2006, the defense again moved, under seal, to dismiss the charges based on egregious governmental misconduct, or in the alternative to recuse the entire district attorney's office, or to remove the individual prosecutors. The defense provided a

detailed analysis of the privileged materials and why the case should be dismissed based on the prosecutor's access to the privileged documents.

On February 6, 2006, the trial court again refused to recuse the entire district attorney's office, finding "that it wasn't this D.A.'s office that committed this egregious misconduct," and the defense had not presented enough "to show that the entire D.A.'s office needs to be recused in this matter . . . ." The court observed it had reviewed the privileged material the special master had segregated. The court reiterated that "I don't believe under any scenario we are going to get to a recusal of the entire D.A.'s office," but that a hearing should be held on the possible recusal of the two prosecutors. (The prosecutor had had no access to the sealed pleadings, and no opportunity to respond to the defense claim that the prosecution's theory of the case was altered in light of the privileged information.) The court also reiterated its finding that "I don't think that we have egregious misconduct on the part of this prosecutorial agency such that the court would have to dismiss the case as a sanction," and indicated that "in a perfect world, perhaps [prosecutor Jackson] should step aside."

At a hearing on February 15, 2006, on the recusal issue, prosecutor Jackson reported that his office declined the court's suggestion he step aside. The court found no disabling conflict of interest under section 1424, but believed it had "the inherent authority to disqualify a prosecutor who has been tainted by attorney/client privilege material." The court decided prosecutor Jackson should review the privileged documents cited and analyzed in the defendant's recusal request, so that he would have the opportunity to demonstrate that the privileged material had already been disclosed to others such that the court could find a waiver of the privilege.

The prosecutor then filed, for a hearing on March 6, 2006, a detailed analysis of the documents the special master concluded were privileged, arguing that "defendant has not, and cannot, establish that he has suffered any prejudice as a result of [Deputy District Attorney] Alan Jackson's review of the claimed privileged documents." The prosecutor described the documents and categorized them as either (1) documents with no facial indication that they were protected communications; (2) nonprejudicial as not pertaining

33

to the Thompson murders; or (3) documents to which waiver applied because the subject matter had been published in alternate, unprivileged sources. The prosecutor attached various publications, including a transcribed interview from "America's Most Wanted," as well as defendant's memorandum to the producers of that television show, and concluded defendant "has systematically published in almost every media forum available his thoughts, theories, defenses, excuses, accusations, analyses and beliefs surrounding the Thompson murders."

At the March 6 hearing, the court expressed doubt that it had inherent authority to recuse the district attorney (as opposed to authority under section 1424), and ruled: "[G]iven what the People have presented to the court by way of, No. 1, that there was a waiver; No. 2, the issue of the documents being irrelevant and third argument that there was no prejudice, . . . I think the People's response addresses the court's concerns and I don't know at this point that I'm prepared to go any further assuming I have inherent authority to recuse the DA to enforce the order that I made earlier. I am not prepared to go that way." And, "even assuming I do [have inherent authority], . . . there has been no substantial showing of prejudice which would warrant the court taking that next step [removing prosecutor Jackson]. I think the remedy that I imposed earlier in these proceedings is adequate." And, "I think I can guarantee that the attorney-client privileged material is not used." "I am basically saying that based on what I have now, all of the available information to me including now all of the information that I have seen that is in the public domain — let me put it that way. Not that it is not privileged, but it is information in the public domain and so based upon all of the available information that I have as of this moment, I am not prepared to take a step that I think is a drastic step that does implicate separation of powers arguments and is a remedy that I would have been prepared to utilize in the appropriate case. This is not the appropriate case given all of the available information I have before me and so that is where I am at."

### iii. *The motion to exclude witnesses' testimony*

In May 2006, defendant filed a motion to exclude the trial testimony of 12 witnesses, including Phillip Bartinetti, Dolores Cordell, Jeffrey Coyne, and Karen

34

Stephens-Kingdon – and in the alternative, again renewed its recusal and removal motions. The named witnesses were the "financial witnesses," and defendant argued that "by calling the financial witnesses, the prosecutors would be changing theories of the case based upon the content of [defendant's] privileged documents [(the ones that pertained to the 'federal fraud litigation')]." (In 1993, defendant was charged in federal court with bankruptcy and loan fraud, and was ultimately convicted of making false statements to a financial institution. According to defendant, some of the named witnesses "were part of the driving force behind [defendant's] prosecution for federal crimes relating to his bankruptcy," and they "will be the prosecutor's main witnesses to try to establish 'motive' for these murders.") "The blueprint of his defense to the financial allegations has been exposed. His thought processes and conduct relating to his handling of the civil judgment and bankruptcy have been exposed. His right to testify on his own behalf has been compromised as he is now going to have to face a prosecutor who is armed with information that he received outside the bounds of the rules governing fair trials."

The prosecutor challenged the defense to point to "anything that establishes that the defendant has suffered a prejudice so bad that he cannot receive a fair trial if I call any of those witnesses who deal with his financial status."

The court heard and denied defendant's motion on June 20, 2006. The court pointed out its earlier order on the prosecutor's obligation not to use any privileged material or any material derived from it. "So I assume that that order has been taken seriously by the People. I assume that the People are calling witnesses that they were planning on calling all along. And that they did not obtain any new information from their accidental review of the privileged material. So correct me if I'm wrong on that."

The court concluded: "I think that the People's position has actually a great deal of merit based on what I have reviewed and what I ruled on in the previous litigation in terms of whether or not they are able to comply with my order. I think they are. And the remedy was that they were not permitted to use evidence obtained from the privileged material. And they say they are not. [¶] And I guess until we get to a point during trial

where the defense wants to renew their motion based on testimony, I don't know what else I can do pretrial in that regard. I mean it's an unfortunate situation I think we all agree. But we really kind of resolved this issue before. And I don't think there is any need for any additional sanction. Because that's what is being requested here is that the court exclude testimony. [¶] The court will not exclude testimony that's otherwise relevant at this trial. And it does appear that the financial motive is the motive in this case. And the court doesn't believe that there has been a sufficient showing to warrant the recusal of these prosecutors from this case. But, again, the court has the ability to monitor and enforce the court's previous order. And that will be done."

### b. The law

We begin our discussion of the legal basis for rejecting defendant's dismissal and recusal claims with a few prefatory comments. We share the trial court's recognition that certain of the conduct that occurred in Orange County in connection with defendant's attorney-client privileged documents appeared to have been, in the trial court's words, "egregious misconduct." We do not condone or countenance those actions. But established principles of law govern our review of claims that a criminal proceeding should be dismissed or prosecutors recused on that account.

As our narration of the proceedings in the trial court shows, the court took great care in its assessment of the circumstances surrounding the seizure, retention and review of the privileged documents, entertaining renewed motions, engaging a special master, and holding multiple hearings as the defense developed its evidence and theories. The trial court gave meticulous attention to the evidence and arguments presented. In so doing, it plainly appreciated the gravity of the underlying invasion of defendant's attorney-client privilege, and showed skepticism about claims of prosecutorial ignorance of privileged matters. We have done so as well in our independent review of the record. But in the end, we cannot gainsay the trial court's conclusions that "it wasn't this D.A.'s office that committed this egregious misconduct," and that the necessary showing of prejudice to defendant's right to a fair trial was absent.

We turn to our discussion of defendant's several different but related claims.

36

### *i. Dismissal for outrageous governmental misconduct*

Defendant contends the case should have been dismissed based on outrageous governmental misconduct that violated his due process rights. He asserts the district attorney was accountable for "the outrageous misconduct of the investigators and the prosecutors, both in Orange County and in Los Angeles," and the trial court erred in considering only the Los Angeles prosecutor's conduct. Specifically, defendant asserts the district attorney was responsible for the conduct of Detective Lillienfeld of the Los Angeles Sheriff's Department, who headed the search team that seized the documents in Orange County and who "could not have missed the sign on [defendant's] home office door asserting attorney-client privilege and directing police to his attorney . . . ." Defendant argues that, just as the prosecutor is responsible for any nondisclosure of favorable evidence under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), including evidence known to anyone acting on the government's behalf, the prosecutor here is presumed to be responsible for the violation of defendant's attorney-client privilege, whether committed by government agents from Orange County or Los Angeles. And, defendant says, dismissal is required whether or not he can demonstrate prejudice.

Defendant is mistaken on all counts.

First, we note the standard of review. "The determination of whether the government engaged in outrageous conduct in violation of defendant's due process rights is a mixed question." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857 (*Uribe*).) A deferential standard of review applies to the factual determination of whether and to what extent misconduct occurred. (*Id.* at pp. 857-858.) Whether the governmental conduct "constitutes outrageous conduct in the constitutional sense of violating defendant's due process rights" is primarily a legal question. (*Id.* at p. 858 ["the trial court's finding that the governmental conduct was outrageous in violation of defendant's due process rights thereby warranting dismissal is subject to independent review"].)

Second, where a defendant seeks dismissal for outrageous governmental acts, "a showing of prejudice to defendant's right to a fair trial [is] required and . . . the absence of such a showing preclude[s] dismissal as a sanction for prosecutorial

37

misconduct." (*Uribe, supra,* 199 Cal.App.4th at p. 861; *id.* at p. 865 [prosecutor's misconduct "was certainly conscience-shocking in the sense that it involved false testimony by a prosecutor in a formal criminal proceeding," but "it did not involve 'brutal and . . . offensive' conduct employed to obtain a conviction"; the defendant "was not entitled to dismissal for outrageous governmental conduct shocking the conscience in violation of substantive due process"]; see also *United States v. Morrison* (1981) 449 U.S. 361, 367, 362, 365-366 (*Morrison*) [the high court, while "not condon[ing] the egregious behavior of the Government agents" – who met with the defendant without the permission or knowledge of her counsel, disparaged her counsel and told her she would face a stiff jail term if she did not cooperate – concluded that dismissal of the indictment was "inappropriate where the violation . . . has had no adverse impact upon the criminal proceedings"; "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate"].)

In this case, the trial court found there was no "egregious misconduct" by the Los Angeles prosecutors in the first place. Specifically, the court found that "it wasn't this D.A.'s office that committed this egregious misconduct," and that the Los Angeles prosecutor was not made aware of the objections that had been made in Orange County after the seizure, and so had no obligation "three or four years after the fact to then bring to the court's attention the fact that there might be some privileged material." Substantial evidence supported the trial court's findings.

It was undisputed that the Los Angeles District Attorney had nothing to do with the search of defendant's home. There was no evidence that prosecutors Jackson or Dixon relied on any privileged materials to make any decision in the trial of the case (and there was evidence otherwise, in the form of Mr. Jackson's declaration). Mr. Jackson also told the court at a hearing: "I looked at tons of stuff, and I don't remember looking at any attorney/client privilege stuff until [defense counsel] gave it to me. And it's only the items she's given to me. I have not gone back and filtered through 60-odd boxes or 40-odd boxes of stuff to look for other things."

The trial court later reviewed the privileged material the special master had segregated, and reiterated its earlier finding of no egregious misconduct by the prosecutors. Still later, the court repeated that once the case came to Los Angeles, there had been no misconduct on the part of the Los Angeles District Attorney's office. Defendant identified no privileged document relied on by the prosecutors to his prejudice (or at all), either at trial or on appeal.

Defendant is left to argue that the prosecutor may be taxed, for purposes of a claim of outrageous governmental misconduct, with actions taken or not taken by the Orange County prosecutor's office. There is no pertinent authority for that notion, and we reject it. Defendant cites *Brady* and its progeny for the principle that the prosecutor is responsible for disclosing evidence favorable to the defense, and that duty includes the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." (*Kyles v. Whitley* (1995) 514 U.S. 419, 437; *In re Brown* (1998) 17 Cal.4th 873, 879 (*Brown*) [courts have focused on the " ' " 'prosecution team,' " ' " and "any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution"].)

But the legal authorities on outrageous government misconduct do not employ the "prosecution team" principle, nor is there reason to do so. A *Brady* violation can be remedied only by providing the defense with the exculpatory material. Without the "prosecution team" principle, the prosecutor could " ' "avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," [citation].' [Citations.]" (*Brown, supra,* 17 Cal.4th at p. 879.)

That principle has no logical application in the context of an outrageous misconduct claim. Case authority likewise supports the conclusion that a prosecutor is not chargeable with the outrageous misconduct of another agency. (See *People v. Shrier* (2010) 190 Cal.App.4th 400, 405, 417 (*Shrier*) [dismissal was too drastic a remedy where law enforcement agents intentionally eavesdropped on attorney-client privileged communications; "[e]xclusion of overheard communications and any derivative evidence

flowing therefrom" was the appropriate remedy; the prosecutor "was unaware of the eavesdropping plan"]; *Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 432 (*Boulas*) ["There is no suggestion in [*Morrison, supra*, 449 U.S. 361] that the prosecutor's office participated in the decision of the police officers to speak with the defendant outside of the presence of her attorney. In contrast, the record before this court contains substantial evidence of such participation on the part of a deputy district attorney."].)

Defendant points out that the detective who headed the search team in Orange County was a member of the Los Angeles Sheriff's Department, and he "led the charge that resulted in the wholesale seizure" of attorney-client privileged documents. But the trial court expressly found the search warrant was properly executed. And while defendant broadly claims the prosecutor's "seizure, retention and review of the privileged material" requires dismissal, he presents no argument supported by legal authorities for the proposition that the warrant was improperly executed in the first instance.

Even if we were to hold the Los Angeles prosecutors responsible for all that went before, it would avail defendant nothing. "[A] showing of prejudice to defendant's right to a fair trial [is] required" to sustain a due process claim of outrageous government conduct requiring dismissal. (*Uribe, supra,* 199 Cal.App.4th at p. 861.) Defendant cites several California cases where dismissal of charges was upheld or required based on flagrant interference in defendant's attorney-client relationship. But in all of them, not only was the prosecutor complicit in an intentional interference between attorney and client, but prejudice appeared on the face of the matter.

Neither factor applies here. In *Boulas*, for example, law enforcement officers, with the tacit approval of the prosecutor, undermined the defendant's relationship with his attorney by telling the defendant that he had to fire his attorney and retain another attorney in order to secure a plea bargain. (*Boulas*, *supra,* 188 Cal.App.3d at p. 427.) "We find it to be beyond [peradventure] that the . . . course of conduct undertaken by law enforcement officials actively caused irremediable harm to Boulas's relationship with his attorney and was, therefore, improper." (*Id.* at p. 433.) *Boulas* points out that the high

40

court in *Morrison*, which found dismissal an improper remedy in that case, "did not rule out the possibility of ordering the dismissal of a case upon a proper showing of prejudice."[8] (*Boulas*, at p. 431.) But there was no such showing here.

Defendant argues that prejudice may be presumed where the privileged documents to which the prosecutor has access "contain details of the defendant's trial strategy," citing federal cases where government informants participated in attorney-client conferences and provided the prosecution with confidential information about the defense's strategy or position. (E.g., *United States v. Levy* (3d Cir. 1978) 577 F.2d 200, 208 (*Levy*) [actual disclosure of defense strategy occurred; "[w]here there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is"].)

The federal cases do not assist defendant. First, we need not follow federal authorities other than the high court.[9] Second, in this case the trial court did not find any

---

[8]     See also *Barber v. Municipal Court* (1979) 24 Cal.3d 742. There, an undercover police officer posing as a codefendant attended confidential attorney-client conferences with the other defendants (the district attorney knew he was a police officer and did not inform defense counsel). This was a violation of the right to counsel, and there was prejudice: "there was evidence that since the disclosure of [the officer's] undercover role, [the other defendants] had become reluctant to cooperate fully with their attorney." (*Id.* at p. 755.) Dismissal was the appropriate remedy: "Whether or not the prosecution has directly gained any confidential information which may be subject to suppression, the prosecution in this case has been aided by its agent's conduct. [Codefendants] have been prejudiced in their ability to prepare their defense. They no longer feel they can freely, candidly, and with complete confidence discuss their case with their attorney." (*Id.* at p. 756.)

[9]     In any event, those authorities are split on the question whether a deliberate attempt by the government to obtain defense strategy information or to otherwise interfere with the attorney-defendant relationship through the use of an undercover agent constitutes a per se violation of the Sixth Amendment. (See *United States v. Danielson* (9th Cir. 2003) 325 F.3d 1054, 1070-1071, discussing cases; see also *United States v. Glover* (9th Cir. 1979) 596 F.2d 857, 863-864 & fn. 10 [government agent's "attempt to

41

deliberate intrusion or "knowing invasion" by the Los Angeles prosecutor in the attorney-client relationship, instead finding "they did not obtain any new information from their accidental review of the privileged material." Third, defendant fails to identify in his opening brief any defense "strategy or position" that was revealed in the privileged documents. By contrast, in *Levy* the court specifically identified the defense strategy learned by the prosecutor.[10]

Here, instead of pointing to any defense trial strategy or tactics that were revealed in the privileged materials, defendant argues the trial court's remedy – the order not to use privileged information at trial – was "impossible to enforce," and it was "unrealistic to believe" the prosecutors did not use privileged information to their advantage. Defendant points to "between 150 and 200 pages" of privileged documents relating to defendant's federal criminal case (not to the murders). That case involved alleged bankruptcy fraud, and at the murder trial, the prosecutors called witnesses who testified, as mentioned previously, about transactions undertaken to move defendant's business assets without paying the creditors, the transfer of assets to defendant's wife, and so on. Defendant cites the testimony of these witnesses as showing "at least one critical instance of actual prejudice," claiming the prosecutors used the privileged communications that

interfere with the attorney-client relationship, as reprehensible as it was," did not amount to a constitutional violation of the right to counsel; "the existence or nonexistence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant in determining if the defendant has been denied the right to counsel"].)

[10] In *Levy*, the government learned that the defense intended to dispute the credibility of the government's key witnesses, and "thereby necessarily became privy to the fact that this was the *only* likely defense strategy that the prosecution had to anticipate." (*Levy, supra,* 577 F.2d at p. 208.) The government witnesses were two black men who claimed to be present at a private club where drug transactions took place, and "[t]he defense strategy obviously would be to discredit the black witnesses by attempting to establish that blacks were never admitted to that private club. The government's knowledge of this planned strategy would permit it not only to anticipate and counter such an attack on its witnesses' credibility, but also to select jurors who would be more receptive to the testimony of black witnesses against white ethnic defendants." (*Ibid.*)

pertained to the federal criminal proceedings "in formulating the prosecution's case for motive," and "chang[ed] theories of the case based upon the content of [defendant's] privileged documents." (The Orange County prosecutors charged defendant with conspiracy and murder for financial gain, and defendant claims, without citing to any particular documents, that his communications with his lawyer exposed the fallacy in the notion that defendant stood to gain financially from Mr. Thompson's death.)

But this is pure speculation. Defense counsel admitted below that "I can't say whether [the prosecutors] read these documents and therefore changed their mind. I can't say if they just are a little bit more on the ball than the district attorneys in Orange County. I can say that the appearance of impropriety is large." Speculation, without reference to any supporting evidence, does not suffice, and it seems obvious the question of financial gain or its absence could be investigated and determined without regard to privileged communications. Defendant points to nothing to show the prosecutors used any privileged document, or evidence derived from a privileged document, and the prosecutor avers none of the documents were used to make any prosecutorial decision. As for the financial witnesses, they were intimately involved in the bankruptcy litigation, thus accounting for their trial testimony. There was no showing they were privy to any privileged documents, and defendant does not attempt to trace any testimony to a privileged source. Dismissal cannot be based on unsupported speculation.[11]

---

[11] Defendant also cites a Connecticut opinion, *State v. Lenarz* (2011) 301 Conn. 417, where the court "conclude[d] generally that prejudice may be presumed when the prosecutor has invaded the attorney-client privilege by reading privileged materials containing trial strategy, regardless of whether the invasion of the attorney-client privilege was intentional," and the state may rebut that presumption by clear and convincing evidence. (*Id.* at p. 425.) California cases do not so hold, and in any event, in *Lenarz*, the court found both that the privileged materials "contained a detailed, explicit road map of the defendant's trial strategy" (*id.* at p. 451); "the defendant was prejudiced by the prosecutor's intrusion into the privileged communications" (*id.* at p. 442); and the state had the burden to prove that any prejudice could be cured by a less drastic remedy than dismissal (*id.* at pp. 443-444), which it could not do in that case (*id.* at p. 445). No similar findings were made, or could have been made, here.

Defendant also cites *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 (*Morrow*). There, the court held: "Where a prosecutor orchestrates courtroom eavesdropping on a privileged attorney-client communication and the witnesses thereto invoke the privilege against self-incrimination, the prosecution may not successfully oppose a motion to dismiss on the ground that no prejudice has been shown." (*Id.* at p. 1258.) In those circumstances, "the court's conscience is shocked and dismissal is the appropriate remedy. Even when the issue is narrowed to a Sixth Amendment violation, dismissal is still appropriate because here there is a 'substantial threat of demonstrable prejudice' as a matter of law." (*Id.* at p. 1251, citing *Morrison, supra,* 449 U.S. at p. 365.) This case bears no comparison to *Morrow*; here, the prosecutor engaged in no misconduct, and indeed demonstrated to the satisfaction of the trial court that nothing in the privileged materials was or would be used to the prejudice of defendant. (See *Shrier, supra,* 190 Cal.App.4th at pp. 405, 417 [exclusion of overheard communications and any derivative evidence was the appropriate remedy for eavesdropping on attorney-client communications where prosecutor was unaware of the eavesdropping plan].)

In sum, substantial evidence supported the trial court's conclusion that the prosecutors here engaged in no misconduct, and that in any event their review of attorney-client privileged material did not result in the prejudice to defendant that is necessary to justify the sanction of dismissal. Our independent review of the record confirms the absence of any "outrageous conduct in the constitutional sense of violating defendant's due process rights . . . ." (*Uribe, supra,* 199 Cal.App.4th at p. 858.) And there was no showing of any use of privileged documents or information derived from them by the prosecutors in trying the case. In short, the required showing of prejudice to defendant's right to a fair trial was absent and precluded dismissal. (*Id.* at p. 861.) As the high court said in *Morrison*, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests," and "[o]ur approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of

44

counsel and a fair trial." (*Morrison, supra,* 449 U.S. at pp. 364, 365.) That is exactly what the trial court did here.

### ii. *Recusal issues*

Defendant argues the trial court erred in denying his motions to recuse the Los Angeles District Attorney's office, or to remove prosecutors Jackson and Dixon from defendant's prosecution. We review this claim "only for an abuse of discretion." (*Hariguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted (*Hariguchi*) ["The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious."].) We find no abuse of discretion.

Under section 1424, a motion to disqualify a district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (*Id.*, subd. (a)(1).) Section 1424 establishes "a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a 'conflict' exists whenever there is a 'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment.' [Citation.]" (*People v. Eubanks* (1996) 14 Cal.4th 580, 594, 583-584 (*Eubanks*) [substantial financial assistance victim provided to district attorney's office resulted in a disqualifying conflict of interest].) "The statute demands a showing of a real, not merely apparent, potential for unfair treatment, and further requires that that potential 'rise to the level of a *likelihood* of unfairness.' [Citation.]" (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 (*Vasquez*).) The defendant "bear[s] the burden of demonstrating a genuine conflict; in the absence of any such conflict, a trial court should not interfere with the People's prerogative to select who is to represent them." (*Hariguchi, supra,* 43 Cal.4th at p. 709.)

We have already recited at length, in connection with defendant's dismissal arguments, the relevant facts. Those facts lead to the same result: no error by the trial court.

Here, the trial court repeatedly found that no conflict existed. In June 2005: "The only thing I can say is that the People are in possession of privileged material, that . . . they agreed not to use that material in any way and not to use any evidence obtained as a result of that material in the trial," and "there is no showing that the defendant would receive anything other than a fair trial based on the possession of this information." In February 2006: "But I am convinced of what I said a month ago. I don't believe this is a [section] 1424 situation." In March 2006: "This is not a [section] 1424 situation in my opinion and I think I have been consistent in saying that."

Defendant fails entirely to identify any conflict of interest, merely repeating his claim that the "prosecution team intentionally and illegally invaded the defense team" by seizing and reviewing privileged communications and "us[ing] them to form their theories of the case." First, as we have seen, that is not a proper characterization of the prosecutor's conduct; the prosecutor saw privileged communications, but his conduct was not intentional, and he did not "use them to form [the prosecution's] theories of the case." As the Supreme Court has said, "[t]he trial court was entitled to credit [the prosecutor], and his statements constitute substantial evidence." (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 730 (*Hollywood*).) Second, defendant showed no conflict of interest – no " 'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citation.]" (*Eubanks, supra,* 14 Cal.4th at p. 594.)

*Vasquez* explains the point: public prosecutors "are required to exercise their discretionary functions " ' "with the highest degree of integrity and impartiality." ' [Citation.] Impartiality, in this context, means . . . that the prosecutor is 'expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual.' [Citation.]" (*Vasquez, supra,* 39 Cal.4th at p. 55 [because of a close family relationship between longtime employees of the prosecutor's office and the defendant, there was a " 'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner' "]; see also *Hollywood*, *supra*, 43 Cal.4th at p. 731 [trial court did not abuse its discretion in finding no cognizable conflict of interest under section 1424, where prosecutor disclosed

case files to filmmaker and acted as a consultant on a movie about the defendant's life and alleged crimes; "[w]hile in the abstract it is conceivable a fear of criminal sanctions might alter how [the prosecutor] handled this case, the trial court found [the prosecutor] credible and concluded the possibility that confidential documents might have been disclosed inadvertently would not prevent [the prosecutor] from acting fairly toward [the defendant]"; that conclusion "does not appear arbitrary or capricious and is supported by substantial evidence"].)

Defendant cannot explain how the prosecutor's exposure to privileged materials created a conflict of interest such that the prosecutor might not exercise his discretionary functions in an evenhanded manner. As *Hollywood* tells us, "section 1424 does not exist as a free-form vehicle through which to express judicial condemnation of distasteful, or even improper, prosecutorial actions. [S]ection 1424 offers no relief for actions simply because they appear, or are, improper. [Citations.] The Legislature has closely defined the limits of judicial authority to recuse prosecutors, and we must observe them. . . . A defendant must identify, and a court must find some *conflict of interest* that renders it unlikely the defendant will receive a fair trial." (*Hollywood, supra,* 43 Cal.4th at p. 735, fn. omitted.) The trial court found none here, and we can find no abuse of its discretion in that finding.

Defendant next argues that, apart from Penal Code section 1424, the court had inherent power under Code of Civil Procedure section 128, subdivision (a)(4) to remove prosecutors Jackson and Dixon. Under that statute, every court has the power to "compel obedience to its judgments, orders, and process," and to "control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(4)&(5).) But section 1424 now specifies the requirements for disqualification, and it was enacted in response to the case which established that section 128 gives the court power to remove a prosecutor. (*People v. Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 269 [concluding, before the enactment of section 1424, that "a trial judge may exercise his power to disqualify a district attorney from

47

participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a conflict of interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office"]; see *Eubanks*, *supra*, 14 Cal.4th at pp. 590-591 [section 1424 allows disqualification "only when a conflict 'render[s] it unlikely that the defendant would receive a fair trial,' [citation] whereas *Greer* allowed disqualification even when the conflict might merely 'appear to affect' the prosecutor's fairness"].) But the point is that "a conflict of interest which might prejudice [the prosecutor] against the accused" (*Eubanks,* at p. 591) is required for recusal, and there was no such conflict in this case.

Even in a case where the circumstances present a conflict of interest, the conflict would be disabling only if it makes it unlikely that defendant will receive fair treatment. (*Eubanks, supra,* 14 Cal.4th at p. 594.) That returns us to the point we have already decided in connection with defendant's claim the trial court should have dismissed the case for outrageous government misconduct: There was no showing of prejudice to defendant's right to a fair trial, so any conflict of interest that might be identified under section 1424 would not render it " 'unlikely that defendant will receive fair treatment.' [Citation.]" (*Eubanks,* at p. 594; see also *People v. Griffin* (2004) 33 Cal.4th 536, 570, fn. 15 ["Because we conclude that the trial court did not err in denying defendant's motion for an order recusing the district attorney's office for a conflict of interest, we reject as well defendant's claim that the trial court's asserted error violated his rights under the United States Constitution, specifically . . . the due process clause of the Fourteenth Amendment."].) In short, there was no error in the court's refusal to recuse the prosecutors.

Finally, defendant makes one other point. He contends the right to counsel is violated when a state agent is present at attorney-client conferences, and that Detective Lillienfeld obtained privileged information by "using someone from the defense camp as a spy for several weeks," and "knew Butch Jones was providing him information Mr. Jones had gleaned from his presence at attorney-client conferences." In this argument, defendant fails to acknowledge that the court took testimony from defendant's

then-lawyer (Jeffrey Benice), from Detective Lillienfeld, and from Mr. Jones, and found otherwise.

Specifically, the court found there was *no* "intentional act on the part of law enforcement to interfere with the attorney/client privilege or to obtain privileged material." "There may have been some relationship that existed between Mr. Jones and Mr. Benice, but I can't say that Detective Lillienfeld attempted to intentionally obtain privileged information from that relationship by virtue of his contact with Mr. Jones." Detective Lillienfeld testified that Mr. Jones told him on one occasion that defendant was going to meet with Mr. Benice on defense strategy, but he never indicated that he (Mr. Jones) attended any such meeting, and "the contents of that meeting" were never supplied to Detective Lillienfeld. Mr. Jones also told the detective, who confirmed the information, that defendant, not Mr. Benice, paid Mr. Jones, whose job was as a runner, a messenger, and a researcher for defendant. Mr. Benice testified that, at defendant's suggestion, he paid Mr. Jones once or twice to review and obtain documents from case files concerning Mickey Thompson's estate, but Mr. Jones did no substantive legal work for him, and he did not invite Mr. Jones into strategy meetings. And Mr. Jones testified that he never supplied Detective Lillienfeld with information he gleaned from meetings with defendant and Mr. Benice.

In short, substantial evidence supported the trial court's finding that there was no intentional interference with the attorney-client relationship through the use of Mr. Jones as an informer – in contrast to both cases defendant cites. (See *Barber*, *supra*, 24 Cal.3d at p. 755 [finding a violation of the right to counsel and prejudice from the violation; see fn. 8, *ante*] and *Morrow, supra,* 30 Cal.App.4th at p. 1258 [prosecutor orchestrated courtroom eavesdropping on attorney-client communication]; see also *Weatherford v. Bursey* (1977) 429 U.S. 545, 558 ["unless [undercover agent] communicated the substance of the [attorney-client] conversations and thereby created at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation"; "[t]here being no tainted evidence . . . , no communication of

49

defense strategy to the prosecution, and no purposeful intrusion by [undercover agent], there was no violation of the Sixth Amendment"].)

In the end, defendant's argument is that "the record cannot fully disclose the extent to which [prosecutorial] decisions were affected – whether consciously or subconsciously – by the privileged information they reviewed," and so there was structural error requiring reversal of the judgment. Defendant made the same argument to the trial court: "Every decision that they're [(the prosecutors)] going to make cannot be said to now not be derived from the reading of those documents," and "[t]here is simply no way for anyone to know what parts of the case that form Mr. Jackson's thoughts on prosecution were derived from these letters." That is simply not the law.

There was no error in the trial court's denial of defendant's motions to dismiss or to recuse the prosecutors.

## 2.  The Insufficient Evidence Claim

Defendant claims the evidence was insufficient to sustain the convictions. This argument includes two principle components:  first, that there was no evidence of any association or agreement between defendant and the killers (and hence "no corpus [delicti] to prove a conspiracy") and second, the eyewitness identification testimony of Ronald and Tonyia Stevens was not "substantial, credible evidence [defendant] engaged in a conspiracy to murder the Thompsons." Defendant is mistaken.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'  [Citation.]  Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction."  (*People v. Elliott* (2012) 53 Cal.4th 535, 585

50

(*Elliott*).) So, " 'if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).)

As a preliminary matter, we note defendant's claim there was "no corpus [delicti] to prove a conspiracy" is simply inapt. Defendant was not charged with conspiracy. He was charged with murder. To convict a defendant of a crime, the prosecutor must prove that a crime – "the corpus delicti or body of the crime" – actually occurred, and the prosecutor may not rely exclusively on the defendant's extrajudicial statements to do so. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1164-1165 (*Alvarez*).) As the facts we have recited show, the occurrence of the crimes with which defendant was charged – multiple murders committed by means of lying in wait – is not open to question.

Conspiracy was merely one of the theories of liability by which the prosecution sought to establish that defendant was responsible for those crimes. There is no support in the authorities or in logic for the proposition that the corpus delicti rule may be applied to a theory of liability. The rule "is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Alvarez, supra,* 27 Cal.4th at p. 1169.) The two charged murders happened – and once there is independent evidence of a crime, "the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Id.* at p. 1171.) That is so here.

And so we turn to the substance of defendant's claim: whether there was insufficient evidence to prove beyond a reasonable doubt that defendant conspired to kill the Thompsons. A conspiracy is an agreement to commit the crime, and the essence of defendant's claim is that there was no evidence of any association with, or agreement with, the unknown killers to commit the murders – the sine qua non of conspiracy. He points out that a legal inference cannot flow from the nonexistence of a fact, and may not be based on suspicion or conjecture or guesswork. (*People v. Stein* (1979) 94 Cal.App.3d 235, 239.)

We do not agree there was no evidence of an agreement to murder the Thompsons. Certainly there was no *direct* evidence of defendant's association or agreement with the actual killers.  But a conspiracy " 'may be proved by indirect evidence and inferences justified by the circumstances.  [Citations.]'  [Citations.]" (*People v. Hardeman* (1966) 244 Cal.App.2d 1, 41; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 ["Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.  [Citation.]  The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."].)

Here, the circumstances fully justified the inference that defendant conspired with the shooters.  While defendant tells us what evidence was absent (such as evidence of payments to the shooters, telephone records, witnesses to defendant's solicitation of the murders, meetings or talks with the shooters), he ignores the evidence that *was* adduced.  The Thompsons were killed in a carefully planned operation for which there was no robbery or other motive (*ante*, pp. 15-19).  Defendant was present in the neighborhood with binoculars and another person a few days before the murders (*ante*, pp. 13-14).  The shooters knew where and when to find the Thompsons, how to get to their house, and how best to escape the scene (*ante*, pp. 16-18).  Defendant repeatedly threatened to kill Mickey Thompson and hurt his family (*ante,* pp. 6-13) and indeed made statements to two witnesses about the cost involved in having Mr. Thompson killed (*ante*, pp. 8-9), and told others he was too smart to get caught (*ante*, p. 7).  These facts were placed in evidence, and the jury could properly infer from them that defendant agreed with the shooters to commit the murders.

To this, defendant's answer is to characterize defendant's presence near the Thompson home as a "highly speculative 'fact' " that was "not sufficient," even if the Stevenses' eyewitness identifications were credible, which he claims they were not. Neither of these arguments assists defendant.  He says his presence in the neighborhood shortly before the murders "is simply too tenuous and speculative" to support a finding of

52

an agreement to commit murder. In the abstract and without any other evidence, defendant might be right – but there *was* other evidence (delineated in the preceding paragraph), and defendant ignores it. As the jury was instructed, properly, the "formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent . . . ."[12]

At its core, defendant's argument is that the eyewitness testimony of Ronald and Tonyia Stevens is not substantial, credible evidence, and without it he cannot be connected to the murders. We disagree with defendant's premise.

Defendant recites at length various inconsistencies between the Stevenses' testimony at trial and their testimony at the preliminary hearing and interviews with the police. (These inconsistencies include statements about the race of the passenger in the car with defendant, how far away Mr. Stevens was when he saw defendant, for how long and at what angle he saw defendant, and so on.) Defendant challenges the photographic and live lineup procedures as "suggestive and unreliable." He points out that in the photos, there was only one man "that had any sort of pock marks." He says Mr. Stevens admitted on cross-examination that he had pointed to three different photos, saying "this type of nose" and "that type of hair" and "this type of complexion," and that Detective Lillienfeld posed the question, "Yeah, but the guy you saw in the wagon that

---

[12]    Defendant relies on *United States v. Todd* (8th Cir. 1981) 657 F.2d 212, where the defendant's conviction for murder was affirmed but his conviction for conspiracy to murder was reversed. The only evidence of conspiracy to murder was that all the principals (defendant, his alleged coconspirators, and the victim) were members of the same basic training company at Ft. Leonard Wood, and defendant said he and his alleged coconspirators intended to rob the victim. The court held it was improper to convict defendant of conspiracy to murder based on an assumption that they also intended to murder the victim so he would not identify them after the robbery. (*Id.* at p. 217 ["Although the government is allowed to prove an agreement by circumstantial evidence, . . . here there is only speculation and inference."].) We fail to see any favorable comparison between the evidence in this case, where defendant stated his intent to kill Mr. Thompson and discussed hiring someone to do so, and the speculation in *Todd*.

day that most resembles who in this photo array now?" rather than admonishing Mr. Stevens that the suspect might or might not be in the photo array.

Mr. Stevens viewed a live lineup five months later, where defendant was the only person whose photo was also in the photographic lineup, and the only person with pock-marked skin. (Tonyia Stevens also viewed that lineup, separately, and identified defendant. She had seen defendant on a newscast (footage of four to six men walking out of a courtroom, with no mention of defendant's name) and recognized him as the person she saw in the car before the murders; at the time, she told her husband she was sure he would remember him too.) Defendant also cites numerous cases and studies discussing the unreliability of eyewitness identifications and suggested reforms in identification procedures. And he cites the many other factors that reduce the reliability of identifications: lapse of time (13 years), limited opportunity to observe, intervening influences affecting memory (such as reenactments of the crime on television), and so on.

Nonetheless, Mr. and Ms. Stevens did in fact testify that it was defendant they saw with binoculars in an old station wagon with Arizona license plates parked near their home a few days before the murders. And Kathy Weese offered some corroboration when she testified that while she was working for defendant's company, on one occasion she saw an older station wagon with out-of-state plates in the parking lot; it had never been there before and she never saw it again. The jury heard all this evidence, including all the inconsistencies defendant cites, and also heard testimony from defendant's expert witness on eyewitness identifications, explaining all the factors supporting the unreliability of identifications made under the circumstances existing in this case. The jury also heard defendant's arguments about the unreliability of the Stevenses' identifications. It was for them to decide whether or not they believed the Stevenses' testimony.

In his reply brief, defendant contends the issue is "not about reassessing witness credibility," but about the "inherent unreliability of eyewitness identifications obtained under circumstances that corrupt human memory," as shown in the studies he cites (studies not presented to the trial court). But we are bound by the law as stated by the

54

Supreme Court, and that court has expressly rejected claims that eyewitness testimony was unreliable "because the witnesses' initial descriptions of the perpetrator were inconsistent and because the identification testimony was tainted by suggestive lineups and photo arrays, and by the passage of time." (*Elliott, supra,* 53 Cal.4th at p. 585 ["Inconsistencies in [the witnesses'] initial descriptions of the perpetrator and any suggestiveness in the lineups or photo arrays they were shown are matters affecting the witnesses' credibility, which is for the jury to resolve."]; see also *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 ["when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court"].) In short, we necessarily decline defendant's invitation to hold as a matter of law that the Stevenses' identifications were unreliable.

In sum, though the jury could have disbelieved the Stevenses' testimony, for all the reasons defendant presented to it, the jury chose to believe them. Their testimony constitutes substantial evidence, and it was not the only evidence connecting defendant to the crime, as we have already pointed out; there was evidence of a carefully planned and coordinated execution and escape that required research and reconnaissance, defendant's repeated statements of intent to kill Mickey Thompson and hurt his family, and statements about the cost of having Mr. Thompson killed. From all this evidence, the jury could reasonably infer an agreement by defendant with the shooters to commit the murders.

Finally, we note that, in his motion for a new trial, defendant presented an affidavit from the jury foreperson, saying, among other things, that he was initially reluctant to vote for conviction because of no evidence "connecting [defendant] to the actual killers, even though most of the other evidence pointed towards guilt"; that the conspiracy instruction allowed the jury to infer from "all of the other incriminating evidence" that defendant wanted Mickey Thompson dead "and could have hired the killers to commit the crime even though no evidence of a connection between the conspirators was presented"; and, since the jury concluded it was reasonable to believe

55

defendant "could have been responsible," "we felt we reconciled that lack of connection to the killers by applying the instruction on conspiracy, which allowed us to infer that connection."

We may not consider these statements (which in any event appear merely to reflect defendant's mistaken notion that a direct – rather than circumstantial – link between defendant and the actual killers must be shown). Under Evidence Code section 1150, "[n]o evidence is admissible . . . concerning the mental processes by which [the verdict] was determined." (*Id.*, subd. (a); see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1281 ["The jurors' statements about the mental processes by which that verdict was reached were expressly barred by . . . section 1150."].) The trial court, we note, nevertheless considered the foreperson's declaration, saying it "tend[ed] to agree that . . . probably a portion of it got into what is prohibited by [section] 1150," but "I'm considering that declaration and accepting it at face value." Nonetheless, the trial court concluded that, while "this was a circumstantial evidence case with nothing – no direct evidence to connect [defendant], . . . the circumstantial evidence was overwhelming." We agree.

### 3. The Delay in Prosecution

Defendant was arrested on December 13, 2001, for murders that occurred in March 1988, and his preliminary hearing in Los Angeles occurred in October 2004. In January 2006, defendant filed a motion to dismiss because of the lengthy delay, and asked the court to defer ruling on the motion until completion of the trial. The trial court did so, and ultimately denied the motion.

Defendant contends on appeal the delay in prosecuting him was unjustified and prejudicial: that the evidence offered at the trial in 2006 was "essentially identical to what the [Los Angeles District Attorney] could have mustered for trial soon after the killings in 1988," and in the interim, "the defense evidence faded away almost completely." We conclude the trial court did not abuse its discretion in denying defendant's motion.

### a. The governing principles

The pertinent legal principles are these. The due process clauses of the federal and California Constitutions "protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).) " ' "[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence." [Citation.]' [Citation.]" (*Ibid.*) " ' "A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." [Citation.]' [Citation.]" (*Ibid.*)

"Prejudice may be shown by ' "loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." ' " (*Cowan, supra,* 50 Cal.4th at p. 430.) While "the federal constitutional standard for what constitutes sufficient justification for delay is unclear [citation], we have noted that 'the law under the California Constitution is at least as favorable for defendant in this regard' as federal law [citation]."[13] (*Id.* at pp. 430-431.)

"Under the California standard, 'negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. This does not mean, however, that whether the delay was purposeful or negligent is irrelevant.' [Citation.] Rather, 'whether the delay was negligent or purposeful is relevant

---

[13] In *People v. Nelson* (2008) 43 Cal.4th 1242 (*Nelson*), the court discussed the federal standard at some length. *Nelson* observed that the high court has said that " 'the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense,' " but that some of the high court's earlier cases "suggest the test might be somewhat less onerous." (*Id.* at pp. 1253-1254.)

to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] The justification for the delay is strong when there is 'investigative delay, nothing else.' [Citation.]" (*Cowan, supra,* 50 Cal.4th at p. 431.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]."[14] (*Cowan, supra,* 50 Cal.4th at p. 431.)

### b. The trial court's ruling

Defendant's position is that the trial court erred in finding justification for the delay, and in addition that the court "skipped the third step – balancing prejudice against the prosecutor's justification – altogether." Thus, defendant contends, because the prosecutor's showing of justification was "insubstantial," if defendant showed "even minimal prejudice, the trial judge's error in not undertaking the required weighing requires reversal."

We do not agree with either point in defendant's analysis. To begin, we describe the court's ruling in some detail. We then review defendant's claims of prejudice (pt. c., *post*) and the prosecutor's justification (pt. d., *post*), and conclude there was no abuse of discretion in the court's refusal to dismiss the case for prearrest delay.[15]

---

[14]    Defendant compares this case to *People v. Cromer* (2001) 24 Cal.4th 889 and concludes we must employ de novo review. *Cromer* was not a case of prearrest delay. In *Cromer*, the court held that appellate courts "should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*Id.* at p. 901.) *Cowan* was decided years after *Cromer*, and its statement of the standard of review on a motion to dismiss for prearrest delay could not be clearer.

[15]    Defendant says he was "substantially handicapped" in preparing and arguing the prearrest delay issue in the trial court, because the court refused to order daily transcripts. He does not, however, identify any evidence in the record that he did not bring to the trial

58

Some of the trial court's comments suggest its belief that a legitimate reason for the delay in prosecution would be dispositive, without regard to defendant's showing of prejudice. But the court did in fact find prejudice to defendant (and to the prosecution, as well) from the delay, and a fair reading of its analysis shows an implicit, if not explicit, balancing of the prejudice against the justification.

After first correctly rejecting the prosecutor's contention that a defendant must show intentional delay by the government, this is what the trial court said: "[T]o prevail on due process grounds . . . the defense has to show some actual prejudice by the delay. [¶] Once the defendant shows some actual prejudice, . . . the burden shifts and the court has to find that there was no legitimate reason for the delay." The court then said that the second question was the easiest to answer, and it would answer that first: "There appears to me to be ample reason why this case took so long to result in an arrest of [defendant]. . . . [¶] . . . [¶] . . . [S]imply based on the evidence that I heard at this trial, there were new witnesses that came forward in 2001. It appears that . . . Ron and Tonyia Stevens made an identification in 2001 and although they attempted to contact law enforcement before, the fact of the matter is that the identification was not made until 2001." The judge also mentioned Gail Moreau-Hunter's information, presented at the preliminary hearing but not at trial, that defendant made a statement to her "where he at the very least suggested that he was responsible for the murders." The court observed that when the new information – the identifications and Ms. Moreau-Hunter's statements – was obtained in 2001, the sheriff's department did not delay in presenting the case for filing.

The court then said: "There were ample reasons for the delay. And I think that, in and of itself, is dispositive, I will be honest with you. I think that the court doesn't have to even address the first question [prejudice]. [¶] But for purposes of this record, let me go ahead and attempt to at least clarify what I think the standard is. I don't know that

court's attention, or that he was unable to bring to the court's attention because he did not have daily transcripts.

59

there is any authority for the proposition that the court has to assume that every witness that was unavailable for the trial would have presented testimony favorable to the accused. [¶] . . . [¶] . . . *I don't know that any of the evidence that was not presented because of the delay would have been beneficial to the defendant.* But what I can say is that the evidence that was presented at the trial by the prosecution was certainly hindered by the delay." (Boldface & italics added.)

The court noted the case was aggressively defended, with the defense doing an "excellent job in presenting to the jury . . . the problems inherent in a lot of the testimony presented by the People. [¶] And those problems were in large part due to a lack of recollection; a lack of physical evidence that may have existed in this case. So the bottom line I think it's fair to say the delay did not just prejudice – potentially prejudice the defense. The delay prejudiced I think both sides in this case. And that's unfortunate. But I'm not going to assume that every witness that wasn't called would have testified favorably . . . for [defendant]. [¶] However, even . . . if I make that assumption, I then get to that second question: was there a legitimate reason for the delay? Whereby the answer is yes. [¶] So no matter how I look at it, given the legal standard that I believe applies on this case, I have made inquiry into whether or not there was prejudice. I agree there was prejudice, but there was a legitimate reason for the delay."

The court pointed out that the Court of Appeal in Orange County, when it ruled venue was not proper there, "did point out this new evidence that was presented or discovered," and "practically begged Los Angeles to take another look at this case." The court continued: "I think there was ongoing investigation. I know that Detective Lillienfeld took over the case and pursued the case. And I can't fault anyone for the fact that it took so long to actually get enough evidence to file the case. And at the behest of the Court of Appeal that's what the L.A. County District Attorney did. [¶] So given all of that, I do not believe that there has been anything that rises to the level of due process violation here. . . . [F]rom what I can glean from the cases that have been cited, the due process violation has not been established."

60

It thus appears that the court, while not expressly balancing the prejudice to defendant against the justification for the delay, implicitly did just that:  The court plainly concluded it could not fault anyone for the length of time that elapsed in the investigation before the authorities charged defendant.  And the court further concluded, correctly, that it would be wrong to assume that every unavailable witness would have provided testimony favorable to defendant.  Indeed, the court went so far as to observe that "I don't know that *any* of the evidence that was not presented because of the delay would have been beneficial to the defendant."  (Italics added.)  Based on these findings by the court, the balancing of prejudice against justification could have only one result.

And so, the question for us is whether the trial court abused its discretion in making those findings and concluding there was no due process violation.  We think not, and turn first to defendant's showing of prejudice.

### c.  Defendant's claims of prejudice

Defendant asserts prejudice from the loss of material witnesses, loss of documentary evidence, and witnesses' failing memories.  We address his claims of prejudice in the order he has raised them.  Our conclusion is that, as the trial court found, defendant demonstrated some prejudice, sufficient to require justification by the prosecution for the delay, but the demonstrated prejudice was, on the whole, minimal.

### i.  *The Arizona license plate number*

Defendant first claims prejudice from the loss of the Arizona license plate number of the car in which Mr. Stevens saw defendant a few days before the murders.  Mr. Stevens made a note of the license plate number, but by the time defendant was arrested, he could no longer find it.  Defendant asserts the license plate number would have "exonerated" him, or "at the very least would have confirmed he had no connection with the station wagon the Stevenses described."  That is pure speculation.  (See *People v. Morris* (1988) 46 Cal.3d 1, 38 [finding no abuse of discretion where, among other things, the defendant's "claim that his own memory had faded was speculative at best"], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5; *People*

*v. Hartman* (1985) 170 Cal.App.3d 572, 579 (*Hartman*) ["A defendant must show *actual* prejudice based on the facts of the case."].)[16]

### ii. Defendant's alibi evidence and the Stevenses' memories

Defendant contends if the investigators had interviewed the Stevenses in 1988, "there would have been fewer influences distorting the Stevenses' memories, and [defendant] would have been in a position to present an alibi." He says that by the time of the trial, the Stevenses could not pinpoint the date they saw him parked in front of their house, and defendant's "1988 day-timers and personal notes were lost, depriving him of his opportunity to prove alibi." Similarly, defendant could have established his alibi by producing credit card and financial receipts, but by the time he was charged, these documents had already been destroyed in the normal course of business. Defendant says these records would also have demonstrated a consistent spending pattern during the weeks prior to and after the murders.

This lost evidence too is speculative. As for the Stevenses' memories, defendant had a full opportunity to cross-examine both witnesses on this point and did so; their "distort[ed]" memories were fully explored at trial and any prejudice could at most be

---

[16]     The *Hartman* case illustrates a showing of "*actual* prejudice based on the facts of the case." (*Hartman*, *supra*, 170 Cal.App.3d at p. 579.) There, the medical examiner at the original autopsy found death by natural causes. A year later, an independent pathologist concluded the death stemmed from a homicide, although the actual cause of death could not be determined, and the several experts hired by the victim's widow expressed new but conflicting interpretations of the cause of death. Finally, "six years after the second autopsy . . . and without the discovery of any new or additional evidence since then," the defendant was charged with murder. By then, both the medical examiner and the supervisor who supported his finding had died, and were thus unable to explain the medical examiner's findings at trial, or to rebut the implication by other witnesses that he had been negligent. In addition, the victim's brain had been misplaced after the initial autopsy, and the heart had disappeared after the second autopsy, making it impossible to resolve the medical inconsistencies among the experts at trial. The court found actual, substantial prejudice to the defendant, and the five-and a-half-year delay in prosecution after the new expert evidence became available "was without any justification whatever." (*Id.* at p. 583.) As will become apparent, this is not a comparable case, in terms of either prejudice or justification.

minimal.  And with respect to the lost alibi evidence – daytimers, personal notes, credit card receipts and so on – defendant had every incentive to preserve that information.  As he told the trial court below, he "was a named suspect within hours of the murder."  (See *Cowan, supra,* 50 Cal.4th at p. 432 [rejecting the defendant's argument that, 10 years later, he could not identify alibi witnesses or recall what he was doing during the first few weeks of September 1984; "defendant was aware by at least February 1985 . . . that he was a suspect in the . . . murders"; he "therefore had an incentive to record any exculpatory information he had regarding his whereabouts, . . . or the identity of alibi witnesses"].)

### iii. Information about improper influences on Detective Griggs's investigation

Defendant contends that Mr. Thompson's sister, Collene Campbell, improperly influenced and interfered with Detective Griggs's investigation of other viable suspects, from the time of the murders until the detective retired in 1992.  By the time defendant learned of this alleged interference, most of the information in Detective Griggs's personnel file had been destroyed (further to the internal policy of the Los Angeles County Employees Retirement Association (LACERA)), and Detective Griggs was uncooperative.  Once again, defendant only speculates that the file contained relevant documents, the destruction of which was "extremely prejudicial" to him.  In any event, defendant did not make this claim in his motion to the trial court, and cannot do so for the first time on appeal.  (*People v. Accredited Surety & Casualty Co.* (2004) 132 Cal.App.4th 1134, 1146 [appellant is precluded from raising a new theory for the first time in its appeal].)

### iv. Telephone records

Kathy Weese and Joel Weissler testified about threats defendant made over the telephone, including when Mr. Thompson called defendant's office.  By the time defendant was charged, the telephone companies had purged records, so that the defense could not obtain telephone records for the homes and offices of defendant, Mr. Thompson and Mr. Weissler.  Again, we have only speculation; there is no reason to

assume these telephone records would have contradicted, rather than substantiated, the witnesses' testimony. "To avoid murder charges due to delay, the defendant must affirmatively show prejudice." (*Nelson, supra,* 43 Cal.4th at p. 1250.)

### v.   *John Williams's testimony about towing defendant's Mercedes*

Mr. Williams testified to defendant's threats on Mr. Thompson's life that occurred when Mr. Williams seized defendant's Mercedes to collect on Mr. Thompson's judgment. The documentation, including Mr. Williams's notes of the altercation, were purged, so defendant could not impeach Mr. Williams with his own notes (to establish that the incident occurred in 1986, rather than shortly before the murders in 1988, and to establish that no altercation was noted). But defendant was able to produce other, undisputed evidence that the towing occurred in 1986 (a receipt from the towing company and other documentation). Mr. Williams was thoroughly cross-examined and impeached with the documents on the issue of when the levy occurred, so the purged notes would have been cumulative – and defendant's claim that those notes did not mention an altercation is complete speculation. So any prejudice from loss of the notes was minimal.

### vi.  *Lawyers' records*

Fee details and records kept by Mr. Thompson's lawyers and lawyers for the bankruptcy estate were no longer available by the time defendant was charged. These records allegedly would have shown whether or not the meeting Mr. Coyne testified to, during which defendant threatened Mr. Coyne, actually took place and whether defendant was present. The fee details about phone calls "could have been used to impeach the witnesses who testified about outbursts heard after calls they assumed to be between Goodwin and his own or Thompson's attorneys." Once again, defendant offers no reason to assume these records would contradict, rather than substantiate, the witnesses' testimony.

### vii. *Locksmith records*

Detective Jansen testified that to the best of his recollection, the damages to the safe in the Thompsons' garage, mentioned in his notes, was created by the locksmith

when he opened the safe, rather than pointed out by the locksmith before he opened the safe. By the time of trial, defendant was unable to impeach Detective Jansen with the locksmith's records – which "presumably . . . would have noted the date of service and any damage the company had caused to a private individual's safe." This, too, is only speculation – both as to whether and how long any such records are kept and as to what they would have shown – not an affirmative showing of prejudice.

### viii. Allison Triarsi's diary

At the preliminary hearing in 2004, Miss Triarsi, the only eyewitness to the killings, testified that she kept a journal when she was very young "and wrote down the specific events which I ended up showing to a psychiatrist where I documented what I had seen." She said she had not located her journal when she first talked to Detective Lillienfeld in 1997, but had located it later, "I don't know, five years ago." She said her journal "gave me the evidence in my mind that these are the things that I saw." She testified the journal was at her parents' home, and the defense subpoenaed the diary after the preliminary hearing, but her mother told the defense she did not have it and had not seen it in years.

Defendant contends the loss of the diary was "extremely prejudicial," as the diary "likely effectively superseded her memory of the events themselves"; because of the prosecutor's delay, defendant was deprived of the opportunity to cross-examine Miss Triarsi using the diary, which "was crucial to his defense."[17] Defendant fails to identify any respect in which the diary might have been "crucial to his defense." At trial, defendant's counsel elicited that Miss Triarsi told Detective Lillienfeld in 1997 that "one or the other of the killers could have been white," whereas at trial she testified she did not know the race of the gunmen.

Again, any prejudice from loss of the diary appears quite speculative. The race of the killers was established with the testimony of other witnesses. Defendant relies on

---

[17] Defendant also claims that records from Miss Triarsi's school counselor were unavailable, and "might have shown Allison to be fantasizing," but his citations to the record do not show any attempt in the trial court to obtain these records.

*Ross v. United States* (D.C. Cir. 1965) 349 F.2d 210, 213-214 (*Ross*), where the court found a delay in prosecution prejudicial. There, the sole witness to a drug transaction was the undercover drug purchaser, who had no personal recollection of the transaction and testified based entirely on his notebook recording his drug transactions. The court found a purposeful seven-month delay between offense and arrest, a plausible claim by the defendant of inability to recall or reconstruct the events on the day of the offense, and a trial in which the entire case consisted of one witness's recollection refreshed by his notebook. (*Id.* at pp. 212, 215.) That is nothing like this case, where Miss Triarsi had an independent memory of the shooting, and others testified to hearing the same screams from the victims and to seeing the shooters as they escaped. (Cf. *Harrison v. United States* (D.C. 1987) 528 A.2d 1238, 1240-1241 [observing that precedential value of *Ross* was questionable in view of more recent authority].) In short, again there is only speculation that the diary might have contained something with which to impeach Miss Triarsi's eyewitness account of the murders.

### ix. Evidence of Mickey Thompson's gold purchase

According to the investigative notes of Detective Rene Laporte, Eric Miller, a friend of Mickey Thompson's, told police that the night before the murders, he heard Mickey Thompson say he had taken possession of $250,000 in gold. (The jury was told "a valuable item" in "a specific dollar amount," rather than $250,000 in gold.) According to counsel, federal law at the time required registration of such an acquisition with the Internal Revenue Service, but those records were purged in 1995 and unavailable to the defense. Defendant argues that if he had been prosecuted in a timely fashion, he would have had an opportunity to prove, in connection with his theory the murders occurred during a robbery, that Mr. Thompson purchased gold and it was unaccounted for after the murders.

This lost evidence might conceivably have been relevant. But there was no basis to believe that any gold Mr. Thompson might have purchased had been delivered to his residence, no suggestion how the shooters would have found out about Mr. Thompson's gold purchase, and no evidence of forced entry into the Thompson residence. So, while

66

the possible evidence of a gold purchase may have been relevant, the prejudice arising from its absence appears minimal.

### x. *Unavailability of witnesses*

Defendant identifies several witnesses, dead or otherwise unavailable by the time of trial, who might have provided relevant evidence, as follows.

### A. *Unidentified people involved in the Joey Hunter investigation*

A man named Joey Hunter was seen by several witnesses "hitchhiking frantically with a bicycle at a bus stop," about two and a half miles from the crime scene and less than an hour after the murders. The original investigators followed up and arrested Mr. Hunter, who failed polygraph tests regarding his involvement in the Thompson murders. Defendant says Joey Hunter "suddenly and inexplicably ceased to be a suspect," and by the time of defendant's prosecution, "people who were involved in the Joey Hunter investigation had died." (The Joey Hunter evidence was proffered by the defense (and excluded by the trial court) to establish that someone other than defendant arranged the murders (see pt. 9, *post*).)

This contention was not raised in the trial court, and therefore cannot be raised on appeal. In any event, defendant does not specify the nature of the testimony these unidentified individuals would have given if they had been available as witnesses, instead merely asking us to assume that an investigative decision not to pursue Mr. Hunter as a suspect was based on something other than lack of evidence. This is unvarnished speculation, and does not show prejudice.

### B. *Yacht broker William Redfield*

Mr. Redfield assisted defendant's wife in her search for a yacht and, according to defendant, would have testified she began searching months before the murders, and was expecting a distribution of JGA/Whitehawk funds that would cover all her expenses. Mr. Redfield would also have testified to the structure of the payments for the deposit on the boat, thereby explaining the prosecution's attempt to allege that $20,000 was not accounted for. (Defendant provides no citation to the record for this last point, but apparently is referring to testimony from Karen Stephens-Kingdon, who testified about

Ms. Goodwin's withdrawal of $20,000 from her account on March 16, 1988; Ms. Kingdon-Stephens could not trace this money, and testified it was likely a cashier's check or cash. Defendant pointed out that the yacht deposit consisted of checks for $11,000 and $20,000.)

This testimony is again hypothetical, but assuming its substance, it would have been relevant to the defense. Its absence, however, appears only marginally prejudicial. The parties stipulated to testimony from a bank employee that a letter from Diane Goodwin dated December 24, 1987, months before the murders, stated she was in the process of deciding which yacht she was interested in purchasing. And the point about expected distribution of JGA/Whitehawk funds to cover the yacht purchase has little significance, as the point of Ms. Stephens-Kingdon's testimony was that the JGA/Whitehawk investment was funded by assets belonging to defendant and Ms. Goodwin, not Ms. Goodwin alone. So overall, any prejudice was not substantial.

*C. Sable Reeves, the Thompsons' housekeeper*

According to defendant, witnesses testified the Thompsons left for work together every morning. (Defendant does not cite this testimony, and we have not found it, either.) Ms. Reeves, however, told police the Thompsons rarely drove in the same car to work together, Trudy Thompson was often at home alone when she arrived, and Mr. Thompson usually had already gone to work by 6:00 a.m. Ms. Reeves would also have been able to testify about whether valuables were missing.

We consider this testimony inconsequential. Even if Mr. Thompson typically left for work earlier than he did on the day of the murders, there is nothing to show the killers were not lying in wait at that earlier time. Nor is there anything to contradict the prosecution argument that the timing of the shooting was inconsistent with a typical residential burglary, where the perpetrators tend to choose times when the residents are likely to be absent. And hypothetical testimony about "whether valuables were missing" is completely speculative.

### D. Tom Villelli

Mr. Villelli was Baron Wehinger's stepfather. Mr. Wehinger testified, for the first time at trial, that Mr. Villelli and defendant discussed the price of hit men in 1984. In his preliminary hearing testimony, Mr. Wehinger did not mention the discussion of the price of hit men; he simply testified that he overheard defendant saying that "he would have Mickey Thompson taken care of if he lost his court battles with him." He also said this occurred two or three months before the murders, but then on cross-examination, when asked if the conversation occurred in 1987, said "I believe so," and then when asked, "Or '86?" Mr. Wehinger answered, "'86, it had to be earlier, yeah."

Defendant says that "Wehinger never indicated before trial the conversation had occurred in 1984 and [defendant] and Villelli discussed the price of hit men." Defendant says he was prepared to impeach Mr. Wehinger on his preliminary hearing testimony, because defendant was in the Bahamas during Christmas of 1987, but "by the time the defense became aware Wehinger was claiming Villelli had discussed hit men with [defendant], Villelli was very near death and unable to testify to rebut this claim."

Again, this is hypothetical testimony; we do not know whether Mr. Villelli would have rebutted or substantiated Mr. Wehinger's testimony. If we assume Mr. Villelli would have contradicted Mr. Wehinger, the loss of this testimony would prejudice defendant. But, after Mr. Wehinger's uncertainty at the preliminary hearing as to when the conversation occurred, defendant certainly could not count on impeaching Mr. Wehinger at trial with his Bahamas alibi for Christmas of 1987. So after the preliminary hearing in 2004, defendant had every incentive to interview Mr. Villelli, both about the date and the nature of the conversation, and apparently failed to do so. Given the speculative nature of Mr. Villelli's lost testimony, and the other extensive evidence of defendant's threats (such as Gregory Keay's testimony that defendant said "he would have [Mr. Thompson] wasted"), defendant was not unduly prejudiced by Mr. Villelli's unavailability.

69

### E. *Gregory Keay's mother (defendant's aunt)*

As just noted, Gregory Keay testified to a threat defendant made at a family gathering two or three months before the murders, to have Mickey Thompson "wasted." Dorothy Keay "could have testified to the date the gathering occurred, her son's lack of credibility and his bias against [defendant]." Again, this is nothing more than speculation, not an affirmative showing of prejudice

### F. *Charles Clayton*

Mr. Clayton was defendant's friend and financial advisor and, defendant says, "would have testified [defendant] always intended to pay the Thompson judgment . . . ." Mr. Clayton also structured the yacht purchase and could have testified to the circumstances surrounding the purchase and the couple's plans to live on the JGA/Whitehawk distributions.

Defendant does not tell us when Mr. Clayton died or why the information he had about the yacht purchase would not be available from other sources. Moreover, his testimony about defendant's intent to pay off the Thompson judgment based on any financial planning the two may have done together would be inconsequential, in light of the evidence from Dolores Cordell that defendant did indeed repeatedly express his willingness to accept settlement terms, only to renege at the last minute. Accordingly, any prejudice defendant suffered from the unavailability of Mr. Clayton's testimony was minimal.

### G. *Anne Clark*

Ms. Clark was a close friend of the Thompsons. After the murders, on February 15, 1989, she called into a television show that solicited tips about the murder. The "clue sheet" stated she "want[ed] to know why they didn't mention the drug deal. Mickey's sister [Collene] knew about a drug deal. [Mickey Thompson] had asked [Ms. Clark] to give him one million dollars. She does not know what for. Sheriff took over call." (The clue sheet also says, "cleared" and "no new info.") Detective Lillienfeld interviewed Ms. Clark in May 2002, and the report of the interview did not mention the

70

call to the tip line. When defendant sought to interview Ms. Clark, "her dementia was so advanced she no longer recognized anyone."

We fail to see any basis to conclude Ms. Clark had any information helpful to the defense; no prejudice was shown.

### H. Frank Gullett

According to defendant, Joey Hunter confessed his involvement in the murders to Frank Gullet, while they were both in jail after Mr. Hunter's arrest in late April 1988, when Mr. Hunter was a suspect in the murders. (Defendant does not cite to it, but we found in the record a search warrant affidavit that recounts a police interview with Frank Gullet, in which Mr. Gullet said that he asked Mr. Hunter if he was actually involved in the murders and Mr. Hunter stated, " 'Yes, but they can't prove it . . . .' ") If he had been alive at the time of trial, defendant says, Mr. Gullet "could have provided valuable testimony about Hunter's confession that would have supported [defendant's] attempt to present third party culpability evidence to the jury and impeached the investigation."

Defendant does not say what this "valuable testimony about Hunter's confession" was, or how it would support his attempt to present third party culpability evidence. (The trial court properly excluded defendant's third party culpability evidence (as we discuss in pt. 9, *post*), and indicated that "there is no evidence that Joey Hunter has any connection with this case.") Defendant has not shown prejudice from the loss of Mr. Gullet's testimony.

### xi. Memory loss of trial witnesses

Defendant cites the trial testimony of 12 witnesses who he contends "suffered memory distortion and loss prejudicial to defendant," forgetting details, including specific words defendant spoke and dates threats were allegedly made. These were as follows:

Dale Newman could not recall the exact words of the threat he overheard, and a police report was used to refresh his recollection. (Defendant tried to impeach his testimony that the threat occurred in the fall of 1987 by showing him a police report stating he said it happened in July 1986, but Mr. Newman insisted that he "certainly did

71

not" say that, and "[t]hat would have to be a typo on [the detective's] part or whatever," and "[r]egardless it was not correct.")

Bill Wilson could not remember to whom he spoke when he first called the police with information about the murders, and could not remember when defendant and Mr. Thompson became business partners. Nina Wilson could not remember the precise date of the dinner party at which defendant threatened Mickey Thompson, or why they had invited the Goodwins, or whether Detective Lillienfeld was the first detective she spoke to about the case.

Karen Dragutin could not remember which detective she spoke to in 1989, or details concerning television broadcasts about the murder and rewards offered, or the date or other details of the dinner at which she heard defendant threaten Mickey Thompson.

Baron Wehinger and Gregory Keay could not recall the dates of the threats they heard, so defendant could not investigate or impeach them and could not establish his whereabouts or find witnesses to testify the conversations never occurred.

Dolores Cordell, Jeffrey Coyne, and Karen Stephens-Kingdon all said "I don't recall" to various questions, the materiality of which defendant does not explain; he merely claims their failure to recall "would not have withstood scrutiny had the case been brought in 1989 or 1990." (Defendant's assertion that the prosecutors presented expert opinion on his financial wrongdoing "without regard to the facts" and "knew the original documents supplying the basis for these opinions were lost or destroyed years ago" is entirely unsupported by the record.)

Penn Weldon could not remember precisely when his conversation with defendant occurred, and he no longer had his appointment book.

Defendant also asserts that the passage of time and outside influences "no doubt" affected Allison Triarsi's memory of the incident, and that Detective Griggs could not recall the details of interviews that would have contradicted prosecution witnesses, "including [Detectives] Verdugo and Jansen," and was unable to authenticate his notes. As to Detective Griggs, defendant provides no information about or citations to the record explaining these asserted contradictions, and merely complains that Detective

72

Griggs did not recall entering the Thompson home to determine whether personal property was missing, and that Detective Verdugo was permitted to testify no property was missing despite the absence of his original notes on that issue.

Many of the memory lapses just described were inconsequential. All of them are speculative, in the sense that we are asked to assume that had memories been sharper, the testimony would have been more favorable – rather than more damning – to defendant. This falls far short of the affirmative showing of prejudice necessary to avoid murder charges. (*Nelson, supra,* 43 Cal.4th at p. 1250.)

In sum, for the reasons we have given, we cannot characterize the loss of witnesses, and the loss of evidence due to fading memory, in this case as more than minimally prejudicial to the defense. Almost all of the lost evidence or testimony defendant cites demonstrates only the potential for prejudice, rather than actual prejudice, and the trial court correctly concluded that it would be improper simply to assume the cited evidence would have been favorable to defendant.

### d.  The justification for the delay

The prosecutor's justification for the delay, certainly in the abstract, is strong. The state did not amass the necessary evidence for a successful prosecution until 2001, when the police learned that Ronald and Tonyia Stevens had seen defendant in the neighborhood with binoculars a few days before the murders. In the end, the question whether the 13-year delay in prosecution violated defendant's due process rights turns on whether there was malfeasance or negligence in the state's failure to obtain that evidence sooner. As *Cowan* tells us, a weak showing of prejudice would tip the scales toward a due process violation if the delay was purposeful, but "[i]f the delay was merely negligent," a greater showing of prejudice would be required to establish a violation. (*Cowan, supra,* 50 Cal.4th at p. 431.)

Here, the trial court concluded that it could not "fault anyone for the fact that it took so long to actually get enough evidence to file the case." Defendant contends otherwise, saying that the prosecution had "constructive knowledge" of the Stevenses'

73

information in 1988.  This is because the Stevenses called the police several times, telling them they had possible information about the murders.  Specifically:

On the day the Stevenses saw the car parked outside their home, Tonyia Stevens called the Temple City Sheriff's Department and reported a suspicious looking car, telling the police " 'I just want you to know in case anything happens that we have information.' "  A couple of weeks after the murders, a uniformed policeman at a roadblock stopped Tonyia Stevens and asked her if she had any information.  She testified:  "And I said, 'yes, I do' and I told him.  He says, 'Have you told the police?' and I said, 'Yes.'  He says 'Okay, go on then.' "  Ronald Stevens said he tried to report the incident to the police, "either three or four times, not long after the murder."  After talking to a friend, he called the Duarte Sheriff's Department, at about 9:00 p.m., and told the person who answered the phone that he thought he had some information on the Thompson murder.  Mr. Stevens was told a detective would call him, but no one did.  A couple of weeks later, Mr. Stevens called the Temple City Sheriff's Department "and left another message.  Same thing."  In addition, Mr. Stevens said:  "I think there was one or two other times that I called because I just, you know, tried to call someone.  But I don't remember the dates or times."

Despite these efforts by the Stevenses in 1988 to report their information, no investigator contacted Mr. Stevens about the incident until 2001.  Defendant contends the information was not "new" in 2001; "investigators had it in 1988 and ignored it"; and the information "is imputed to the prosecution," citing *Kyles*, *supra*, 514 U.S. at page 438.  *Kyles* is inapposite.  There, the court was discussing exculpatory evidence withheld by the government, and stated the well-established proposition that, under *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  (*Kyles,* at p. 437.)  Here, we do not have a *Brady* question of disclosure of exculpatory evidence.  Moreover, the police did not in fact obtain the Stevenses' information until 2001, so it can hardly be "imputed to the prosecution" as of 1988.

We do not know how or why the Stevenses messages to the police went astray, but they did. This is certainly not "malfeasance." It was an error, but we cannot necessarily characterize it as negligence. This was not a situation where the investigators received information that the Stevenses saw defendant at the scene, or had the license plate number of a suspicious vehicle, and then failed to follow up. Instead, unidentified police personnel apparently did not pass on telephone messages about information possibly relating to the murders. In a more perfect world, the investigators would have had the information sooner, but in fact they did not. So in the absence of a showing of prejudice considerably more significant than we have seen, the justification for the delay in prosecution – that the police did not have sufficient evidence to prosecute defendant until 2001 – plainly outweighs the prejudice. (See *Cowan, supra,* 50 Cal.4th at p. 436 [finding no evidence of negligence; "[r]ather, at worst the . . . Sheriff's Department simply erred when it failed to determine before 1994 that defendant's fingerprints matched the [crime] scene latent prints"].)

Defendant's other attacks on the investigation fare no better. He asserts that "discovery and testimony at trial indicate investigators did nothing during the periods 1990 through 1992, 1992 through 1995, and 1996 through 1997." But he cites nothing in the record to support this assertion, other than defense counsel's own argument to the trial court. And Detective Lillienfeld testified that Sergeant Yarborough of the cold case unit had the lead on the investigation after Detective Griggs retired. (See *Cowan, supra,* 50 Cal.4th at pp. 428, 436 [no active investigation from 1987 to 1994; court rejected defendant's claim the investigation was dormant during that period, as there was testimony that the supervisor of the unit was responsible for the case after the assigned detective left in 1987; "we will not second-guess the department's decision to allocate its resources in this manner"].)

Defendant also claims – citing only counsel's affidavit "on information and belief" seeking discovery of Detective Griggs's personnel file – that Detective Griggs did not focus on leads he should have followed. But counsel's declaration is not evidence of malfeasance or negligence. Nor is defendant's assertion that in 1988, four detectives

were re-assigned to other matters due to staffing requirements. (See *Nelson, supra,* 43 Cal.4th at p. 1256 ["[a] court may not find negligence by second-guessing how the state allocates its resources"].)[18]

Finally, defendant also argues that Gail Moreau-Hunter's information – that defendant had in effect confessed his responsibility for the murders – was not "new" in 1999, when Detective Lillienfeld located and interviewed her; that Ms. Moreau-Hunter "confirmed an interview" in January 1993 (the nature of which is not specified in defendant's brief or in the record); and that in any event Ms. Moreau-Hunter was "delusional." We need not linger long on these points, since Ms. Moreau-Hunter did not testify at trial, and it was the Stevenses' evidence that enabled the prosecutors to file the case. In any event, there is no evidence of police negligence in respect of Ms. Moreau-Hunter's testimony and, in the absence of any evidence of negligence or malfeasance, we will not second-guess the conduct of the investigation (*Nelson, supra,* 43 Cal.4th at p. 1256) based on speculation that somehow the police could have elicited the information from Ms. Moreau-Hunter earlier. The fact is, as the Court of Appeal in Orange County pointed out, these were new developments in the case.

---

**18** Defendant also characterizes Detective Lillienfeld's investigation as "grossly negligent." The investigative files he reviewed from 1988 contained an Arizona license plate number for a car which, defense counsel told the trial court, was parked in the driveway of a drug dealer (seven miles from the Thompson home) associated with Joey Hunter (who was then being investigated in connection with the murders). Defendant complains that, after the Stevenses told him the car in front of their house had an Arizona license plate, Detective Lillienfeld did not try to determine the make and model of the car that had been parked in the drug dealer's driveway. We fail to see the significance of this claim, as Joey Hunter had long since been abandoned as a suspect. To the extent defendant's claim is that Joey Hunter should have continued to be a suspect, there is no basis to suggest that is so. (See *Nelson, supra,* 43 Cal.4th at p. 1256 ["A court may not find negligence by second-guessing . . . how law enforcement agencies could have investigated a given case."].) And Detective Lillienfeld did attempt to trace the vehicle parked outside the Stevenses home, but could not find a vehicle that matched the best description he had (a 1973 Chevrolet Malibu nine-passenger station wagon).

### e. Summary

While most of defendant's claimed losses of evidence are speculative, we cannot definitively say that the passage of time resulted in no prejudice to defendant. But "[t]o avoid murder charges due to delay, the defendant must affirmatively show prejudice." (*Nelson, supra,* 43 Cal.4th at p. 1250.) Defendant's affirmative showing of prejudice was minimal. And we *can* definitively say – despite defendant's claims the delay in prosecution was "intentional" and "the real purpose . . . was to weaken [defendant's] ability to defend himself" – that there is not the slightest evidence of a deliberate delay to gain a tactical advantage. (See *id.* at p. 1256 [" 'Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' "].)

There is no doubt that 13 years is a long prearrest delay, but it was not a purposeful one. The bottom line is that the prosecutors concluded they did not have enough evidence to convict defendant until 2001. This is a strong justification for the prearrest delay. Errors in an investigation do not always amount to negligence, and they did not here. "It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra,* 43 Cal.4th at pp. 1256-1257.)

The court's summary in *Cowan* is apt in this case: "[T]he investigation of the . . . murders was not perfect; no investigation is. Like the trial court, however, we find no evidence that law enforcement or the prosecution deliberately delayed the investigation in order to gain a tactical advantage over defendant. Nor do we find evidence of negligence. Rather, at worst the . . . Sheriff's Department simply erred . . . . That being the case, balancing defendant's weak showing of prejudice against the strong justification for the delay [citation], we find no due process violation. Accordingly, the trial court did

77

not abuse its discretion when it denied defendant's . . . motion[] to dismiss due to prearrest delay." (*Cowan, supra,* 50 Cal.4th at p. 436.)

### 4. The *Pitchess/Brady* issue

Before the trial, defendant filed several motions seeking information from Detective Griggs's personnel file, under *Pitchess*, *supra*, 11 Cal.3d 531 and *Brady*, *supra*, 373 U.S. 83.

Under *Pitchess* procedures, on a showing of good cause, a criminal defendant is entitled to material information contained in confidential personnel records of a police officer. If good cause is shown, the trial court must review the requested records in camera to determine what information, if any, should be disclosed. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).) Under *Brady*, the prosecution is required to disclose favorable evidence to the defense.

Here, the defense sought material from Detective Griggs's personnel files, particularly information relating to his disability retirement, psychiatric evaluations and the like, as well as any other exculpatory or impeaching material within the meaning of *Brady*. The defense theory was that Detective Griggs was incapable of conducting a fair, competent and unbiased investigation; that his deficient investigation ignored other viable leads and suspects, particularly Joey Hunter; that there were complaints from Collene Campbell about his job performance; that all this led to a stress-related early retirement, and the disability he claimed substantially affected his judgment and credibility. The defense sought personnel files from both the sheriff's department and LACERA for the retired detective.

We need not describe the multiple motions and arguments on the *Pitchess* and *Brady* theories relating to discovery of Detective Griggs's personnel file. In the end, on May 23, 2006, the trial court ordered the sheriff's department and LACERA to produce any documents in the personnel files referring to the Mickey Thompson investigation for in camera review. Counsel for LACERA had brought LACERA's records, and left them with the court for in camera review, with a hearing scheduled for June 7, 2006.

(LACERA had destroyed all its files except for those relied on in granting Detective Griggs's disability retirement.)

On June 7, 2006, the court announced it had reviewed the entire file from LACERA, "and paper clipped and put post-its on the portions that I feel should be disclosed." That package was identified as "Court's Exhibit 1, LACERA *Pitchess/Brady*," and preserved for appellate review.

Also on June 7, 2006, the court briefly reviewed the personnel file materials provided by the sheriff's department, and observed it appeared there was nothing to be disclosed. But, to be certain, the court directed the custodian and her counsel to cull the file to eliminate material pertaining to the period before the murders, and to return with the remaining material for the court's in camera review. On June 16, 2006, the sheriff's department brought the personnel records for the period March 16, 1988, to March 23, 1993, and the court ordered certain of the documents disclosed to the defense, staying its order until June 29, 2006, to permit the sheriff's department to decide whether to seek writ review. Apparently no writ was sought.

The parties agree that this court should independently review the sealed transcripts of the hearings and related sealed personnel files, to ascertain whether the trial court properly exercised its discretion in identifying discoverable information. We have reviewed the sealed transcript of the in camera hearing at which the trial court described, on the record, the items in Detective Griggs's personnel file produced by the sheriff's department, and find no abuse of discretion. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1285-1286 [trial court directed that personnel file not be copied and inserted into the record, "but the court adequately stated for the record the contents of that file," citing *Mooc*, *supra*, 26 Cal.4th at p. 1229, for the principle that "in some circumstances it suffices for the court to 'state for the record what documents it examined' "].) We have likewise reviewed the in camera transcript and the confidential documents produced by LACERA and preserved for appellate review, and again find no abuse of discretion.

79

**5. Karen Stephens-Kingdon's Expert Testimony**

We have described Karen Stephens-Kingdon's testimony in part 7.a., *ante*, of the facts. In a nutshell, Ms. Stephens-Kingdon looked at thousands of financial records to determine the source and ultimate disposition of certain assets and funds, and opined, for example, that the yacht Diane Goodwin purchased in her own name was bought with funds that had been commingled for years, and that "funds that were originally commingled and invested end[ed] up going offshore or to purchase gold coins, cash or traveler's checks."

On appeal, defendant contends Ms. Stephens-Kingdon's testimony was inadmissible, principally because the testimony could not assist the jury in its fact finding and on relevance grounds. Defendant made the same arguments, unsuccessfully, at the preliminary hearing and when he moved under Penal Code section 995 to set aside the information after the preliminary hearing.[19] None of them has merit.

An expert may offer an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Mayfield* (1997) 14 Cal.4th 668, 766.) An expert is qualified if he or she " 'has sufficient skill or experience in the field so that his [or her] testimony

---

[19] Respondent contends defendant did not object at trial to the expert's testimony on the ground she was not qualified as an expert, and therefore forfeited those objections on appeal. It is true that, in his brief reciting his objections at trial, defendant implies he objected that Ms. Stephens-Kingdon "was not a qualified expert on the financial issues," and defendant does not identify any such objection in the record. But his argument on appeal does not address Ms. Stephens-Kingdon's qualifications as an expert on financial issues; it is directed to the content or nature of her testimony. To the extent respondent is contending that points raised in defendant's unsuccessful motion to set aside the information must be explicitly raised again at trial but were not, the record is not so clear. (Defense counsel told the trial court, "I don't think that necessarily means it required an expert," and "if they could prove it, then the jury could make up its own mind about what those assets transfers mean.") And the case on which respondent relies, *People v. Hawkins* (2012) 211 Cal.App.4th 194, 203-204, is not directly on point, holding only that an issue not raised in a Penal Code section 995 dismissal motion was not preserved for appeal. We will therefore address defendant's claims on their merits.

would be likely to assist the jury in the search for the truth.' [Citation.]" (*People v. Mayfield,* at p. 766.) We review a trial court's ruling permitting expert testimony for abuse of discretion. (*Ibid.*)

Defendant asserts the expert testimony was inadmissible because it "could not assist the jury in understanding the evidence and brought incompetent hearsay before the jury." According to defendant, Ms. Stephens-Kingdon "overstepped her 'expert' status," because the Evidence Code does not "authorize[] a witness to review documents not brought before the court and give an opinion regarding the defendant's purpose for his or his family member's financial dealings," or "to testify to the state of mind and intent of a defendant based on his wife's financial dealings." The expert "did not assist the jury in its fact-finding," because "she was in no better position than they were to evaluate the evidence concerning [defendant's] 'consciousness of guilt.' "

As we have seen, Ms. Stephens-Kingdon examined thousands of financial records and testified to the source and disposition of certain assets and funds. She did not testify to the defendant's purpose or state of mind or intent as to those transactions. She opined that assets originally purchased with commingled funds of both spouses were transferred to investments or purchases in the name of one spouse. This subject matter is sufficiently beyond common experience that the opinion of a qualified accountant and auditor would assist the trier of fact.

Defendant insists the expert testified to defendant's "state of mind and intent" based on his wife's financial dealings. To support his claim, defendant cites only the expert's testimony about the purchase of the yacht with commingled funds and contends that this testimony "draw[s] conclusions regarding motive." When asked if, as she had testified, funds were commingled as of January 1988, "what does that tell you, if anything, about [defendant's] interest in the boat transaction," the witness replied, "What I saw was that even though this boat was in Diane Goodwin's name, that it had been purchased with funds that had been commingled for so many years that this boat purchase was for both Mr. and Mrs. Goodwin." We reject the notion that the quoted testimony was tantamount to an opinion on defendant's motive, purpose, state of mind or intent. It

81

was simply a statement, consistent with the rest of the expert's testimony, on the source and disposition of assets – not on why the transaction was undertaken.[20]

Defendant also argues the expert testimony "brought incompetent hearsay before the jury," and the expert "did not bring to court any of the documents she reviewed . . . or about which she testified." Because defendant does not elaborate on these claims, we need not consider them. We do note, however, that the prosecutor questioned the witness with specific reference to a limited number of documents (as defendant admits) that were identified in court. And when the expert expressed opinions in reliance on specific documents, the trial court instructed the jury, during the testimony, that the "information referred to now by the witness is being offered not for the truth of what it says but just to show what the witness based her opinion on," and "she's explaining what her opinion is based on, but you are not to assume that the letters state what she says they state for the truth of the matter." Further, it is well established that an expert may base an opinion on reliable hearsay. (*People v. Harris* (2013) 57 Cal.4th 804, 847 ["Expert testimony in the form of an opinion may be based on hearsay or facts outside the personal knowledge of the expert."]; see Evid. Code, § 801, subd. (b) [expert opinion may be "[b]ased on matter . . . made known to [the witness], whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"].)

Next, defendant argues the admission of Ms. Stephens-Kingdon's testimony violated Evidence Code section 1523, subdivision (d). Section 1523, subdivision (a)

---

[20] Defendant asserts, erroneously, that *Kotla v. Regents of the University of California* (2004) 115 Cal.App.4th 283 is analogous to this case. In that employment termination case, the trial court erred in permitting a management expert to offer opinion testimony about whether certain facts were "indicators" of a retaliatory motive. (*Id.* at p. 286.) The appellate court found the opinions "about the significance of the evidence did not assist the jury in its factfinding process," and that the expert "was in no better position than they were to evaluate the evidence concerning retaliation. Absent unusual facts, it must be presumed that jurors are capable of deciding a party's motive for themselves without being told by an expert which finding on that issue the evidence supports." (*Id.* at p. 293.) As we have observed, Ms. Stephens-Kingdon did not testify about the motive for the financial transactions on which she opined.

makes oral testimony "to prove the content of a writing" inadmissible except as otherwise provided by statute. Section 1523, subdivision (d) provides an exception "if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole." Defendant cites no authority for his claim, and it has no merit. Section 1523 has nothing to do with expert testimony, and Ms. Stephens-Kingdon did not purport to testify "to prove the content of a writing." She testified about the documents she relied on in forming her opinions, and there was nothing improper in that testimony.

Finally, defendant contends Ms. Stephens-Kingdon's testimony was irrelevant, because "Diane[] [Goodwin's] financial transactions did not show a consciousness of guilt on [defendant's] part." Defendant fails to identify in the record any objection made at trial on grounds of relevance. (Defendant did object on this ground to Ms. Stephens-Kingdon's testimony at the preliminary hearing. The prosecutor explained that the testimony was relevant to the theory of "consciousness of guilt in the defendant attempting to flee the country," and the court found that "potentially the People have a relevant theory here.") In any event, the testimony was relevant. As the prosecutor put it at trial, the ultimate opinion he sought to elicit was "what [defendant] and Diane Goodwin were doing financially from the period of 1986 to the spring of 1988." And as the trial court stated, the prosecutor sought to show defendant "was engaged in . . . transferring of assets to avoid, I think the argument is, to avoid having to pay a substantial judgment, and this witness is competent to testify to whether or not she believes based on her review of these documents, whether or not that is what occurred." The claim of irrelevance is meritless.

Because there was no error in the admission of Ms. Stephens-Kingdon's testimony, we need not consider defendant's further contention that the error was prejudicial.

### 6. The Admission of Nancy Lucia's Testimony

Nancy Lucia (formerly Wilkinson) was permitted to testify to a statement Mickey Thompson made in September or October 1987 while Ms. Lucia was visiting the

Thompson home (pt. 2.*l.* of the recitation of facts, *ante*). Mr. Thompson came upstairs, out of breath and frantic, "almost kind of yelling, saying '[c]lose the window. Close the drapes. [Defendant] could have a sniper out there right now.'"

We review the trial court's ruling for abuse of discretion (*People v. Guerra* (2006) 37 Cal.4th 1067, 1140 ["we apply an abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence"]), and find none.

### a. The trial court's ruling

The trial court concluded Mr. Thompson's statement was not hearsay, because it was not being offered for its truth, and it was relevant "on the issue of the level of hostility that existed in this litigation. [¶] It's circumstantial evidence which would tend to corroborate the People's argument and the People's witnesses that this litigation was so vitriolic; this litigation was so intense and caused such animosity and hatred between the parties, that Mr. Thompson truly believed that because of the litigation he was involved in with [defendant], that his life was in danger. That's a non-hearsay purpose in my mind."[21]

The court elaborated: "[I]t is circumstantial evidence tending to corroborate the People's description of what they believe the motive was in this case. It's circumstantial evidence that the litigation got so out of hand and was so intense that there was a realistic belief on the part of Mr. Thompson that his life was in danger. [¶] Now, the reason I say that it's circumstantial evidence to show all of that is because it's not so important as to

---

[21]    The court said that, if the statement were being offered for its truth, "it would clearly be hearsay. And then the court would have to find it is [an Evidence Code section 1240 spontaneous] statement and that its probative value outweighs its prejudicial effect, all of which I can easily find. [¶] However, it's not being offered for the truth." Then, after elaborating on the admissibility of the statement as circumstantial evidence "tending to show that because of the animosity generated and the vitriolic nature of this lawsuit that [defendant] had a motive to murder these two people," the court said: "So my analysis is, assuming it's hearsay, it comes in under [section] 1240. Its probative value outweighs any prejudicial effect. However, I think the proper analysis would be that this is a non-hearsay statement not offered for the truth of the matter asserted. And the People can't argue that it's offered for the truth of the matter asserted."

84

what was said, if anything, by [defendant]. And I don't think Mr. Thompson attributes the statement to [defendant], but he is attributing a belief. And that belief has to be based on some fact or facts. [¶] And it appears to me that given the testimony I have heard so far, it's not unreasonable to conclude that Mr. Thompson, as a party to this litigation, was aware of and a participant in the goings-on between the sides. Therefore, he was aware of the fact that . . . the hatred generated by the litigation was rather intense. This statement was allegedly made [in] early fall, late summer 1987. So it's not that long before the murders. [¶] So for those reasons, I view it as a non-hearsay statement coming in for the value that it brings or demonstrates in terms of the level of hostility believed to have existed by Mr. Thompson; not being offered for the truth."

The court further ruled that the probative value of the testimony far outweighed its prejudicial effect: "It's extremely probative. And the prejudicial effect, quite frankly, we have heard nothing but statements from the People's witnesses attributed to [defendant] that he allegedly wants to kill Mr. Thompson. [¶] So the extent to which this is too prejudicial is nonexistent. It's simply the same kind of evidence that we have heard from just about every witness that has testified so far. So I do believe under [Evidence Code section] 352 the probative value is considerable. The prejudicial effect [is] minimal to nonexistent when taken in context with the other evidence. So I will allow it."

Defense counsel asked about a limiting instruction, and the court replied, "I was going to simply tell the jury what I'm supposed to tell them, which is this statement is not being admitted for the truth of the matter asserted, that is that [defendant] has some sniper standing outside the house. But it's being admitted as circumstantial evidence tending to show how the victim perceived the tenor of this lawsuit or this litigation." There was no further discussion until after Ms. Lucia testified two days later.

The court did not admonish the jury when Ms. Lucia testified, and later in the day inquired whether counsel wanted the court "to admonish them now or would you just simply like to include the admonition in a jury instruction?" After argument about the content of the admonition, defense counsel ultimately said: "Our request is that the admonition be that it's offered not for the truth of the statement, but for the state of mind

85

of the declarant. Period. And if that's not the admonition, then we are not requesting one." After more discussion, the court pointed out it would not admonish "that the People were offering it solely on the issue of the state of mind, because that would have been for the truth," and reiterated that it had ruled that the statement was "circumstantial evidence corroborating the level of animosity that existed between the parties in this litigation." The defense then stated, "we're not requesting the admonition," and the court stated: "All right. I'm not going to say anything then. And I stand ready, willing and able to do so when requested."

### b. Defendant's contentions

Defendant contends the court committed reversible error by admitting the testimony, claiming it was "irrelevant and prejudicial hearsay." We disagree.

Defendant argues at length that the trial court "erred by admitting evidence of Thompson's state of mind, offered under Evidence Code [section] 1250, because the evidence was irrelevant to [defendant's] motive."[22] This claim simply misstates the trial court's ruling, as well as the prosecutor's theory of admissibility. The evidence was not offered to prove Mr. Thompson's state of mind; the prosecutor explicitly said that "[w]e're not offering it under [section] 1250. We are offering it to prove another factor, which is that this litigation was not one of conciliatory settlement." And the trial court refused defense counsel's request to admonish the jury that the statement was being offered "on the issue of state of mind, because that would have been for the truth." Thus defendant's extended discussion of whether and when a victim's out-of-court statements expressing fear of a defendant are admissible, under section 1250, to prove the defendant's motive is entirely inapposite.

---

[22]     Evidence Code section 1250 provides that "evidence of a statement of the declarant's then existing state of mind . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind . . . at that time or at any other time when it is itself an issue in the action; or  [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (*Id.*, subd. (a).)

Defendant points out that a hearsay objection to an out-of-court statement "may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute." (*People v. Armendariz* (1984) 37 Cal.3d 573, 585.) The trial court did exactly that here.

When defense counsel suggested the defense was not arguing "that this litigation was anything less than hostile nor do we intend to," the trial court "[took] issue with the statement that you are not disputing the level of hostility." The trial court pointed out that the cross-examination of Dolores Cordell the previous day sought to show a settlement was in the offing, and "if the argument is that it's the lawsuit that caused [defendant] to form the intent to have the Thompsons or Mr. Thompson taken out, certainly that intent would be somewhat vitiated were one to assume that they were on the verge of a settlement just prior to the murders. Otherwise it would have no relevance."[23] And in an earlier discussion on the admissibility of the statement, the court observed that "the fact that the victim appreciated the level of hatred and contempt communicated by [defendant] to others" was "pretty potent evidence" that "tends to show that it existed," contradicting the defense position that defendant's statements to others were merely "blowing off steam." Similarly, the statement tends to corroborate Joel

---

[23]    In his reply brief, defendant disavows reliance on the argument that Mr. Thompson's statement did not qualify under Evidence Code section 1250's state-of-mind exception to the hearsay rule, contending his argument is that Ms. Lucia's testimony "was simply irrelevant." He then cites *People v. Jablonski* (2006) 37 Cal.4th 774 for the rule that a victim's out-of-court statements expressing fear of a defendant are relevant only when the victim's conduct in conformity with that fear is in dispute. But *Jablonski* was construing section 1250: " 'As our cases have made clear, "a victim's out-of-court statements of fear of an accused are admissible under section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. [Citations.]" ' [Citation.]" (*Jablonski,* at p. 819.) The prosecutor was clear: "[W]e could probably have 15 witnesses walk into the court . . . and say Mickey Thompson wasn't afraid of anything. [¶] We're not proposing this evidence to prove fear. We're proposing this evidence to prove the level of animosity; the level of vitriol in the litigation in general."

Weissler's testimony later in the trial that he heard defendant say, in late 1987 or early 1988, that he was "going to hurt [Mr. Thompson] and [his] family."

In short, Mr. Thompson's statement was not offered for its truth. It was offered for the relevant, nonhearsay purpose of showing Mr. Thompson believed the litigation with defendant was so vitriolic that he might carry out his threats to kill both Thompsons, which is circumstantial evidence of defendant's motive. And there was no abuse of discretion in the trial court's conclusion that the evidence was more probative than prejudicial. The record fully supports the trial court's observation that the prejudicial effect was "minimal to nonexistent," as it was "the same kind of evidence that we have heard from just about every witness that has testified so far."[24]

For the same reasons – the presentation of similar evidence from many other witnesses – any error in admission of Ms. Lucia's testimony would have been harmless beyond a reasonable doubt. While defendant describes the admission of the testimony as "extraordinarily damaging," particularly because of the reference to a sniper and because of the prosecution's "hit man" theory, several other witnesses testified to defendant's statements about having Mr. Thompson killed. In addition, there was no argument to the jury referring to the statement about a sniper. So, even if there were error in admitting Ms. Lucia's testimony – and we hold there was not – it was harmless.[25]

---

[24]   Defendant also argues the statement did not fall within the spontaneous utterance exception to the hearsay rule. (Evid. Code, § 1240.) While the trial court briefly referred to that theory of admissibility, it was not the basis for the trial court's ultimate ruling (see fn. 21, *ante*), so we need not consider the point.

[25]   Defendant points to the jury foreman's declaration that the jury "discussed that this statement was important in that it showed Thompson was in fear and that [defendant] was the source of that fear," and that Ms. Lucia "was one of fifteen witnesses who testified about threats," and "one of several witnesses regarding the threats that we deemed credible." As we observed earlier, statements such as these "concern[] the mental processes by which [the verdict] was determined" and cannot be used to impeach the verdict. (Evid. Code, § 1150, subd. (a); *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 58 ["Evidence of jurors' internal thought processes ordinarily is not admissible to impeach a verdict."].)

**7. Evidence of Defendant's Threats to Third Persons**

Under Evidence Code section 1101, evidence of a person's character or a trait of his or her character, including evidence of specific instances of his or her conduct, "is inadmissible when offered to prove his or her conduct on a specified occasion." (*Id.*, subd. (a).) But section 1101 does not prohibit the admission of evidence "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive [or] intent . . .) other than his or her disposition to commit such an act." (*Id.*, subd. (b); see *People v. Catlin* (2001) 26 Cal.4th 81, 145, 146 [section 1101 "recognizes . . . that there are facts other than criminal propensity to which other-crimes evidence may be relevant"; "[t]he categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but . . . the list is not exclusive"].)

"On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

Defendant challenges the trial court's admission of four instances of testimony from four different witnesses, claiming that the testimony in each instance was forbidden by Evidence Code section 1101. He also claims the testimony was inadmissible under section 352, because its probative value was substantially outweighed by the probability that its admission would "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) The admission of this evidence, defendant contends, violated his due process right to a fair trial "because it allowed the jury to find him guilty of two murders because of the person he was, rather than what he actually did."

We see no abuse of discretion in the trial court's rulings. In each case, the evidence consisted of statements by defendant that the trial court correctly viewed as

89

admissions,[26] and they were offered to prove defendant's motive or state of mind, not to prove his disposition to commit murder. Nor was there any error in concluding the evidence was more probative than prejudicial. The disputed evidence was as follows:

Charles Stewart Linkletter was permitted to testify to a "diatribe" he heard, while defendant and Mr. Thompson were negotiating their business agreement, in which defendant said "he was going to screw Mickey out of his business" and "rip him off." (See fn. 2, *ante.*) Then defendant told Mr. Linkletter, "Stew, if you ever say a word about this conversation to anybody, I will fucking kill you."

Defense counsel argued this evidence "bears no relevance to the murder," and "[i]t's simply to say that [defendant's] a bad guy." The trial court disagreed, observing that "the People's case rests primarily on the fact that they believe that there was a motive on the part of [defendant] to do harm to the Thompsons, or Mr. Thompson, because of a business dispute gone bad leading to a judgment." And: "[t]his conversation, though, is specifically with reference to the partnership agreement which formed the basis of a lawsuit. So I think it's – I don't see it as character evidence. I see it as relevant and an admission on the part of [defendant]. And it tends to show his state of mind with respect to his business dealings with Mr. Thompson. [¶] In addition, the fact that he makes a threat, allegedly, to Mr. Linkletter, I can't imagine that that's being offered by the People as [section] 1101 evidence to prove since he made the threat to someone on that occasion, therefore, he made a threat . . . with respect to this occasion, the 1987/'88 litigation."

The court summarized, repeating that the defendant's statements Mr. Linkletter overheard were "certainly relevant with respect to his state of mind, which if one were to believe the statements that he fully intended to rip off Mr. Thompson, which is similar to the claim, I guess, in the litigation that was pending at the time. [¶] So I do see its relevance and I don't see it as too prejudicial. I don't think the People are offering it to

---

[26] "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." (Evid. Code, § 1220.)

prove conduct in conformity with a character trait. I think they're offering it for a permissible purpose that does not violate [Evidence Code section] 1101, [subdivision] (b)."

In addition, defendant objected to certain of the testimony of Penn Weldon and Jeffrey Coyne. Penn Weldon was a private investigator; in addition to testifying that defendant said Mickey Thompson "had ruined his life and he wanted to get even with him," Mr. Weldon testified defendant wanted him to place listening devices in the home and cars of Phillip Bartinetti (Mickey Thompson's attorney). (See pt. 2.g., *ante*, of the facts.) Jeffrey Coyne was the bankruptcy trustee who was marshalling the assets of the bankruptcy estate; he testified about threats defendant made to him a few weeks before the murders, after a meeting at which Mr. Coyne had refused several demands defendant made relating to payments to and from the bankruptcy estate. (Defendant, trembling and in a "black rage," said, "You better lighten up or things will get bad," and "If you fuck up my life, I'll fuck up yours.")[27]

The trial court said, as to Mr. Weldon's testimony, that "there was an established relationship between Bartinetti's law firm; Bartinetti himself with the Thompsons. I mean, I don't know how you separate them. Being angry at Bartinetti is certainly relevant on the issue of one's anger about the lawsuit which is the stated motive for the murders. So I don't have a problem with it." Defendant does not cite any specific comments by the court as to Mr. Coyne's testimony, but the prosecutor argued that the same animosity defendant felt for Mickey Thompson was extended to both Mr. Coyne

---

[27]   In his brief, defendant states that Mr. Coyne "told the jurors he was so afraid of [defendant] he got a bullet-proof vest and a concealed weapons permit." There was no such testimony before the jury; in a discussion of Mr. Coyne's prospective testimony, the prosecutor told the trial court that the bankruptcy court had approved an application by Mr. Coyne for a bullet-proof vest and handgun. Mr. Coyne did testify that the threats defendant made to him had an impact on his decision to resign as trustee: "Those statements in conjunction with the deaths of Mickey Thompson and his wife Trudy, left me in a place where I could not objectively work with this estate. I was so angry and so upset as to have no ability to continue to be fair or even in my own framework be justified in continuing to do things that required objectivity."

and Mr. Bartinetti. The court observed: "[t]he argument is that the defendant made certain statements which circumstantially tend to indicate that he was going to cause harm to Mr. Thompson and did, in fact, cause the death," and "[w]e're talking about statements that were made to everyone, . . . including Penn Weldon," and "these are all statements of [defendant]. And as such, they would qualify as admissions. They tend to indicate when taken with other evidence, that he was responsible – [¶] . . . [¶] . . . – for the crime."

And finally, Lance Johnson, a friend of the Thompsons, testified to a threat he heard defendant make, years after the murders, to Mickey Thompson's sister: "You're going to get yours, bitch." The court said the statement was "clearly an admission on the part of the defendant. And it tends to show either he is, in fact, the one that is responsible for the death of Mr. Thompson and his wife. Or because of being accused of that, he finds Mrs. Campbell to be the responsible party and now wants to threaten her, which is consciousness of guilt. [¶] . . . The fact of the matter is it is a statement. It's probative. The prejudicial effect is minimal because this whole case has been basically statements of the defendant."

Defendant argues that "hostility toward people other than Thompson did not prove anything related to the murders," and in any event the relevance of the testimony was outweighed by its prejudicial effect. We see no abuse of discretion in the trial court's contrary conclusions on both points. We have just described the court's analysis in some detail, and that analysis is sound. And even if the testimony were analyzed as evidence of "prior offenses" that may not be introduced "solely to prove criminal disposition," such testimony "may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People . . . ." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332.) That is the case here.

In each instance, the testimony described a statement by defendant that was highly relevant to prove the extreme level of hostility defendant harbored toward Mr. Thompson, supplying defendant's motive for the murders. The testimony was not cumulative because each witness testified to different circumstances in which defendant

92

effectively expressed his extreme hatred of Mr. Thompson, sustained over time, either directly or toward those who allied themselves with Mr. Thompson's interests and opposed defendant's efforts to avoid paying the Thompson judgment. There was nothing in the testimony to "confuse[] the jury"; nor was any of the cited testimony significantly more inflammatory than the rest of the evidence. In short, there was no error and, as necessarily follows, no due process violation.[28] (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].)

## 8. Character Evidence – Mickey Thompson

Defendant objected on relevance grounds, and in one instance on "character evidence" grounds, to a number of questions posed by the prosecutor to several witnesses. On appeal, he argues the trial court prejudicially erred by permitting "irrelevant evidence of Thompson's good character," and the court "acted contrary to law – specifically contrary to Evidence Code [section] 1103" when it admitted the evidence. We find no merit in defendant's contentions.

Only relevant evidence is admissible (Evid. Code, §§ 210, 350), and the trial court "lacks discretion to admit irrelevant evidence." (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) Evidence is relevant if it " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*Ibid.*) In a criminal action, evidence of the character of the crime victim "is not made inadmissible by Section 1101" – which prohibits character evidence to prove conduct on a specified occasion – if it is offered by the defendant "to prove conduct of the victim in conformity

---

[28]    Again, defendant cites the jury foreman's declaration stating the jury discussed "the character evidence that had been offered against [defendant]," and that "certain witnesses clearly painted [defendant] as a good and honorable fellow and [defendant] as just the opposite." The "bad character" of defendant was "very evident from the testimony of these witnesses," and "we could not escape the reality that, coupled with his overtly stated hatred of Mickey Thompson, this guy was the kind of guy who was capable of coordinating this event." These statements cannot be used to impeach the verdict. (See fn. 25, *ante*.)

with the character or trait of character," or if it is offered by the prosecutor to rebut such evidence adduced by the defendant. (§ 1103, subd. (a).)

We preface our discussion by noting that Evidence Code section 1103 has no application here. No evidence was offered or admitted to prove any conduct by the victim in conformity with his character. The only issue is the relevance of the testimony to prove something other than the victim's character (which *is* irrelevant). Defendant's claims of error are as follows.

First, William Wilson, who had worked with both Mickey Thompson and defendant on various sports promotions and who had both a professional and social relationship with Mr. Thompson, was permitted to testify about Mr. Thompson's deep affection for his wife, over a defense objection that the question "calls for character evidence" and relevance. Mr. Wilson recounted that at their first dinner together, "all [Mr. Thompson] could do was talk about Trudy; about how much he loved her; the light of my life. And he got her a '10' necklace that she wore on her neck with diamonds. And he just glowed. You could just tell the man was tremendously in love with Trudy."

Mr. Wilson's testimony about Mr. Thompson's love for his wife was not irrelevant evidence of his character. It was relevant evidence supporting the inference that the shootings were planned in such a way as to force Mr. Thompson to watch his wife being murdered. In his opening statement, the prosecutor told the jury he would prove that Mickey Thompson was "kept alive" until he could see his wife being executed. And Allison Triarsi gave testimony lending support to that theory, stating that one of the gunmen held Mr. Thompson at bay as he pleaded for his wife's life and while the other gunman shot Trudy Thompson. The nature of the Thompsons' relationship was a material point, as the evidence at the murder scene suggested both Thompsons were targeted for killing, while defendant's acrimony was directed at Mr. Thompson, not at Trudy Thompson. Testimony showing that Mr. Thompson's devotion to his wife was apparent to his colleagues was thus relevant to show the motive for murdering Trudy Thompson.

94

Second, Gregory Smith, the Anaheim Stadium executive who stopped doing business with defendant and hired Mr. Thompson and another company to produce the stadium's motor sports events, testified that it was critical that the promoters they hired be cooperative in promoting each other's events. After the witness explained how Mickey Thompson met that criterion, defendant objected, on relevance grounds, to the question, "Was he [(Mr. Thompson)] easy or difficult to deal with on a business level?" Mr. Smith was thus permitted to testify that "Mickey Thompson was a very easy, very honorable man to deal with."

Mr. Smith's testimony was not irrelevant evidence of Mickey Thompson's character. It was relevant evidence explaining why Anaheim Stadium chose to do business with Mr. Thompson and not with defendant – a decision that angered defendant, and was part and parcel of events explaining the development of defendant's extreme hostility toward Mr. Thompson.

Third, Philip Bartinetti, Mr. Thompson's lawyer, testified that he came to know Mr. Thompson as more than a client. Over a defense objection on relevance grounds, Mr. Bartinetti was allowed to testify that their relationship "became a very good friendship." After a discussion at sidebar where defense counsel objected that the prosecutor was trying to elicit good character evidence, the prosecutor said he would end his examination by asking Mr. Bartinetti where and when he found out about Mickey Thompson's death. A defense objection on relevance grounds was overruled after the prosecutor pointed out that Mr. Bartinetti continued to represent the estate after the murders. Mr. Bartinetti then answered that he was getting ready to go to work and heard about the murders when he received a phone call between 8:00 and 9:00 on the morning of the murders.[29]

Defendant does not explain how Mr. Bartinetti's testimony could be "irrelevant evidence of Thompson's good character," since the testimony had nothing to do with Mr. Thompson's character. In any event, the testimony about the friendship was relevant

---

[29]     Defendant says Mr. Bartinetti testified that the phone call was from Collene Campbell, but that testimony was stricken from the record.

95

in the context of other evidence the prosecutor later elicited to show that defendant's rage against Mr. Thompson was so extreme that it extended to his friends and allies. (See pt. 7, *ante*.)

Of course, relevant evidence may be excluded if its probative value is substantially outweighed by the probability that its admission will "create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) Defendant says it is "hard to imagine more prejudicial facts than that [defendant] – who was known for being loud, obnoxious and abusive – was allegedly responsible for the brutal murders of two such beloved individuals," and that the prosecutor "unfairly set up a good guy / bad guy dichotomy." This is mere hyperbole. "Evidence is prejudicial within the meaning of . . . section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' . . . or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " (*Cowan, supra,* 50 Cal.4th at p. 475, citations omitted.) None of the evidence cited falls into that category.

The final claim defendant places in his list of "irrelevant evidence of Mr. Thompson's good character" involves a photograph of the victims that was introduced, without objection, for identification purposes. On the first day of testimony, during the afternoon session beginning at 1:30, defense counsel presented her opening statement, after which the prosecution called its first witness, William Wilson. Just before Mr. Wilson testified, a photograph of the victims was marked for identification, and Mr. Wilson identified the victims and testified he knew them personally.

Defendant complains that the prosecutors left the photograph on the projector for the jury to see "during the entire first day's proceedings" (a clear exaggeration), and that it was "misconduct" to display a sympathetic photograph to the jury "long after the purpose of the display had been satisfied." But the trial court could not see the display from the bench, and defense counsel did not object until the following day. The trial court pointed out that the controls to the projector were "right there," and one of defendant's attorneys indicated that he had eventually covered the projector.

96

But defense counsel told the court "it's bad form to do it in the first place, and they know it," and asked the court "to admonish them that . . . we're all aware that this was a trick that happened yesterday and ask that it not be repeated." The court said, "I can't say it was a trick," and that the simplest thing for defense counsel to have done was to ask, "Can we approach?" Defense counsel responded that, if she had done so, the photograph would have been removed and "it would have been quite obvious that we objected to this nice family photo being up in front of the jury." When the court then asked what defense counsel wanted the court to do, counsel said, "Nothing. We've had the discussion. That's all I was asking." The court reiterated that it could not do anything unless something is brought to its attention, "[a]nd I think either counsel can hit that kill switch [to turn off the projector]. . . . So, I mean, that's – it's there. I don't have access to it, but you do."

The nature of defendant's claim of error on this point is unclear, but it is clear there was no error. The photograph was properly admitted for identification and thus was not "irrelevant evidence of good character." The trial court cannot correct a problem of which it is not made aware, and there was no showing of deliberate prosecutorial misconduct, prejudicial or otherwise. (See *People v. Harrison* (2005) 35 Cal.4th 208, 242 ["A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' "].) Nothing of the sort occurred here.

## 9. The Exclusion of Evidence Claimed to be Exculpatory

In *People v. Hall* (1986) 41 Cal.3d 826, 829 (*Hall*), the Supreme Court "reaffirm[ed] the admissibility of any relevant evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that a party other than the defendant committed the offense charged. Such evidence may be excluded only when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury."

"To be admissible, the third-party evidence . . . need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 517 (*Abilez*) ["A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it."].)

Defendant contends the court denied him due process by excluding evidence of third party culpability found in Los Angeles Sheriff's Department investigative files on the Thompson murders. We disagree.

### a. Defendant's third party culpability theory

Defendant proposed to show that a man named Dean Kennedy ordered the Thompson murders, and they were committed by John Young (a very tall, athletically built black man) and Kit Paepule (a dark-skinned, very stocky man of Samoan descent). The theory was that Kennedy ordered the Thompson murders at the instance of a man named Larry Cowell, who had a motive for having the Thompsons murdered.

Cowell's motive for murdering the Thompsons stemmed from Cowell having killed Scott Campbell (Collene Campbell's son and Mickey Thompson's nephew). Scott Campbell was a drug dealer who in 1979 was convicted of manslaughter in the killing of another drug dealer who had ties to the Vagos motorcycle gang. Cowell, who owned an auto repair shop for Pantera sports cars (a type of expensive sports car that Scott Campbell owned) had been a friend of the Thompson and Campbell families for years.

In 1982, Scott Campbell, who was then the target of an investigation of interstate transportation of cocaine, arranged for Cowell to fly him in a private plane to North Dakota in connection with an anticipated cocaine sale. Before the trip, he left his Pantera

at Cowell's shop for repairs. During the flight, Cowell and Donny DiMascio killed Scott Campbell and threw him out of the plane. The primary motive was robbery, but DiMascio was a known Vagos motorcycle gang associate, and the Vagos gang had been threatening Scott Campbell since the 1979 killing.

Mickey Thompson testified at Larry Cowell's first trial for the murder of Scott Campbell. Cowell had tried to fabricate an alibi for the murder by leaving telephone messages for Scott Campbell (while he was missing during the weeks after the murder); the messages said Campbell's car was ready to be picked up after extensive repairs. Mr. Thompson testified that he and the police went to Cowell's shop, and Mr. Thompson saw that the car was in pieces and missing major parts (as defendant puts it, "the car had not been repaired at all – ruining the alibi"). Cowell was convicted, but the conviction was overturned based on a coerced confession, and Mickey Thompson was killed before the second trial (at which Cowell was again convicted).[30]

The theory continues: Cowell, who thus had motive, was a close friend of Ed Losinski (who owned a Pantera and used Cowell's repair shop). Losinski was an engineer and mason who had also known Mickey Thompson for years, had worked on the Thompson property and would know the neighborhood. Ed Losinski was also a good friend of Dean Kennedy, whom he had met through the boat racing community; they both had shops in the same area. Dean Kennedy, in December 1987, ordered two other murders; he sent John Young and Kit Paepule to kill a drug dealer named Thomas Wilson (and his girlfriend if she were present), and a week later hired Young to kill Jerome Genoway (who was being investigated for drug dealing) and the woman who lived with him (if she was present). Kennedy's alleged motive for having Wilson killed was that he had burglarized Kennedy's home and was "disrespectful," and his motive for having Genoway killed was to avoid paying money he owed Genoway. In taped conversations

---

[30]    Respondent points out that Mr. Thompson's testimony was not critical. He testified that he saw the car at Cowell's shop, missing major parts that were necessary for operation of the car, but that occurred a year after Scott Campbell's murder.

between Kennedy and a drug-smuggling friend, Kennedy said he was not worried about doing time for the Wilson and Genoway murders, because he had a friend who was willing to take the fall for him in return for cash. (Kennedy was convicted of these murders and was in custody at the time of the Thompson murders.)

In addition: Richard Passmore, a neighbor of the Thompsons, saw a maroon Volvo with two athletic-looking African-American men unloading bicycles within a couple of blocks of the murder scene a day or two before the murders. Larry Shaleen, a close friend of Dean Kennedy, saw John Young (one of Kennedy's hit men) driving a maroon Volvo in the past. Shaleen visited Kennedy just before Kennedy was arrested, and noticed two brand new 10-speed bicycles in Kennedy's garage, when Kennedy was too overweight to ride a bicycle. (Two of Kennedy's neighbors, Linda Osborne and Kathy O'Neill, also saw the bikes, and they heard Kennedy brag about knowing Mickey Thompson "and about knowing the killers of Mickey Thompson's nephew Scott Campbell.") Hit man John Young "bears an uncanny resemblance" to the composite drawings made of the men who killed the Thompsons, and his companion Kit Paepule habitually wore a hooded sweatshirt, as in the composite drawing of the stockier shooter. (Linda Osborne and Kathy O'Neill also thought the composite drawing of the Mickey Thompson shooter was John Young.)

Finally, the defense also sought to introduce evidence to show "that a local drug user named Joey Hunter was their lookout for this crime." (We have referred to some of this evidence in pt. 3.c.x.A. & H., *ante*.) Five witnesses saw a white man "hitchhiking frantically" with a bicycle at a bus stop, about two and a half miles from the crime scene and shortly after the murders. Two of those witnesses identified Mr. Hunter from a photographic lineup. (The others identified someone other than Hunter, or said the person they saw was not in the photographs they were shown.) Mr. Hunter was arrested. He failed polygraph tests regarding his involvement in the Thompson murders, and told a fellow inmate that he was involved in the murders. He also confessed his involvement to his cousin, Bonnie Dalton, telling her he was not worried about doing hard time, because he worked for someone who promised him that if he took the fall he would only get two

years and would get $50,000.[31] (The defense points out that Dean Kennedy similarly said, as noted above, that he had a friend who was willing to take the fall for the Wilson and Genoway murders in return for cash.)

In sum, the defense intended to show – "through the testimony of Larry Shaleen, Richard Passmore, Linda Osborne, and Kathy O'Neill," as well as through the testimony of the two detectives who investigated the Wilson and Genoway murders – "that Dean Kennedy and his hit men were responsible for the death of Mickey and Trudy Thompson." And the defense also intended to show that Joey Hunter was their lookout.

### b. The trial court's ruling

The court ruled that the connection "between Kennedy and Larry Cowell coupled with presumably the two hit men . . . all of that I don't see any connection. . . . It certainly made for interesting reading . . . . But I don't see even a remote theory here of relevance."

As for the Joey Hunter evidence, the court observed that "if, in fact, there are two witnesses who put Joey Hunter at the scene and there are statements by Joey Hunter which can be construed as confessions or admissions at that point, perhaps there is something relevant." Defense counsel then confirmed its offer of proof as stated by the court, and further that Joey Hunter's statement to Ms. Dalton about being paid $50,000 to take the fall was "a connection in and of itself to Dean Kennedy who indicated the exact same plan." The court responded, "it could be. But so it's so tenuous, I don't see this."

---

[31]    The prosecutor argued the confession to Hunter's cousin, Bonnie Dalton, was unreliable. The prosecutor explained that, before Hunter was interviewed by the police (but after he was aware of the police's interest in him), Ms. Dalton asked him if he murdered the Thompsons, "to which he replied that he did not. Hunter then sarcastically said 'I did it, Bonnie, I killed them.' When she did not respond, he then started laughing and said 'Ha, ha, you believe me, don't you?' Dalton then told Hunter that he was 'full of shit,' and the conversation ended." And on the day before Hunter went to the police, "he got drunk and began rambling. Hunter told Dalton that he was the man on the bicycle and that the killers were not black but white men spray painted black. He also said that the Mafia wanted him to turn himself in, and that he would only get two years in prison. He said that the Mafia would pay him $50,000 for his time in jail."

101

Defense counsel replied that "when you combine all of them" – referring to John Young driving a maroon Volvo and bicycles at Kennedy's house when he could not ride them – with Kennedy, who committed other horrific murders "very similar" to the Thompson murders, "then the relevance comes. [W]hat we're failing to do is put them all together."

The court said "[t]here is a reason I can't put them all together because the connection or the links that you refer to are really tenuous. I just don't see any connection whatsoever between [the other contract murders] with this case." "[I]n terms of relevance, I don't see it. . . . What I am willing to say at this point is there may be some relevant information with respect to the Joey Hunter connection."

The court then invited counsel to "[t]ell me how under [Evidence Code section] 352, the weighing and balancing, would dictate that I allow that information to come in. Because it does require the testimony of two witnesses who will say that was him. It does require that the cousin will attribute the two statements to him which could tend to incriminate him. But I can't draw any other inferences from any of that. So I'm left with a perhaps on Joey Hunter."

The prosecutor argued defendant could not show the hitchhiker was relevant to the murder, that it was unlikely Joey Hunter was the hitchhiker, Joey Hunter had an alibi, his statements to his cousin were "asinine remarks," and his alleged confession to deceased inmate Frank Gullet was inadmissible. The tenuous nature of the evidence surrounding Mr. Hunter was "no better than the other 1300 clues that we've had saying I know the white guy on the bicycle."

The court asked defense counsel if Joey Hunter could be connected to the crime scene, since the defense theory was that he was a lookout, not one of the perpetrators. Counsel said that two witnesses said the shooter at the bottom of the driveway "could have been white." Also, counsel had spoken to the person who gave Mr. Hunter an alibi, and if that person were to testify, he would say he had no recollection whatsoever. One of Trudy Thompson's several broken-off acrylic fingernails was found east of the driveway where her body lay, and counsel said this was circumstantial evidence she had

102

run out of the driveway and then turned back because someone was standing on Woodlyn Lane, and that person would have had to be white to avoid attracting attention.

The court then said that "it just boils down to what I seem to think potentially might have relevance is Joey Hunter.  But, again, that depends on a connection between Joey Hunter and the crime scene.  And I'm not hearing it."  The court concluded that "whatever relevance the information regarding Joey Hunter might have, at this time I can't say that that relevance outweighs the undue consumption of time; confusion of the issues; and the potential for prejudice.  But primarily the undue consumption of time and the confusion of the issues.  [¶]  . . .  I'm not finding that connection which I would like to see.  So I'm not foreclosing this forever.  I'm just saying right now I agree there is some evidence to suggest that at least according to Bonnie Dalton that this Joey Hunter had admitted some responsibility for the murders.  [¶]  Other than that . . . there are then two potential witnesses . . . who place Joey Hunter perhaps a few miles away hitchhiking with a bicycle.  At this point, I just don't have that missing link.  [¶]  If . . . any of the witnesses that I hear at the trial refer to an individual who appears to match the description of Joey Hunter as a look-out, I'm certainly willing to change my mind.  But at this point, I think it has marginal relevance.  And the other side of that, under [Evidence Code section] 352, just overwhelms and outweighs the marginal relevance I think it has."

### c.  Conclusions

We see no abuse of discretion in the exclusion of the proffered evidence of third party culpability.

*Hall* is quite clear, and we repeat:  "[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.)

As to the theory that Dean Kennedy ordered the murders, there was no link at all between him and "the actual perpetration of the crime."  To recap:  The only third person identified with a conceivable motive was Larry Cowell, who may have wanted to prevent

103

Mickey Thompson from testifying at his second trial. But there was no connection between Cowell and Kennedy, except (1) they were both friends of Ed Losinski, who was familiar with the Thompson neighborhood, and (2) two of Kennedy's neighbors said that Kennedy said that he knew Scott Campbell's murderers (of whom Cowell was one). But evidence – even if it were not inadmissible hearsay – that Kennedy knew Cowell does not by any stretch of the imagination create a link to the Thompson murders. (According to the prosecutor, in January 1998 Kennedy was specifically asked if he knew Cowell, and confirmed he did not.) And except for the hearsay statement from Kennedy's neighbors (that he bragged that he knew Mickey Thompson), there was no evidence linking Kennedy himself to the Thompsons, much less to their murders. In addition, both Kennedy and Cowell were in custody, in separate facilities in different parts of California, when the Thompsons were murdered. In short, under the *Hall* requirements, the Dean Kennedy evidence was plainly not relevant. (*Hall, supra,* 41 Cal.3d at p. 833; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1018 ["Quite apart from the obvious hearsay problems, defendant's proposed evidence did not . . . link any third person to the commission of the crime."].)

As to the theory that Joey Hunter was the lookout, there was likewise no abuse of discretion in the court's exclusion of defendant's proffered evidence. Mr. Hunter himself had no motive to murder the Thompsons; defendant showed no connection of any kind between Joey Hunter and Larry Cowell or Dean Kennedy or Ed Losinski or Kennedy's two hit men for the other contract murders; and there is no evidence Joey Hunter was at the crime scene. And, as respondent points out, the actual perpetrators of the Thompson murders made their escape from the scene in minutes over a bike route leading to quick freeway access – so even if Hunter was correctly identified as the man "frantically hitchhiking" with a bicycle, two miles from the murder scene and an hour later, it is hard to see how he could have been part of the conspirators' plan for the Thompson murders. So in the end, in light of the lack of any evidence linking Joey Hunter to the crime scene, only his own statements to his cousin (see fn. 31, *ante*) and to deceased inmate Frank Gullet (see pt. 3.c.x.H., *ante*) provide any kind of connection to the "actual perpetration

104

of the crime." Under these circumstances, the court did not err in finding that under Evidence Code section 352, the undue consumption of time and confusion of the issues "just overwhelms and outweighs the marginal relevance" of the Joey Hunter evidence.

Having failed to show any link between the Dean Kennedy/Larry Cowell evidence and "the actual perpetration of the crime," or between Kennedy or Cowell or anyone else and Joey Hunter, defendant asserts that it was error to evaluate the evidence "solely under the third party culpability standard" required by *Hall*. This is because "the point of this proposed evidence was not to show that a specific third party was guilty of the offense charged," as in *Hall*, "but rather to show the investigators were given information about Joey Hunter and other likely suspects and did not even pursue it." Because of this "failure to pursue other leads," defendant says, it is "unreasonable" to require him to comply with *Hall* by presenting evidence that links those other suspects to the crime. The exclusion of "the proposed evidence of what the police failed to do when investigating the Thompson murders," he says, violated his due process rights; that evidence "would have helped prove what defense counsel identified as the central issue of [defendant's] defense: if evidence did not point to [defendant], then investigators would not look at it." The Los Angeles Sheriff's Department investigators "could have been questioned about the information in their investigative reports," which were "[t]he sources of most of the evidence that other people committed the Thompson murders . . . ."

We note first that the assertion, repeated many times in defendant's briefs, that investigators would not look at evidence if it did not point to defendant, is only that: an assertion without support in the record. The police obviously did investigate Joey Hunter (and indeed arrested him at an early stage).[32] In 1998, police interviewed Kit Paepule

---

[32] Apparently defendant's complaint is that Detective Griggs did not interview Joey Hunter, and that "investigators never contacted Hunter again after 1988." (Defense counsel below asserted, "every single time this case was reopened, not a single investigator went to contact [Joey Hunter]." She claimed this was relevant to the defense, "separate and apart whether we are blaming him for the murder. It's not for the truth of whatever he was or whatever he did, it's for the fact that because somewhere along the

and John Young about the Thompson murders, both of whom denied involvement. (Young, serving life without parole, took full responsibility for the Wilson/Genoway murders but adamantly denied any involvement in the Thompson murders.) Apparently, police also interviewed Dean Kennedy, who denied knowing Larry Cowell. The suggestion that police did not continue to pursue Joey Hunter after 1988, because somehow they knew Hunter would not implicate defendant in the plot, is little short of ludicrous. As the trial court noted at the hearing on defendant's new trial motion, even if defendant could show Joey Hunter was present as a look-out – and the defense presented no such evidence – that "doesn't mean that there is a reasonable doubt that [defendant] was involved."

In short, it is complete speculation to suggest that the reason defendant could not establish the requisite link between Dean Kennedy (or any of the other hypothetical conspirators) and the crime was because the police "conducted a wholly inadequate, botched investigation," thus violating defendant's due process rights. There is simply no reason to believe that, if only the police had investigated other suspects further than they did, they would have been able to connect Dean Kennedy or Joey Hunter or any of the others to the murders.[33] Defendant cites no legal authority for the notion that, because counsel identified the claim of a "botched" or "biased" investigation as the "central issue of [defendant's] defense," the court therefore "had to permit him to use any available evidence casting doubt" on the investigation, without regard to the rules of evidence. We

line some investigator said this guy is never going to lead you to [defendant], no investigator subsequently sat down with an interview with Joey Hunter; not since 1988. And that is relevant. And to be precluded from that is to be precluded from having a defense in general.") The trial court pointed out that was not the motion before the court, and "I can't say without hearing what is going to be presented that you would not be able to elicit testimony regarding what leads were followed and what leads were ignored. I'm just not prepared to say that."

[33]    Defendant's example of the "botched investigation" – other than not re-investigating Joey Hunter after 1988 – was that investigators never tested fingernail scrapings taken from the Thompsons (the defense later did so, with no useful results).

106

thus reject defendant's attempt to avoid the application of the principles established in *Hall* for the exclusion of third party exculpatory evidence – principles correctly applied by the trial court when it excluded the proffered testimony.

Defendant's reliance on cases such as *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) for his due process claim does not persuade us otherwise. In *Chambers*, the application of state evidentiary rules, "under the facts and circumstances of [that] case," deprived the defendant of a fair trial. (*Id.* at p. 303.) There, a third person named McDonald had signed a sworn confession and later repudiated it. (*Id.* at pp. 288-289.) At defendant Chambers' trial, the state court excluded hearsay testimony critical to the defense: testimony that McDonald had orally confessed the murder to three different friends (confessions that were corroborated by other evidence in the case, and that bore persuasive assurances of trustworthiness). This exclusion – coupled with the state's refusal to permit the defendant to cross-examine McDonald because of a state rule that a party may not impeach his own witness – denied the defendant a trial "in accord with traditional and fundamental standards of due process." (*Id.* at p. 302.)

This is not a case like *Chambers*. As the high court tells us, "*Chambers* specifically confined its holding to the 'facts and circumstances' presented in that case; we thus stressed that the ruling did not 'signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.' [Citation.] *Chambers* therefore does not stand for the proposition that the accused is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." (*United States v. Scheffer* (1998) 523 U.S. 303, 316 (*Scheffer*).)

*Scheffer* states the applicable rule: "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. . . . [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' . . . [W]e have found the exclusion of evidence to be

107

unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused."**34** (*Scheffer, supra,* 523 U.S. at p. 308, citations and fn. omitted; see *Holmes v. South Carolina* (2006) 547 U.S. 319, 325 (*Holmes*) [describing "arbitrary" rules as "rules that excluded important defense evidence but that did not serve any legitimate interests"].)

As *Holmes* tells us: "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Holmes, supra,* 547 U.S. at p. 326.) And as *Holmes* further tells us, "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged," and "[s]uch rules are widely accepted." (*Id.* at p. 327.)

That is the case here. Nothing in California's principles governing the exclusion of third party exculpatory evidence is arbitrary or disproportionate to the purposes they are designed to serve. As our Supreme Court has expressly stated, "the ordinary rules of evidence, including the application of Evidence Code section 352, do not infringe on the

---

**34** Defendant relies at length on *Tinsley v. Borg* (9th Cir. 1990) 895 F.2d 520, saying *Tinsley* "outline[s] the test to be applied in evaluating whether excluding defense evidence amounts to a due process violation under *Chambers* . . . ." *Tinsley* does not even cite *Chambers*, and did not involve third party exculpatory evidence. *Tinsley* merely tells us that, "[t]o evaluate whether the exclusion of evidence reaches constitutional proportions, we should consider five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense," and "[w]e must then balance the importance of the evidence against the state interest in exclusion." (*Tinsley*, at p. 530.) In the context of the exclusion of third party exculpatory evidence, we analyze the issue consonant with precedents from the high court and our own Supreme Court.

accused's due process right to present a defense." (*People v. Frye* (1998) 18 Cal.4th 894, 948; accord, *Hall, supra,* 41 Cal.3d at pp. 834-835.) Consequently, there is no merit to defendant's claim that the exclusion of the proffered evidence violated his due process right to present a defense.

**10. The Exclusion of Hearsay Evidence of Mickey Thompson's Purchase or Intent to Purchase Gold Just Before the Murders**

### a. The factual background and rulings

During the case-in-chief, defense counsel asked Detective Verdugo if he had any reason to believe Mickey Thompson had recently made a large purchase of gold coins, but the detective knew nothing about that. Later, during the defense case, defense counsel offered to present testimony that, in the weeks and months before the murders, Mr. Thompson talked about buying gold, and the night before the murder, Eric Miller heard him say that he had just taken possession of $250,000 in gold. (See pt. 7.b. of the facts, *ante*.)

Defense counsel agreed with the trial court that the defense wanted "to show that basically Mr. Thompson was announcing to others his plan to acquire a large amount of gold." The trial court observed that "[w]e're not dealing with a hearsay exception, we're dealing with circumstantial evidence to show that others may have had a motive." The court said that if the defense could show the safe in the garage was empty and had pry marks on it, the testimony "may have a great deal of relevance." The court concluded it "would like to hear the foundation that the safe was empty and there were pry marks," and if that testimony were presented, Mr. Miller's testimony would be relevant as circumstantial evidence of motive. "So I'm certainly happy to reconsider [the admissibility of Mr. Miller's testimony] based on what the defense has yet to present."

The next day, the prosecutor told the court that police reports showed the damage to the garage safe occurred weeks after the murders. The court agreed that, if the defense could not show that the safe had been tampered with on the day of the murders, then the necessary foundation for relevance of the proffered testimony would be missing.

Defense counsel then stated that Lee Haslam and other witnesses would say that Mr. Thompson said he intended to buy gold, "which is a different statement" and admissible under Evidence Code section 1250. (Section 1250 is an exception to the rule against hearsay, for "a statement of the declarant's then existing state of mind, . . . (including a statement of intent [or] plan . . . )," when the evidence "is offered to prove the declarant's state of mind . . . at that time or at any other time when it is itself an issue in the action," or when it is "offered to prove or explain acts or conduct of the declarant." (§ 1250, subd. (a).)) The court said that Mr. Thompson's "state of mind with respect to purchase of gold" was not an issue in the case. If there were evidence there was gold in the house and there was gold taken, the court said, that could be presented, but even if Mr. Thompson's statements could be admitted as a state of mind exception, "the relevance of that is speculative at best."

Defense counsel then asked to present testimony from Detective Laporte about Mr. Miller's statement. This testimony "would not be offered for the truth," but for the "failure to investigate whether or not there were valuables in this garage." The trial court agreed that the defense could "present all you want about the failure to investigate," but "a statement made by Mr. Thompson prior to the murders that he was going to buy gold doesn't lead us anywhere." The court said the defense could "ask the question as to what [the police] did or what they didn't do without assuming facts that aren't in evidence. . . ." When defense counsel sought to elicit testimony from Detective Laporte that Mr. Miller told him Mr. Thompson had made a large purchase of gold recently, saying it was "not offered for the truth," but "to see what he did as a result of that information," the court sustained the prosecutor's hearsay objection. Detective Laporte then testified that his notes showed he interviewed Eric Miller and Lee Haslam; his reports would have been given to the lead investigators; and he did not try to obtain any financial records.

Then, defense counsel sought to introduce Mr. Miller's testimony about Mickey Thompson's statement, not for its truth, but "to explain why we're asking these officers" whether they sought Mr. Thompson's financial records, that is, "for the purpose of

110

showing that the police did not investigate that angle." When the court asked defense counsel why she could not elicit the information "in a way that would meet your needs, which is: Did Mr. Miller provide information to the investigators which was not followed up," counsel said that would be out of context, "[w]ithout saying that it was information about a recent purchase of a significant valuable item." The court asked, "Well, why not refer to it that way," and counsel responded, "I would love to refer to it that way. That's why I'm asking the court's guidance as to that. I would be happy to not bring up the quote of the statement if I could say to Officer Laporte: Did you receive information from Eric Miller that Mr. Thompson had just come into a very valuable commodity in the last several days?" And "the only thing further I would go is: What did you do as a result? What did you follow-up on?" The court ruled: "I think that's fair. Because we're dealing with a statement that's not being offered for the truth. But I'm attempting to sanitize it so that there is no danger of this jury being misled." Further, "I don't see a danger here in eliciting this type of testimony keeping it limited without reference to gold. I mean I'm just afraid that the jury will misconstrue it or be misled. So I think the way we just agreed to handle it is appropriate."

Defense counsel then elicited testimony from Eric Miller and Detective Laporte. When Mr. Miller was asked if he told Detective Laporte that Mickey Thompson had taken possession of a valuable item recently, Mr. Miller said he "[did not] recall anything regarding taking possession, no." When asked if Mr. Thompson indicated he had made a recent purchase, Mr. Miller said, "No." As previously described (pt. 7.b. of the facts, *ante*), Detective Laporte then testified that Eric Miller had told him Mr. Thompson said he had taken possession of a valuable item of a specific dollar amount, and that he (Detective Laporte) did not, and was not directed to, match up the dollar amount specified with any of Mr. Thompson's financial records, or look at his financial records at all. (The trial court admonished the jury that "this is being offered not for the truth of what Mr. Thompson may have said to Mr. Miller, but to explain the conduct of Officer Laporte.")

111

### b. Contentions and conclusions

On appeal, defendant argues that Mr. Thompson's statements "about buying or having received gold were statements of intent . . . to perform an act and admissible to prove Thompson bought and received gold." Defendant contends the trial court erred in "sanitizing" the testimony so that there was no reference to gold; this deprived him of key evidence that the killers were there to rob, not execute, the Thompsons, "and investigators ignored this lead in their zeal to see [defendant] prosecuted," violating his right to present a defense.

We find no error by the trial court.

First, Mr. Thompson's statement that he had recently taken possession of a large amount of gold is not a statement of his "existing state of mind" or "intent" or "plan." It is hearsay as to which there is no applicable exception.

Second, the other statements defendant proffered – from Lee Haslam and others that Mr. Thompson said he intended to purchase gold – are statements of intent or plan. But to be admissible under Evidence Code section 1250, Mr. Thompson's intent to purchase gold must be "itself an issue in the action" (*id.*, subd. (a)), and it was not. To the extent defendant suggests Mr. Thompson's statements of intent to purchase gold were offered to prove that he did purchase gold – that is, if the statements were "offered to prove . . . conduct of the declarant" (*ibid.*) – it is irrelevant. Mr. Thompson's state of mind (intent to buy gold) would have been relevant had there been any evidence of a robbery, or evidence that he communicated his intent to someone involved in the murders, or evidence there was gold on the premises, but there was no such evidence. The only evidence defendant can cite is that, according to one witness, one of the escaping bicyclists was carrying a white canvas bag, and a coin dealer testified that gold coins are delivered in white canvas bags (usually with a metal seal on the top).[35]

---

[35] Lance Johnson described a small bag, about 12 inches long and four inches wide, "slung over the right shoulder" of the first bicyclist he could see; the bag "went up to a drawstring, so it was more or less pear shaped," and he could not remember the color.

Evidence of a gunman fleeing on a bicycle with a white canvas bag, however, is not credible evidence of a robbery, and all the evidence was to the contrary. There was no evidence valuables were taken; there was evidence of money and jewelry left at the scene of the crime; there was no evidence of forced entry into the house; the garage door was closed; and there was no evidence of pry marks on the garage safe on the day of the murders. Under these circumstances, it was not an abuse of discretion to refuse to admit hearsay evidence that Mr. Thompson intended to buy gold.

Defendant insists the evidence was admissible under *People v. Alcalde* (1944) 24 Cal.2d 177, 187 (*Alcalde*), where the court stated the "[e]lements essential to admissibility" of declarations of intent to do an act in the future. (The Legislature later codified the *Alcalde* decision in Evidence Code section 1250.) (See *People v. Majors* (1998) 18 Cal.4th 385, 404 (*Majors*).) These essential elements are " 'that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case.' " (*Ibid.*, quoting *Alcalde*, at p. 187.) Defendant's claim again falters on the relevance element.

As *Majors* tells us, *Alcalde* "considered the admissibility of a decedent's statement that she was planning to go out with a man named Frank, the defendant's nickname, on the night she was killed." (*Majors, supra,* 18 Cal.4th at p. 404.) Applying the essential elements test, *Alcalde* concluded that the murder victim's statement was admissible because "it was a natural utterance made under circumstances which could create no suspicion of untruth in the statement of her intent," and "[u]nquestionably the deceased's statement of her intent *and the logical inference to be drawn therefrom*, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." (*Alcalde, supra,* 24 Cal.2d at pp. 187-188, italics added.) In addition, in *Alcalde* "the declaration was not the only fact from which an inference could be drawn

Sandra Johnson told police that one of the men was carrying a white canvas bag, shopping bag size.

that the deceased was with the defendant that night." (*Id.* at p. 188; see also *Majors*, at p. 405 ["[a]s in *Alcalde*, there are ample 'corroborating circumstances' "].)

Defendant claims the three essential elements in *Alcalde* were met, but we do not agree. There is no "logical inference" to be drawn from Mr. Thompson's statements that he intended to buy gold, and consequently there is no relevance to any issue in the case. We cannot logically infer from Mr. Thompson's statements that the gold was at the Thompson residence, or that the Thompson murderers knew about it, or that there was a robbery. Mr. Thompson's intent to buy gold is only relevant if there were evidence of a robbery, and there was not. Accordingly, there was no abuse of discretion in the trial court's rulings that testimony about Mr. Thompson's statements was hearsay and inadmissible for its truth.

As described above, the trial court permitted the defense to inquire about Mickey Thompson's statement to Mr. Miller, not for its truth, but in order to prove an inadequate police investigation of Mr. Thompson's purchase of gold (which would have been traceable). Defendant asserts the court had no authority to "sanitize" the statement so that it referred to a valuable item, rather than gold, and that this "vitiated the meaning and the impact of the evidence."

Defendant cites no authority for this claim, and we know of none. The evidence was admitted for a limited purpose, and that purpose was served when defendant was permitted to elicit testimony that police did not investigate the recent purchase of a valuable item or look at Mr. Thompson's financial records at all. The court's ruling allowed the defense to make its point about inadequate investigation, while avoiding having the jury misled by the unsupportable implication there was gold on the premises. There was no error in the trial court's approach.

## 11. The Exclusion of Evidence that Joey Hunter Failed Three Polygraph Examinations

Evidence Code section 351.1 prohibits the admission of polygraph evidence in any criminal proceeding: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer

114

to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, . . . unless all parties stipulate to the admission of such results." (*Id.*, subd. (a).)

Despite the clarity of the statutory prohibition, defendant contends the trial court should have admitted evidence that Joey Hunter failed three polygraph examinations, even though the prosecutor would not stipulate. The exclusion of the evidence that Joey Hunter failed polygraph tests, he says, "prevented him from impeaching Griggs, Lillienfeld and the other investigators on a crucial issue – whether the murders were fully and fairly investigated."

When the trial court refused to admit the evidence, it pointed out that it had excluded third-party culpability evidence, and consequently, "even assuming that you are not violating [Evidence Code] section 351.1, how is this relevant? I just don't see the relevance . . . given the third-party culpability hearing that we had and the rulings that I made. [¶] I think you can certainly present your witnesses to testify as to what was done and what wasn't done to some extent. But I don't think you can go that far. I do believe it's an exclusionary rule that basically precludes any reference to a polygraph in this case. And that is my ruling."

There was no error in the trial court's ruling. The statute unambiguously states that "the results of a polygraph examination . . . shall not be admitted into evidence in any criminal proceeding . . . ." (Evid. Code, § 351.1, subd. (a).) "The statutory ban against admission of polygraph evidence ' "is a 'rational and proportional means of advancing the legitimate interest in barring unreliable evidence.' " ' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 663 (*McKinnon*).) The statute contains no exceptions to the rule. (*Ibid.* ["The state's exclusion of polygraph evidence is adorned with no exceptions, and its stricture on admission of such evidence has been uniformly enforced by this court and the Court of Appeal."].)

Further, the categorical rule against the admission of polygraph evidence does not violate due process or the right to present a defense. (*People v. Richardson* (2008) 43 Cal.4th 959, 1032 ["in *People v. Wilkinson* (2004) 33 Cal.4th 821 . . . we . . . squarely

held that the categorical exclusion of the results of such examinations did not violate the federal Constitution"]; see also *Scheffer, supra,* 523 U.S. at pp. 305, 315 [a military rule making polygraph evidence inadmissible in court-martial proceedings did not unconstitutionally abridge the right of accused members of the military to present a defense; per se rule excluding all polygraph evidence "offend[ed] no constitutional principle"].)

Defendant nevertheless argues that the evidence was not offered "to endorse or attack the credibility of the answers Joey Hunter gave during his polygraph examinations," but "as an operative fact" to demonstrate that investigators "did not follow their own protocols" and "did not follow facts pointing to other suspects" because they "had already fixed on [defendant] as the perpetrator."[36] Evidence Code section 351.1, however, does not distinguish among the purposes for which the results of a polygraph test are offered. In *McKinnon*, the court expressly rejected a claim that polygraph evidence was properly admitted, "not to endorse or attack the credibility of answers given during a polygraph examination, but to explain why [a witness], in his postpolygraph statement to police, changed his story about his involvement in the murder and implicated defendant as the killer." (*McKinnon, supra,* 52 Cal.4th at p. 663 [declining to recognize "a state-of-mind exception to . . . section 351.1 for this limited purpose"].) Similarly, in *People v. Samuels* (2005) 36 Cal.4th 96, 128, evidence that the defendant cooperated with police by offering to take, and passing, a polygraph

---

[36] Defendant cites several Ninth Circuit cases saying that polygraph evidence is inadmissible if offered to prove the truth or falsity of the polygraph results, but "polygraph evidence which is an operative fact may be admissible." (*United States v. Bowen* (9th Cir. 1988) 857 F.2d 1337, 1341 ["If the polygraph evidence is being introduced because it is relevant that a polygraph examination was given, regardless of the result, then it may be admissible; or if the evidence is being introduced as a basis for a cause of action, then it may be admissible as well."].) Here, the polygraph evidence does not fit in either of those categories, and in any event none of the cases defendant cites involves Evidence Code section 351.1 (or any other statute) expressly stating that "the results of a polygraph examination . . . shall not be admitted into evidence in any criminal proceeding . . . ."

116

examination was not admissible to refute the prosecution's evidence that the defendant was uncooperative during the investigation.

In the face of these authorities, defendant's contention that an exception to Evidence Code section 351.1 should be made, where polygraph results are offered to "impeach[] the investigation," is without merit. The trial court did not err.

## 12. The Conspiracy Instructions

Defendant contends the trial court's instructions on uncharged conspiracy vitiated the presumption of innocence and lowered the prosecutor's burden of proof. We review this claim of instructional error de novo, and conclude there was no error.

Defendant first argues that no conspiracy instructions should have been given, because the prosecutor made no prima facie showing of the existence of a conspiracy by independent evidence. We have considered and rejected that claim in part 2, *ante*.

Next, defendant argues the conspiracy instructions were incomplete and misleading. We see no merit in this claim either.

The court instructed the jury on uncharged conspiracy with CALJIC No. 6.10.5 (defining the terms "conspiracy" and "overt act" and describing the elements necessary to find defendant to be a member of a conspiracy).[37] In addition, the court gave CALJIC

---

[37] The trial court instructed, based on CALJIC No. 6.10.5: "A conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder, and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime, but is not charged as such in this case. [¶] In order to find a defendant to be a member of a conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one overt act. It is not necessary to such a finding as to any particular defendant that defendant personally committed the overt act, if he was one of the conspirators when the alleged overt act was committed. [¶] The term 'overt act' means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy. [¶] To be an 'overt act,' the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy. Nor is it required that the step or act, in and of itself, be a criminal or unlawful act."

117

No. 6.12 (that proof of an express agreement is not necessary, and may be inferred from all circumstances tending to show the common intent),[38] as well as CALJIC No. 6.11 (on joint responsibility of each member of a conspiracy for the acts of the other conspirators) and CALJIC No. 6.14 (that acquaintance with all coconspirators is not necessary).[39]

Defendant argues that the trial court also should have instructed with CALJIC No. 6.22. That instruction says that *each defendant* in a conspiracy case is individually entitled to a determination whether he or she was a member of the conspiracy, and that the jury must find, beyond a reasonable doubt, that there was a conspiracy to commit the crime, that a defendant "willfully, intentionally and knowingly" joined with others in the conspiracy, and that one of them committed an overt act.[40] Defendant argues that, by including CALJIC No. 6.12 (that proof of an express agreement is not necessary), but

---

[38] Under CALJIC No. 6.12, the court instructed: "The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence. It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement."

[39] In the trial court, defendant argued that CALJIC No. 6.10.5 (defining conspiracy and overt acts) was the *only* conspiracy instruction that should be given in an uncharged conspiracy case.

[40] CALJIC No. 6.22 – entitled "conspiracy – case must be considered as to each defendant" – states: "Each defendant in this case is individually entitled to, and must receive, your determination whether [he] [she] was a member of the alleged conspiracy. As to each defendant you must determine whether [he] [she] was a conspirator by deciding whether [he] [she] willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy. [¶] Before you may return a guilty verdict as to any defendant of the crime of conspiracy, you must unanimously agree and find beyond a reasonable doubt, that (1) there was a conspiracy to commit the crime[s] of , and (2) a defendant willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy. You must also unanimously agree and find beyond a reasonable doubt, that an overt act was committed by one of the conspirators. You are not required to unanimously agree as to who committed an overt act, or which overt act was committed, so long as each of you finds beyond a reasonable doubt, that one of the conspirators committed one of the acts alleged in the [information] [indictment] to be overt acts."

failing also to instruct with CALJIC No. 6.22, the court "did not make clear for the jury that a conspiratorial agreement must be proved beyond a reasonable doubt," and thus "misled" the jurors.[41]  Defendant also asserts that CALJIC No. 17.00 – instructing the jury to "decide separately whether *each of the defendants* is guilty or not guilty" (italics added) – should have been given.  Defendant is mistaken.First, defendant did not request the court to instruct with CALJIC Nos. 6.22 and 17.00 (or CALJIC No. 6.18).[42]  "To the extent defendant's claim is that the court failed to give clarifying or amplifying instructions, the claim is waived because defendant did not request such clarification below."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020.)

Second, CALJIC No. 6.22 by its plain terms is intended for use in a case where multiple defendants are charged with the crime of conspiracy (and CALJIC No. 17.00 is likewise for use in a multiple-defendant case).  This case involves neither multiple defendants nor a conspiracy charge.  A trial court has no sua sponte duty to give an instruction that does not apply to the case.

Third, there is in any event no merit to the claim that the instructions as given somehow "lowered the prosecutor's burden of proof."  "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."  (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754, 756; accord, *People v. Williams* (2008) 161 Cal.App.4th 705, 711 [concluding the Judicial Council's criminal

---

[41]    Defendant does not challenge the court's other conspiracy instructions (CALJIC Nos. 6.11 and 6.14), observing only that CALJIC No. 6.11 "does not satisfy the purpose of CALJIC No. 6.22."

[42]    Defendant states that the court did not instruct the jury "in the language of CALJIC 6.22 or 6.18," but he presents no explanation or argument about CALJIC No. 6.18, except to say that the trial court's failure to give it "compounded this [instructional] error."  (CALJIC No. 6.18 states that "[e]vidence of the commission of an act which furthered the purpose of an alleged conspiracy is not, in itself, sufficient to prove that the person committing the act was a member of the alleged conspiracy.")

jury instruction on evidence of uncharged conspiracy (CALCRIM No. 416) did not reduce the prosecutor's burden of proof].)

Here, the jury was instructed that a conspiracy was "an agreement between two or more persons with the specific intent to agree to commit the crime of murder," and the instruction made it quite clear that the prosecutor had to prove the agreement, the intent to agree to commit murder, and an overt act: "In order to find a defendant to be a member of a conspiracy, *in addition to proof of the unlawful agreement and specific intent,* there must be proof of the commission of at least one overt act." (Italics added.) The jury was also instructed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt." The jury was instructed that "before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt." (CALJIC No. 2.01.) The jury was instructed that defendant was presumed to be innocent and the People had "the burden of proving [defendant] guilty beyond a reasonable doubt." (CALJIC No. 2.90.) The jury was instructed that the burden was "on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged." (CALJIC No. 2.91.)

In short, it is quite clear that, "[c]onsidered as a whole, the instructions did not reduce the prosecution's burden of proof." (*People v. Williams, supra,* 161 Cal.App.4th at p. 711.) There was no error.

## 13. The Jury Instruction on Eyewitness Identification

Defendant argues the trial court violated his state and federal due process rights when it instructed the jury that it could consider a witness's level of certainty when evaluating an eyewitness's identification. We disagree.

The court instructed the jury, without objection, with a modified version of CALJIC No. 2.92, as follows: "Eyewitness testimony has been received in this trial. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the

120

accuracy of the witness' identification of the defendant, including, but not limited to, any of the following:  [¶]  . . .  [¶]  The extent to which the witness is either certain or uncertain of the identification . . . ."  The instruction also listed a dozen other factors the jury should consider, including the length of time between the act and the identification, whether the identification is in fact the product of the witness's own recollection, and so on.[43]

The witness's certainty or uncertainty has long been used as a factor in evaluating eyewitness identifications, and its use does not violate due process.  In *Neil v. Biggers* (1972) 409 U.S. 188, the court found that, under the totality of the circumstances, the show-up identification in that case was reliable "even though the confrontation procedure was suggestive."  (*Id.* at p. 199.)  The court continued:  "As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  (*Id.* at pp. 199-200; see also *Manson v. Brathwaite* (1977) 432 U.S. 98, 117 (*Manson*) ["the criteria laid down in *Biggers* are to be applied in determining the admissibility of evidence offered by the prosecution

---

[43]    The factors listed in the instruction were:  "The opportunity of the witness to observe the act and the perpetrator of the act;  [¶]  The stress, if any, to which the witness was subjected at the time of the observation;  [¶]  The witness' ability, following the observation, to provide a description of the perpetrator of the act;  [¶]  The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;  [¶]  The cross-racial or ethnic nature of the identification;  [¶]  The witness' capacity to make an identification;  [¶]  Evidence relating to the witness' ability to identify other perpetrators of the act;  [¶]  Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;  [¶]  The period of time between the act and the witness' identification;  [¶]  Whether the witness had prior contacts with the perpetrator;  [¶]  The extent to which the witness is either certain or uncertain of the identification;  [¶]  Whether the witness' identification is in fact the product of his her own recollection; and  [¶]  Any other evidence relating to the witness' ability to make an identification."

121

concerning a[n] . . . identification"]; see also *Perry v. New Hampshire* (2012) ___ U.S. ___ [132 S.Ct. 716, 725, fn. 5, 728] [footnoting the factors as listed in *Biggers* and *Manson*, and holding that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."].)

Further, as defendant admits, the California Supreme Court has approved CALJIC No. 2.92. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1231 (*Johnson*) ["CALJIC No. 2.92 normally provides sufficient guidance on the subject of eyewitness identification factors"].) *Johnson* rejected a claim of trial court error in instructing the jury on the certainty factor. (*Id.* at pp. 1231-1232 [the defendant contended there was no evidence to support the instruction because an expert testified, without contradiction, that a witness's confidence in an identification does not positively correlate with its accuracy; the court concluded the trial court "did not err . . . in instructing the jury on the 'certainty' factor"].) *Johnson* also cited the certainty factor when it restated "the principles that determine whether the admission of identification evidence violates a defendant's right to due process." (*Id.* at p. 1216.) The court said that "[c]onstitutional reliability . . . depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citing *Manson*]; and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. [Citation.] 'If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.]" (*Ibid.*)

In the face of this solid body of law, defendant nonetheless argues the instruction violated his right to due process, because "[s]ubsequent research . . . has shown the

certainty with which the witness makes the identification has little correlation with the accuracy of that identification." The argument fails.

First, defendant did not object to the instruction; indeed, CALJIC NO. 2.92 appears on defendant's list of requested instructions. When an instruction is a correct statement of the law and the defendant claims it should have been modified, "his failure to seek such modification forfeits the claim." (*People v. Richardson, supra,* 43 Cal.4th at pp. 1022-1023 ["while the court may review unobjected-to instruction that allegedly implicates defendant's substantial rights, claim that instruction, correct in law, should have been modified 'is not cognizable, however, because defendant was obligated to request clarification and failed to do so,' " quoting *People v. Guerra*, *supra,* 37 Cal.4th at p. 1134].)

Second, we cannot in any event find a due process violation. Defendant relies only on authorities from other jurisdictions, such as *Brodes v. State* (2005) 279 Ga. 435. There, the court held (over a dissent) that, because of studies showing no correlation between certainty and accuracy, "we can no longer endorse an instruction authorizing jurors to consider the witness's certainty in his/her identification as a factor to be used in deciding the reliability of that identification." (*Id.* at p. 440.) But cases from other jurisdictions do not assist defendant, as we are bound by the decisions of our Supreme Court and the high court and, as we have seen, their directions are clear.

We cannot end without noting that "the jury, not the judge, traditionally determines the reliability of evidence," and there are "other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability." (*Perry v. New Hampshire, supra,* 132 S.Ct. at p. 728.) These safeguards include counsel who "can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments" (*ibid.*), as well as expert testimony – both of which safeguards were well employed in this case.

## 14. The Flight Instruction

The defense objected to the prosecution's request for an instruction on flight after crime (CALJIC No. 2.52), and requested that, if the instruction were given over the objection, it should be modified. The trial court agreed with the requested modification, and instructed the jury as follows: "The flight of a person after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding whether a defendant is guilty or not guilty. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance, are matters for your determination."

Defendant contends it was error to give the flight instruction. We disagree.

### a. The evidence

Karen Dragutin testified (see pt. 2.h. of the facts, *ante*) to threatening statements defendant made about Mickey Thompson during a dinner conversation in the months preceding the murders. These included that "the only way he [defendant] was going to get out of it [(the litigation mess)] is if Mickey Thompson died." Ms. Dragutin said defendant "was talking about a boat and going to Bermuda, and it was still in the context of that conversation. So my conclusion was he was going away."

The facts relating to the yacht are recounted in part 5, *ante*, of the factual summary. In short, defendant's wife made a deposit for the purchase of a yacht in January 1988, received approval of a bank loan for the yacht on March 9, 1988, and consummated the sale in late April or early May. On June 27, 1988, defendant took the 57-foot yacht, which was outfitted such that two people could live on it for an extended period of time, to a South Carolina marina for installation of equipment, and the yacht was there for six weeks. In early August, defendant unexpectedly asked the marina manager to expedite the work; the manager did so, and defendant sailed away. In May 1991, the bank holding the mortgage on the yacht hired a boat surveyor to repossess the yacht, and during his efforts to do so, defendant told him by telephone that "he would

124

never find his boat." The surveyor ultimately located the yacht and defendant in Guatemala.

Detective Griggs testified that he never caused a case to be filed against defendant, never arrested him, and at no time sought to arrest him and could not find him.

### b. The law

"[Penal Code] [s]ection 1127c requires a trial court in any criminal proceeding to instruct as to flight where evidence of flight is relied upon as tending to show guilt."[44] (*People v. Carter* (2005) 36 Cal.4th 1114, 1182 (*Carter*).) CALJIC No. 2.52 is derived from section 1127c. (*Carter,* at p. 1182.) "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] Flight requires ' "a purpose to avoid being observed or arrested." ' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 710 (*Avila*) [police searched unsuccessfully for defendant in 1991 and 1992, and he was ultimately arrested more than four years after the crimes at the Los Angeles International Airport; that was " 'sufficient evidence to warrant instructing the jury to determine whether flight occurred, and, if so, what weight to accord such flight' "; the instruction " 'adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt' "].)

CALJIC No. 2.52 does not require "a defined temporal period within which the flight must be commenced . . . ." (*Carter, supra,* 36 Cal.4th at p. 1182 [where defendant "left California in the days immediately following the charged offenses" and was in

---

**44**    Penal Code section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

possession of a vehicle belonging to the murder victim when he was arrested in Arizona, the flight instruction "plainly was warranted"].)  "[A] flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof, and is proper even when identity is at issue." (*Avila, supra,* 46 Cal.4th at p. 710.)

### c.  Contentions and conclusions

Defendant first contends the flight instruction "improperly focused the jury's attention on 'flight' evidence where little evidence connected [defendant] to the killings." Defendant's premise – that little evidence connected him to the crimes – is unsound, and the only authority he cites is not California authority.  In California, the flight instruction is proper if " 'the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt' " (*Avila, supra,* 46 Cal.4th at p. 710), and that is the only pertinent question.  The evidence we have described above – relating to the purchase of the yacht, its outfitting, and defendant's subsequent sailing to parts unknown, along with his statements before the murders "about a boat and going to Bermuda," in the context of other statements that "the only way he was going to get out of it [(the litigation mess)] is if Mickey Thompson died" – permits the inference that defendant left Los Angeles " 'under circumstances suggesting that his movement was motivated by a consciousness of guilt.' " (*Ibid.*)

Next, defendant says the instruction was defective because it omitted the word "immediate," which appears in Penal Code section 1127c, and because defendant had not been accused of the murders when he "went sailing."  There was no defect.  The statutory language includes the flight of a person both "immediately after the commission of a crime" *and* "after he is accused of a crime that has been committed . . . ." (§ 1127c.)  As defense counsel told the trial court in seeking dismissal of the case, defendant "was a named suspect within hours of the murder."  And, in any event, CALJIC No. 2.52 "neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced . . . ." (*Carter, supra,* 36 Cal.4th at p. 1182.)

126

Finally, defendant contends the instruction was erroneous because the court excluded evidence that defendant had, through counsel, "offered to make himself available in Los Angeles should his presence be required by investigators – a fact vitiating an inference [defendant] 'fled' to avoid arrest." This contention has no merit either. First, defendant offers no argument or legal authority to suggest the court's evidentiary ruling was erroneous, and so we need not consider the point. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Second, there was in any event no error in the evidentiary ruling. Defendant is referring to a letter from then-defense counsel Al Stokke to Detective Griggs in October 1988, apparently offering to make defendant available in Los Angeles if needed. But Mr. Stokke had told police, just a few hours after the murders, and again at a later meeting among Detective Griggs, defendant and Mr. Stokke, that defendant would not make any statement. The trial court ruled that if the defense adduced the statement from Mr. Stokke's letter, the prosecutor could bring out Mr. Stokke's previous statement that defendant would not talk to the police; otherwise the jury would be misled into inferring that defendant was cooperating with the police. Defense counsel then apparently chose not to adduce the letter or any testimony about it. There was no error in the trial court's ruling.[45]

Defendant repeatedly contends the flight instruction provided the jury with an improper basis from which to infer defendant "had a culpable mental state at the time of the offense." But the Supreme Court has repeatedly held otherwise. (*People v. Welch* (1999) 20 Cal.4th 701, 757 [" '[T]he flight instruction "[does] not address the defendant's mental state at the time of the offense and [does] not direct or compel the drawing of impermissible inferences in regard thereto" ' "]; see also *People v. Smithey* (1999) 20 Cal.4th 936, 983, citing cases.)

---

[45]     "*Doyle* [*v. Ohio* (1976) 426 U.S. 610] forbids impeachment of a defendant's exculpatory trial testimony with cross-examination about his or her postarrest silence after receiving *Miranda* warnings." (*People v. Tate* (2010) 49 Cal.4th 635, 691-692.) Defendant here had not been arrested when he declined to cooperate with the police.

In sum, it is error to instruct on flight when there is no evidence of flight. (*People v. Kessler* (1968) 257 Cal.App.2d 812, 815.) Here, there was evidence of flight. Flight requires " ' "a purpose to avoid being observed or arrested" ' " (*Avila, supra*, 46 Cal.4th at p. 710), and the evidence we have described easily permits that factual determination. (See *Abilez, supra*, 41 Cal.4th at p. 522 [" 'the instruction did not assume that flight was established, leaving that factual determination and its significance to the jury' "]; cf. *Carter, supra,* 36 Cal.4th at pp. 1182-1183 ["even if we were to conclude the instruction should not have been given, any error would have been harmless. The instruction did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it"].) There was no error.

## 15.   The Prosecutorial Misconduct Claims

Defendant contends the prosecutor committed numerous acts of prosecutorial misconduct. We do not agree.

The Supreme Court has summarized the standards under which we evaluate a claim of prosecutorial misconduct. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)

" ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' . . . 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.] ' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) When a prosecutorial misconduct claim focuses on comments the prosecutor made before the jury, "the

128

question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.)

The defendant may not complain on appeal of the prosecutor's misconduct unless he timely objected at trial "and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) If the defendant objected, or if an objection would not have cured the harm, we ask whether the improper conduct was prejudicial, that is, whether it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.) Prosecutorial misconduct requires reversal under federal law unless the misconduct was harmless beyond a reasonable doubt. (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

### a. Claims of misconduct in the prosecutor's opening statement

Defendant contends the prosecutor made "numerous bad faith and prejudicial statements" during his opening statement, "promising evidence he failed to produce." As we address defendant's often hyperbolic (and sometimes misleading) claims, it is well to bear in mind the applicable principles.

It is, of course, improper "to make assertions of fact in an opening statement that the prosecutor cannot prove and does not intend to prove . . . ." (5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 621, p. 963.) "But mere failure to prove every point asserted does not amount to prejudicial misconduct," and "[m]ere discrepancy between statement and proof is not reversible error." (*Ibid.*) "[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' [Citation.]" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108 (*Wrest*).) And misconduct in an opening statement "is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial." (*People v. Harris* (1989) 47 Cal.3d 1047, 1080.)

129

In this case, we see no misconduct.  As was true in *Wrest*, "in each case, the variance between prosecutorial statement and actual proof is minor or nonexistent.  In no case can an inference of misconduct be drawn."  (*Wrest, supra,* 3 Cal.4th at p. 1108.)

Defendant cites nine instances of alleged misconduct in the prosecutor's opening statement.

### i.  *The first three claims of misconduct*

Defendant's first three claims of misconduct are based on the following portion of the prosecutor's opening statement.  The prosecutor referred to Allison Triarsi and her parents, Phyllis and Anthony Triarsi, neighbors who could look down on the crime scene area, and said:

"And what they will tell you is that after a volley of several gunshots had been levied, presumably against Mickey Thompson – because of the autopsy findings, it's presumable that Mickey Thompson was shot multiple times before the coup d' gras [*sic*] shot.

"As a matter of fact, the evidence will show that's exactly what happened based on the witness's observations.  As he stood at the top of the driveway, the other gunman shot at the van.  The van had several bullet holes in it.  Trudy Thompson was either pulled from or fell out of the van.  She then got down to her knees.

"The injuries that she sustained indicate the following:  she was crawling down the driveway.  It is a very, very steep driveway.  She was crawling down that driveway for her life.  All of her acrylic fingernails began breaking off.  She was skinning and scraping her knees.  She was in a dress that day.

"The second gunman followed Trudy Thompson all the way down the driveway; gun in hand covering her; but he didn't kill her yet.  That will become incredibly important in this trial.  He didn't kill her yet.  Mickey Thompson, though shot several times – Mickey Thompson ultimately suffered seven separate gunshot wounds.  Seven. . . .

"And he was shot several times in the abdomen; in the hips; in the buttocks; through the arm.  But he was kept alive.  And the evidence will show that at any point at

130

any time either of the gunmen could have put Mickey Thompson down like that, one shot to the head would do it. But they didn't. He was disabled, but he was kept alive.

"Meanwhile Trudy Thompson was being covered by the other gunman. And once they were in a position that they could see each other and Mickey Thompson could clearly watch, the second gunman put the gun to the back of Trudy's head and fired a bullet through her brain. The evidence will show that Mickey Thompson's last vision on this planet was that of his wife being executed.

"[T]he second gunman then screwed that .9 millimeter pistol into the left ear of Mickey Thompson, literally his left ear and fired a bullet that passed completely through his brain and he was killed. Witnesses saw this, then watched as the gunman jumped on bicycles and began to pedal off. . . . "

Based on that opening statement, defendant complains (1) that Phyllis and Anthony Triarsi did not testify at trial, and that no witness testified to "[the prosecutor's] 'dance of death.' " He also asserts (2) the prosecutor "failed to present any evidence that 'Trudy died first' or the shooter held her head up by her hair before shooting her." And he contends (3) there was no evidence a gun was "screwed into [Mickey Thompson's] left ear," or that he "was shot to incapacitate him but kept alive so he could watch Trudy die."

First, we do not see misconduct in the prosecutor's mention of Allison Triarsi's parents as anticipated eyewitnesses, along with Miss Triarsi. Nor can we see what possible prejudice could flow from a prosecutorial decision to produce only one witness instead of three. And, contrary to defendant's assertions, the prosecutor said nothing about a "dance of death" in his opening statement.

Second, the prosecutor at no point suggested in his argument that "the shooter held [Trudy's] head up by her hair before shooting her." Defendant's insinuation that the prosecutor said this is incorrect.[46]

---

**46** Defense counsel, in cross-examination of Lance Johnson, elicited his testimony about this scenario in order to show the witness's bias. Mr. Johnson admitted that he had participated in various television shows recreating the crime, and even though he did not

131

Third, Allison Triarsi's testimony was substantially consistent with the prosecutor's argument that Mickey Thompson was kept alive to watch his wife die. As more fully described in part 4.a. of the facts, *ante*, Miss Triarsi testified there was a man with Mickey Thompson who "had a gun and was directing him and making him go in certain directions"; she heard Mickey Thompson saying, over and over, "Please don't kill my wife," a statement directed to another man "at the bottom of the driveway who had a gun and coming towards Trudy"; it appeared Mickey Thompson was trying to go to his wife, and the gunman was "hold[ing] him at bay with an outstretched hand with the gun in his hand"; and then the gunman near Trudy shot her in the head. Miss Triarsi testified that she did not remember what the gunman who shot Trudy did next, "because the next thing I remember Mickey is getting shot." This is plainly evidence that "Trudy died first." (And, the medical examiner, Dr. Lisa Scheinin, indicated the gunshot wound to Mr. Thompson's head was most likely the last of the wounds inflicted on him.)

Fourth, as for the prosecutor's statements that the gunman "screwed that .9 millimeter pistol into his left ear and fired a shot through Mickey's brain," respondent acknowledges this was an overstatement. As Dr. Scheinin testified, there was "absolutely" no evidence that anyone "screwed a gun in to [Mickey Thompson's] ear and fired a bullet." But Dr. Scheinin also testified that the gunshot wound was "consistent with someone putting a weapon close within inches behind Mr. Thompson's ear and firing it." We consider this inconsistency between the prosecutor's opening statement and the evidence actually adduced to be inconsequential. (See *People v. Dykes* (2009) 46 Cal.4th 731, 761-762 ["the evidence may not have established that the victim died looking at his grandmother, but there was evidence that could support the view that the child was leaning toward his grandmother when he was shot"; any inconsistency was

---

witness the murders, he told the producers on camera that his understanding of how the crime occurred was that Trudy Thompson's head was held up by the hair, so that Mickey Thompson could see the killers shoot her in the head, after which they shot Mr. Thompson.

inconsequential]; cf. *Harris*, *supra*, 47 Cal.3d at p. 1079 ["We reject what appears to be an attempt to elevate hyperbole into misconduct."].)

Finally, in his reply brief, defendant claims respondent conceded misconduct by failing to address a claim he made in his opening brief (in connection with his argument that "nobody testified to [the prosecutor's] 'dance of death' "). Defendant asserted, without elaboration, that "[n]o witness testified" to the following statement of the prosecutor (made while showing photographs of the crime scene and arguing this was a professional hit, not a robbery, and that the Thompsons could see each other): "All the blood Mickey Thompson was losing at the top of the driveway will suggest that he was crawling in circles in this area (indicating)," and "ultimately was shot to death right where the white sheet is." Defendant does not explain how this is in any way significant, and again, any inconsistency with the evidence is inconsequential. There was no misconduct.

### ii. *The bankruptcy fraud claim*

In his opening statement, the prosecutor explained that, after defendant declared bankruptcy, Mr. Thompson was the most aggressive of defendant's creditors, and as a creditor he had two options. The prosecutor continued:

> "And these are important options to understand . . . . [¶] . . . Option 1, pay me what you owe me. That's all I ask for. You can do whatever you want to with the rest of the creditors. But pay me what you owe me and then go on about your business. . . . [¶] Option 2, pay me what you owe me. And I'm going to show the bankruptcy court that you have engaged in fraud, deceit, lying on the court, and the bankruptcy court won't discharge any of your debt. [¶] Guess which one Mickey chose? Option 2. That was the objection that Mickey filed with the bankruptcy court. That case was supposed to go to trial on March 18th. Mickey Thompson was killed two days beforehand."

Defendant contends this argument was misconduct because "[t]he prosecutor failed to prove [defendant] committed bankruptcy fraud." The short answer to this claim is that the prosecutor did not say he would prove defendant committed bankruptcy fraud; he said that Mr. Thompson intended to offer proof to the bankruptcy court that defendant had engaged in fraud. And the prosecution presented considerable evidence of

133

defendant's improper actions during the bankruptcy. For example, and as more fully described in part 1 of the facts, *ante*, when Jeffrey Coyne was appointed bankruptcy trustee, he discovered "there was no operating company to run," as "the operating part" had been sold to a company owned and operated by defendant's wife and another person. Mr. Coyne found "lots of gaping holes" and determined that the transfer "was all done for the purpose of moving the business without paying the creditors," the most vocal of whom was Mr. Thompson. Mr. Coyne testified to his belief the activity of defendant, his wife, and the entities in the transaction was fraud affecting Mr. Thompson's rights as a creditor.

In short, while defendant was not convicted of bankruptcy fraud – he was convicted of filing false loan documents, a fact never published to the jury – the prosecutor did not say otherwise, and there is obviously no misconduct.

### iii. Deputy John Williams

Defendant next cites as misconduct this part of the prosecutor's opening statement:

"I told you about that prized Mercedes, that 1982 SL coupe. Mickey Thompson went after that as a personal asset. It was ultimately seized by authorities. We will introduce you to Deputy John Williams who is now a public official in Orange County; no longer a serving officer. But he is a serving public official, an elected official.

"He will tell you that when he walked up to notify [defendant] that he was going to have to seize his car, he had legal documentation that entitled him, John Williams, to seize the car, [defendant] flew into one of his famous violent rages. He flew into a rage. He turned beet red. His neck got thick. Every vein on his face started sticking out. And he screamed, 'He doesn't know who he's fucking with. He's fucking dead . . . if he thinks he's going to take my car. The car was, in fact, taken."

Defendant cites this as misconduct, saying the prosecutor "failed to prove [defendant] made threats in the presence of Deputy John Williams." He is wrong. Mr. Williams testified just as the prosecutor said he would. But he also said his best recollection was that the incident occurred in late 1987 or early 1988, while other

134

witnesses and documentation showed a levy occurred in June or July 1986. Defendant says Mr. Williams's testimony was "false" because defendant was in bankruptcy since the fall of 1986, so the car could not have been seized in 1987 or 1988 to satisfy Mr. Thompson's judgment. But mistaken testimony is not "false" testimony. (Indeed, Mr. Williams was adamant, even when confronted with evidence that a levy occurred in 1986, that the incident he described "did not occur in August of 1986," and that he was "never told, even by the defendant, he was in bankruptcy or I wouldn't have taken his car.") There is simply no support for defendant's assertion that the prosecutor "failed to prove [defendant] made threats in the presence of Deputy John Williams," much less that the prosecutor's opening statement was "knowingly false and made in bad faith" and a "deliberate misstatement." There was no misconduct.

### iv. *Allegedly false promises of testimony*

Next, defendant makes several claims that the prosecutor "falsely promised" testimony or evidence that was not presented.

First, defendant again returns to the prosecutor's statement (see pt. i, *ante*) about the bullet through Mickey Thompson's brain, killing him. The prosecutor continued: "Witnesses that saw this, then watched as the gunman [*sic*] jumped on bicycles and began to pedal off." Defendant complains that "[n]obody testified to seeing the gunmen jump on bicycles and pedal off." That is true, but inconsequential. Witnesses heard the gunfire, and just after that Lance Johnson saw two men on bicycles riding down the Thompson driveway towards Woodlyn Lane. And Allison Triarsi heard the clicking of the bicycles, "[l]ike a ten speed bike," moving the back way out of the Thompson property. Plainly, "the variance between prosecutorial statement and actual proof is minor" and an inference of misconduct cannot be drawn. (*Wrest, supra,* 3 Cal.4th at p. 1108.)

Next, defendant asserts the prosecutor "falsely promised" the evidence would show defendant planned the murders, "but no such evidence was presented." This is a frivolous contention as to which defendant does not elaborate, and we do not consider it further.

135

Defendant also asserts misconduct in the final lines of the prosecutor's opening statement, where the prosecutor said: "He [(defendant)] would see that Mickey Thompson was killed before he ever got a dime of his [(defendant's)] money. And how do we know that? Because we got it from the absolute, most reliable source. [Defendant] said so." This is misconduct, defendant says, because "no confession was presented to the jury." This claim is nonsense. The prosecutor did not claim that defendant confessed. The prosecutor presented testimony from Gregory Keay that defendant said "Mickey was out to get all of his money and before that would happen, he would have him wasted." And Joel Weissler testified that he heard defendant tell Mr. Thompson, "You will never see a cent of it. I'm going to hurt you and your family." That is just what the prosecutor said, and defendant's claim to the contrary is disingenuous at best.

Finally, defendant asserts misconduct in the prosecutor's statement that: "And through this whole thing every single witness, every witness who heard anything, from the Johnsons to the Hackmans to the Triarsis, every witness that heard anything heard the same thing from Mickey Thompson. . . . Mickey Thompson repeated over and over, 'Please, please don't hurt my wife.' " Defendant points out that the Hackmans did not testify, and neither did the Triarsi parents. Again, this is inconsequential. Three of the witnesses mentioned did testify, and they all said what the prosecutor said they would say. As noted above, we do not see misconduct in the mention of anticipated witnesses who are not produced, when other witnesses provide the promised testimony. There was no misconduct.

### v. *Ronald Stevens's photo identification*

In his opening statement, the prosecutor talked about Ronald and Tonyia Stevens seeing defendant outside their home and their report of that incident to the police years later. The prosecutor continued: "Ron Stevens was asked if he would look at a series of photographs first. He said, sure, I'll look at a series of photographs and see if I can identify the person. He looked at the photographs and he pointed to a particular picture."

Defendant contends this was misconduct, because the prosecutor "knew at the time he made this statement it was false because he possessed a recording of that identification procedure, during which Ron indicated he was unable to narrow his choice down to fewer than three men . . . ."

We cannot find misconduct on this record. Mr. Stevens testified that when he was shown the photographs, he "was asked if [he] recognized anyone in the picture as being the person in that car," and he said, "Yes, I did." He said he recognized "No. 3, the top right corner," and that was defendant. Mr. Stevens was then asked on cross-examination, "Do you recall . . . that you actually weren't really able to draw it to No. 3, you actually narrowed it down to three out of the six?" and he replied, "No, I don't." The defense then played audio recordings in court of portions of the photographic identification procedure. A transcript of the audio recording (defense exhs. Z-1 & AA-1) shows Mr. Stevens saying, "[I]t was this color of hair but it was this type of nose, but was that type of complexion. I couldn't be positive," and, "Well, these three look similar," and "1, 5 and 3 . . . look similar." Detective Lillienfeld then says, "Yeah, but the guy you saw in the wagon that day most resembles who in this photo array now?" Mr. Stevens replies, "Number 3 or . . . [¶] Oh, okay. [¶] 1, 5 or 3 would be – if I saw them in person."

The prosecutor's opening statement was completely consistent with Mr. Stevens's testimony and, while the transcript shows uncertainty (which is why, as defendant points out, Detective Lillienfeld suggested a live lineup), it apparently also shows defendant did point to defendant's photo. In any event, there could be "'no conceivable prejudice'" where defendant was able to confront Mr. Stevens and challenge his testimony as defendant did here. (See *Dykes, supra,* 46 Cal.4th at p. 762.)

### vi. Assertions of false representations

Defendant next makes three claims of allegedly false assertions or promises in the opening statement.

First, in describing defendant's financial actions shortly before the murders, the prosecutor said: "[Defendant] had been hiding a series of investments in his wife Diane's name. You'll see the name Diane Goodwin. But we will also introduce evidence that

137

shows beyond a reasonable doubt that [defendant] was doing that on purpose. Why? To hide his assets from Mickey Thompson; to hide those assets from the Bankruptcy Court; and to set in motion his escape plan when he killed Mickey. [¶] He sold Whitehawk investments. And then another investment Desert Investors was also in Diane Goodwin's name. Within days of the first sale, he sold all of his interest in those, the second one. So what did he do with all this money?"

Defendant contends the prosecutor "falsely asserted '[defendant] sold Whitehawk investments," because the evidence showed "Whitehawk was never sold." This is another completely inconsequential point. It is true the Whitehawk investment itself was not "sold." (Dolores Cordell testified it was a real estate investment and she sought to bring returns from that investment into the bankruptcy estate; she testified she was able to bring the Whitehawk asset into the estate because she showed "the investment itself . . . belonged in the estate.") But in substance, the prosecutor showed what he said he would show: the Whitehawk investment was purchased with commingled funds of the Goodwins, but then distributions from the Whitehawk investment in 1988 were made in the name of Diane Goodwin. The parties stipulated there was a check for $365,000 payable to Diane Goodwin from J.G.A. Group dated May 6, 1988, containing the notation, "distribution from Whitehawk cashier's check." And Karen Stephens-Kingdon testified that $300,000 of that $365,000 was transferred to Diane Goodwin's account in another bank; some $275,000 of that money was used to purchase gold coins, and another $10,000 was wired offshore. That this money was from a distribution and not a sale is unimportant. There was no misconduct.

Second, defendant cites as misconduct the prosecutor's use of the words "skimming" and "stolen" in his description of defendant's actions that precipitated Mickey Thompson's lawsuit. The prosecutor described the inception of the dispute: Mr. Thompson had to "front more cash and more cash" for the venture's first racing event, despite defendant's obligation to furnish 70 percent of the capital. The prosecutor continued: "The evidence will show the reason Mickey Thompson was fronting all the money is because [defendant] was cheating him. He was [siphoning] money off the top;

138

skimming money off the top of the company; and skimming money out of the pocket of Mickey Thompson." So Mr. Thompson sued him, and obtained a judgment of almost $800,000. The prosecutor said the judge found that in eight months of doing business together, defendant "had stolen over $500,000 – $512,000 to be exact – from Mickey Thompson."

Defendant cites testimony that the issues in the dispute were over defendant's refusal to advance cash to put on events and his plan that Mr. Thompson "would have no say in, or revenue from, the operations," and that there was an issue raised of contract interpretation. These issues, defendant asserts, "do not amount to 'skimming' or 'stealing.' " Perhaps not, in a technical legal sense. But when one business partner refuses to contribute his agreed 70 percent share, jeopardizing the racing event and thus forcing the other partner to put up the money (not to mention planning that Mr. Thompson would have no revenues from the operation of their companies), it is hard not to think of this conduct, in the colloquial sense, as stealing. The prosecutor's language was well within the " 'broad scope of permissible argument.' " (*Dykes, supra,* 46 Cal.4th at p. 762 [rejecting contention that language in opening statement describing the defendant in an unflattering light was misconduct; the comments "were based upon evidence to be presented at the trial . . . and were within the 'broad scope of permissible argument' "].) (Defendant's assertion in his reply brief that "*Dykes* was wrongly decided" requires no comment from us.)

Third, defendant asserts misconduct in the prosecutor's statement that "the evidence in this case will show that [defendant] was never ever, ever going to pay Mickey Thompson what he owed him." Defendant says the evidence showed that in the weeks before the murders, defendant's and Mr. Thompson's attorneys had worked out a settlement, and defendant signed that settlement agreement after the Thompsons were murdered. This, defendant says, makes the prosecutor's statement "false[]." On the contrary, the evidence presented reasonably could be viewed just as the prosecutor said. Dolores Cordell testified that defendant repeatedly expressed his willingness to accept settlement terms, only to renege at the last minute. The testimony defendant

139

characterizes as showing that the settlement "would have paid Thompson the entire judgment" actually was that the settlement said "basically that Mickey Thompson's debt would not be dischargeable in the bankruptcy." Defendant signed the settlement after the murders, and Phillip Bartinetti testified that "to this day" the judgment has never been paid by defendant. No misconduct is shown.

### vii. The Insport agreement

As the prosecutor described it, the so-called "Insport agreement" was a contract that gave the signatory the unique ability to put on motor sports races with certain drivers in certain venues. Defendant was a signatory to the Insport agreement, which was worth "tens of thousands, potentially hundreds of thousands of dollars to the holder" of the contract. In his opening statement, the prosecutor said: "In order to try to satisfy his judgment, Mickey Thompson went after the Insport agreement. [Defendant] fought it. [Defendant] lost."

Defendant contends the last quoted statement was one of "numerous falsehoods" in the prosecutor's opening statement. He tells us the evidence showed (1) the Insport agreement became an asset of the bankruptcy estate and was put up for bid; (2) Diane Goodwin and Charles Clayton were the highest bidders, not Mr. Thompson, (3) "so it was not true that [defendant] 'lost' the Insport agreement to Thompson." The first part of defendant's description of the evidence is correct, but his conclusion is incorrect.

The Goodwin/Clayton enterprise (SXI, of which defendant was president) was the highest bidder for the Insport agreement, and purchased it with Bankruptcy Court permission. But SXI failed to make all the payments due to the Bankruptcy Court for the Insport agreement, and the trustee began taking steps to repossess it. Dolores Cordell testified that in December 1987, there was a hearing, and the court "essentially put the Insport agreement up to bid again." According to Ms. Cordell, several parties bid, including the Goodwins, and Mickey Thompson won that bid. Ms. Cordell's recollection was that he paid $500,000, in December 1987. (The trustee also testified that at no point during his tenure as the bankruptcy trustee did defendant ever own the Insport agreement "free and clear.") This evidence clearly supports the prosecutor's statement that "Mickey

140

Thompson went after the Insport agreement," and "[Defendant] fought it. [Defendant] lost." Defendant's claim that Ms. Cordell "had to admit she was wrong" is not borne out by the record. There was clearly no misconduct.

### b. The claimed violation of a court order

Defendant sought to prevent the prosecutor from eliciting any testimony about bankruptcy fraud in connection with defendant's conduct during the bankruptcy proceedings. (In federal proceedings, defendant had been charged with many counts of bankruptcy fraud and filing false loan documents, but was convicted only of filing false loan documents.) Thus, defendant objected to bankruptcy trustee Jeffrey Coyne expressing any opinion about whether the transfer of assets from defendant's company (ESI) to his wife's enterprise (SXI) during the bankruptcy was fraudulent. The trial court overruled that objection, but ordered the prosecutor to "stay away from fraudulent activity as separate criminal conduct." Before Karen Stephens-Kingdon testified about the Goodwins' financial transactions, defense counsel again asserted there should be no reference to bankruptcy fraud, and the prosecutor agreed there would be no mention of bankruptcy fraud.

The prosecutor scrupulously complied with the court's order. Nonetheless, defendant asserts that the prosecutor "repeatedly used the words 'fraud' and 'fraudulent' when questioning witnesses about the bankruptcy proceedings," and says "[t]his was misconduct." In fact, defendant's record citations for this claim of misconduct are completely devoid of any instance of the prosecutor's use of the words "fraud" or "fraudulent." The prosecutor used the word "fraud" once –in an instance not cited by defendant – when he asked Mr. Bartinetti whether Mr. Thompson, when he objected to defendant's discharge in bankruptcy, was "claiming fraud and/or deceit on the part of [defendant]." (Defense counsel's objection on grounds of hearsay and lack of foundation was sustained.) Indeed, our review of the record shows the only reference by the witnesses to "fraud" came from Mr. Coyne, when the prosecutor asked him how he would describe "the activity between [defendant]; his wife Diane Goodwin; E.S.I.; S.X.I.; Chuck Clayton; and the Insport agreement," and Mr. Coyne answered, "I hate to use the

141

'F' word, but fraud."[47]  As noted above, this testimony (not cited by defendant) was specifically permitted by the court.  The witnesses properly testified to events that occurred during the bankruptcy proceedings and to defendant's financial dealings.

In short, defendant's claim that the prosecutor's "obfuscation regarding 'fraud' was intended to confuse the jurors and convince them [defendant] had committed crimes in connection with the bankruptcies" has no basis whatsoever in the record.

### c.  The claim of prosecutorial misconduct by leading witnesses

Defendant contends the prosecutors "constantly engaged in leading" their witnesses and asserts this was prejudicial misconduct.  He cites some 100 objections over the course of 20 days of trial testimony, about three quarters of which were sustained.  Defendant also refers to several instances where the trial court cautioned the prosecutors about leading questions, but refused to admonish the jury that this was prosecutorial misconduct.  Thus:

After the court sustained an objection to a leading question during the prosecutor's examination of Mr. Bartinetti, defense counsel asked the court to cite the prosecutor for misconduct.  The court replied:  "Well, I have continued to sustain defense objections," but the court would "not cite anyone for misconduct right now, but simply admonish that the People try to pose the questions in a nonleading fashion.  And if it continues, we may get to that step, but we're not anywhere close to that yet."  The court said, "the objections have been I think well taken on the leading aspect of several witnesses already.  And I, at this point, just want the record to reflect that you are being asked to avoid leading questions."  And later, still with Mr. Bartinetti, "Let's stay away from leading questions, please."

During questioning of Dolores Cordell, after the court sustained an objection, the prosecutor asked for a sidebar.  The court said to the prosecutor:  "You know, there has

---

[47]  There was another reference by Mr. Coyne to issues in a pleading in the bankruptcy court that included "avoidance of fraudulent transfers," but this testimony was specifically elicited by defense counsel, not the prosecutor.

been a consistent problem with maybe your definition of leading and my definition of leading. I think a lot of these questions have been leading and that's why I have been sustaining the objections. I denied the request for any kind of misconduct citation because I don't believe this is intentional on your part. I think we have an honest disagreement as to the form of the question."

Later, at a sidebar on several subjects during Ronald Stevens's testimony, the court denied defense counsel's request to admonish the jury about improper leading questions, "[f]or right now . . . ." The court refused a similar defense request during Allison Triarsi's testimony. During Karen Stephens-Kingdon's expert testimony, the court observed that "I've been troubled by the leading questions. I'm not saying that the leading questions are necessarily improper. But it's difficult for me to understand exactly what you're asking for if you're supplying the information. [¶] I mean I would rather hear from the witness. The witness is clearly an expert. . . . [¶] I know I would feel more comfortable and I think it would be more helpful if the questions were not so suggestive and so leading."

Based on these objections and the court's rulings, defendant gives two examples of purportedly prejudicial leading questions on key issues in the case. One was a question to Ronald Stevens (who identified defendant as the man with binoculars in the car outside his house a few days before the murders). Pointing to defendant, the prosecutor asked, "Would you describe [defendant's] complexion as ruddy and pock marked?" But before the prosecutor asked that leading question, he had already elicited testimony from Mr. Stevens about defendant's complexion. Mr. Stevens had testified that he described the man to the police as "a big man with reddish colored hair and a ruddy complexion." In addition, the prosecutor had asked Mr. Stevens, "What did you mean when you said he had a ruddy complex [*sic*]?" Mr. Stevens answered, "It's someone that has like pock marks or something when they were young and as they got older it was just a ruddy type of complexion." In short, the prosecutor's subsequent question was leading, but it was not misconduct.

143

Defendant's second example was a question to Allison Triarsi, after she had testified that she was very familiar with the Thompson driveway: "From your [perspective] where you – from your view, I should say, was it your impression – being familiar with that driveway – that Mickey Thompson was in a position to see Trudy Thompson?" Defense counsel objected and asked for a sidebar; no answer was given to the question (and the court did not rule on the objection). At the sidebar, the court refused to cite the prosecutor's leading questions as prosecutorial misconduct and refused to admonish the jury, saying: "The jurors know that when I sustain the objection, that I'm finding that the question is improper. And they were preinstructed as to not to view the question as evidence and not to speculate as to what the answer might be. I think that message has been made quite loud and clear because the objections have been continuing throughout the trial. And they have all, just about, been sustained." After the sidebar, the prosecutor asked Miss Triarsi about the view of a person standing in the driveway where Mickey Thompson was, and she testified that "he could easily look down unobstructedly and see Trudy." We do not see any misconduct – and certainly nothing prejudicial – in the prosecutor's original question.

Further, the only cases defendant cites to support his misconduct claim are cases that say it is misconduct deliberately to elicit inadmissible and prejudicial testimony. That did not happen in this case. (See *People v. Hayes* (1971) 19 Cal.App.3d 459, 470 ["we do not perceive such method of questioning [leading questions] to constitute prejudicial misconduct in the absence of any showing that such examination had the effect of deliberately producing inadmissible evidence or called for inadmissible and prejudicial answers"; the questions complained of "did not produce inadmissible evidence or prejudicial answers, but evidence that could properly have been elicited by questions not objectionable in form"]; cf. *People v. Hinton* (2006) 37 Cal.4th 839, 865 [the prosecutor's argumentative and speculative questions during cross-examination of the defendant "were not improper 'over and above being in violation of the Evidence Code' "].)

144

#### d. The claim of misconduct in closing argument

Defendant asserts there were six instances of prosecutorial misconduct in closing argument. Again we disagree.

##### i. *The claim the prosecutor misstated the burden of proof*

Defendant's first claim of misconduct in closing argument is that the prosecutor "repeatedly misstated the burden of proof" by arguing "a 'totality of the circumstances' burden of proof of a conspiracy, and as the standard for proving that [defendant] murdered the Thompsons." Defendant made no objection during the argument, but afterward asked the court to reread the reasonable doubt instruction, contending that the prosecutor implied that defendant "was responsible as if this were somehow a civil case." We find no misconduct, as the prosecutor's argument, read as a whole, was both clear and correct on the burden of proof. (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 ["we must view the statements in the context of the argument as a whole"].)

In the challenged statements, the prosecutor was explaining the theories of liability (aiding and abetting and conspiracy). In discussing aiding and abetting, the prosecutor observed that defendant "does not have to have been at the crime scene. As long as you are convinced that [defendant] is responsible in any way shape, form or fashion for the murders of Mickey Thompson and Trudy Thompson, he is liable for everything that the actual killers did." Then the prosecutor talked about conspiracy, telling the jury that conspiracy, though uncharged, was important, because every member of a conspiracy is liable for the conduct of the others. So "if you find that he was a conspirator, if you find that he was responsible and there was some agreement to kill Mickey Thompson and Trudy Thompson," then "it's just as if" defendant shot them. The prosecutor continued:

"The formation in existence of a conspiracy can be proved through circumstantial evidence and the circumstances surrounding the totality of the evidence.

"In other words, you don't have to dissect this case to figure out if there is a conspiracy to commit murder. You can look at the totality of the circumstances. As a matter of fact, the jury instruction tells you to do exactly that. These two men, the two killers were acting in concert with one another.

145

"It was well timed, well coordinated and almost perfectly executed. The killers got away. You can infer from that, you have to infer from that the only reasonable explanation is they were working together. These aren't two people who happened upon the same house at the same time and just happened to kill Mickey and Trudy Thompson.

"Everybody agrees these people were obviously working together. There was an agreement there. And if the totality of the circumstances suggest that Michael Goodwin is responsible for the killings of Mickey and Trudy Thompson, then Michael Goodwin is a conspirator along with the two actual killers."

After explaining it was not necessary to prove that defendant knew or met with the killers, the prosecutor said, "As long as the totality of the circumstances proves that [defendant] was responsible for the murders of Mickey and Trudy Thompson, we don't have to show that he even knew the killers. As long as you agree and are convinced that this was a concerted act on all parties." Then the prosecutor explained that unanimity was not necessary on the theory of liability, saying that some jurors could decide defendant was an aider and abetter and others could say, "you know what, I'm absolutely convinced there was a conspiracy and [defendant] was part of it." And: "There does not have to be unanimity among you with regard to the theory of liability as long as everybody is convinced that [defendant] is responsible for the murders of Mickey and Trudy Thompson . . . ."

Immediately following those remarks, the prosecutor said: "I want to say just a couple of words about beyond a reasonable doubt. That's the instruction that puts upon us the burden. And I will tell you right now, [defense counsel] and the defense team has no burden in this case. . . . [¶] [T]he system of justice . . . says that the prosecution bears the entire burden of proof. And that burden is to prove the criminal case beyond a reasonable doubt. Every element of it. I accept that. I . . . embrace that. The defense doesn't have to prove anything." The prosecutor then spoke about the meaning of reasonable doubt, and concluded: "So ask yourselves based on the totality of the circumstances, do you have an abiding conviction that [defendant] is responsible in any way for the murders of Mickey Thompson and Trudy Thompson? If so, we've proved

146

this case to you to an abiding conviction, beyond a reasonable doubt." The prosecutor also told the jury that the case could be proved by circumstantial evidence, and that "as long as you're convinced through both circumstantial and direct evidence or one or the other that [defendant] is responsible for the deaths of Mickey and Trudy Thompson, that's all that's required."

After the argument was completed, defense counsel asked the court to reread the burden of proof instruction, and specifically to instruct the jury that "responsibility" is a civil term, and "responsibility only plays a part in a civil hearing." The court disagreed, explaining that "the context of the argument was [defendant] wasn't there. He was responsible as an aider and abetter and a co-conspirator. And that's how I think the jury would interpret that comment." The statement "was with reference to [vicarious] liability here. And that is the essence of the prosecution's case. I'm happy to reread the burden of proof instruction."

It is apparent from the trial court's comments and from a review of the entire argument – rather than the snippets quoted by defendant – that there was no misstatement of the burden of proof.

### ii. Claims of improper exploitation of excluded evidence

Defendant asserts it was misconduct for the prosecutor to "exploit" the court's exclusion of evidence of third party culpability and Joey Hunter's polygraphs (see pts. 9 & 11, *ante*) and the exclusion of evidence the killings were the result of a robbery gone bad (Mr. Thompson's purchase of gold a few days before the murders) (see pt. 10, *ante*). Defendant asserts the two prosecutors devoted much of their closing arguments to the lack of evidence that anyone other than defendant hated Mr. Thompson enough to kill him, and to the lack of evidence of a robbery.

Thus, for example, the prosecutor argued that "the only evidence you have heard in this trial" was evidence that pointed to "only one person who hated Mickey Thompson so much that he wanted to end his life. And make sure that Mickey Thompson saw the person he loved the most die in front of him before he died. And that is [defendant]." And: "[T]here is really an important concept here as we talk about this. And that is,

147

what is reasonable and what is unreasonable?  What is evidence and what is speculation?

When you hear someone say, well, you know, it could have been.  It could have been a

robbery.  There could have been a video camera there.  They are asking you – [defense

counsel] is asking you to speculate as to what might have been.  As to some evidence that

doesn't exist.  Could have been."  Defendant cites many other instances of similar

arguments in the prosecutor's closing, and concludes that it was "nothing short of

outrageous" for the prosecutor to "unfairly [take] advantage of the judge's rulings."

This claim of misconduct is without merit.  First, the claim is forfeited because

defendant did not make any objection at trial.  (*Thornton, supra*, 41 Cal.4th at p. 454.)

Second, the authorities defendant cites do not support his contention that, in effect, it is

misconduct for a prosecutor to argue his case based on the state of the evidence in the

record.

Misconduct may occur if the court, at the prosecutor's behest, erroneously

excludes evidence that should have been admitted, and the prosecutor knowingly lies to

or otherwise misleads the jury.  *People v. Varona* (1983) 143 Cal.App.3d 566 (*Varona*)

demonstrates the point.  In that case, the defendants, charged with rape and other crimes

and defending based on the alleged victim's consent, tried to introduce evidence that the

complaining witness had earlier pled guilty to prostitution and was on probation at the

time of trial.  The trial court excluded that evidence, and then the prosecutor argued to the

jury that there was no evidence the woman was a prostitute – even though he "knew he

was arguing a falsehood."  (*Id.* at pp. 569-570.)  The Court of Appeal found it was error

to exclude the evidence, and also agreed with the defendant's contention "that it was

misconduct for the prosecutor to argue that there was no proof that the woman was a

prostitute when he had, by his objections, prevented the defense from proving that fact."

(*Id.* at p. 569.)  The court explained:  "[I]n a proper case, a prosecutor may argue to a jury

that a defendant has not brought forth evidence to corroborate an essential part of his

defensive story.  But we know of no case where such argument is permissible except

where a defendant might reasonably be expected to produce such corroboration.  Here the

prosecutor not only argued the 'lack' of evidence where the defense was ready and

148

willing to produce it, but he compounded that tactic by actually arguing that the woman was not a prostitute although he had seen the official records and knew that he was arguing a falsehood. The whole argument went beyond the bounds of any acceptable conduct." (*Id.* at p. 570.)

Similarly, in *People v. Daggett* (1990) 225 Cal.App.3d 751 (*Daggett*), the court erroneously excluded evidence that the child molestation victim (who himself had been charged with molesting younger children) had reported previously being molested by persons other than defendant. The error "was compounded when the prosecutor argued to the jurors that if they believed [the victim] molested other children, he must have learned that behavior from being molested by [the defendant]." (*Id.* at p. 757.) The erroneously excluded evidence was intended to refute that very argument, and the court found the prosecutor misled the jury by making the argument and "unfairly took advantage of the [court's] ruling." (*Id.* at p. 758.)

This case bears no similarity to the cited cases. This is not a case where the court excluded evidence that should have been admitted. Nor did the prosecutor "argu[e] a falsehood" or mislead the jury or unfairly take advantage of an erroneous ruling. The prosecutor properly argued his case, based on the state of the evidence in the record, that this was a contract hit, not a robbery, and there was "only one person who hated Mickey Thompson so much that he wanted to end his life." There was no misconduct. (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [finding *Varona* and *Daggett* inapposite because they involved "erroneous evidentiary rulings on which the prosecutor improperly capitalized"; "[b]ecause the prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld, there was no misconduct"].)

### iii. Claimed references to facts not in evidence

It is misconduct to refer in argument to "matter outside the record." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948.) Defendant claims the prosecutor argued facts not in evidence when he said these things:

"Mickey Thompson stood on the top of the driveway and watched in horror as the love of his life, Trudy Thompson, had a bullet put through the back of her head."

"Mickey Thompson was executed on March 16th, 1988, at 6:05 in the morning, but not before he had to watch his wife, his family, suffer and die. Exactly how [defendant] said he wanted it to happen. Exactly."[48]

"[Defendant] lost the Insport agreement. [Defense counsel] might stand up and say, well, there is no proof that Mickey Thompson got it. Who cares who got it. All we care about is who lost it. [Defendant] lost it."

"Within weeks [they] sold all of Diane Goodwin's interest in Whitehawk. But Diane Goodwin's interest in Whitehawk was really [defendant's] interest in Whitehawk. He had been hiding assets in her name or attempting to hide assets in her name and he dumped them all."

This claim of misconduct, too, is without merit. Defendant made no objection to any of these statements at trial, so the claim is forfeited. (*Thornton, supra*, 41 Cal.4th at p. 454.) In any event, these misconduct claims have no merit. They are essentially duplicates of points we have found to be without merit in connection with similar claims of misconduct in the prosecutor's opening statement. (See our discussion in pt. 15.a.i., pt. 15.a.vi., and pt. 15.a.vii, *ante*.) The only different claim of misconduct is that, after saying that Mr. Thompson had to watch his wife die, the prosecutor said: "Exactly how [defendant] said he wanted it to happen. Exactly." Defendant points out that no one testified to defendant's making such a statement. Defendant is literally correct, in that there is no evidence defendant said he wanted Mickey Thompson to watch his wife die. But there was evidence defendant specifically said, on two different occasions, that he was "going to hurt you and your family," "I'll get you. I'm going to hurt you," and "I'm going to hurt your family." In short, we consider the prosecutor's remark fair comment on the evidence, not misconduct. (*People v. Ward* (2005) 36 Cal.4th 186, 215 (*Ward*) [" ' "[A] prosecutor is given wide latitude during argument. The argument may be

---

**48**     Defendant also cites, but does not quote, other parts of the closing argument that he describes as saying that "Trudy had to die first." Presumably defendant refers to these statements: "That first killer making sure that Trudy was dead and Mickey was still alive to watch it," and "[t]hey couldn't kill Mickey first because Trudy had to die."

vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' "].)

#### iv. *Claimed misrepresentation of bankruptcy law*

Defendant next cites as misconduct the prosecutor's argument at pages 8783-8784 of the trial transcript, saying that argument "misrepresented the law of bankruptcy" in order to make his case that defendant's motive and intention was to avoid paying his civil judgment. In that part of the prosecutor's argument – which defendant does not quote – the prosecutor explained that, after the yacht loan was approved, and shortly after the murders, the Goodwins' house went into escrow; assets defendant had been trying to hide in his wife's name were turned into cash; and cash was turned into gold and moved offshore.

First, no objection was made at trial, and the claim is forfeited. Second, we fail to see how that argument "misstat[ed] the law of bankruptcy." Defendant presents no comprehensible argument or citation of authority for this point, so we do not consider it further. To the extent this is another version of defendant's claim that the prosecutor violated the court's order to "stay away from fraudulent activity as separate criminal conduct," or that there should be no mention of bankruptcy fraud in connection with Karen Stephens-Kingdon's testimony, we have already found, in part 15.b., *ante*, that the prosecutor fully complied with the order.

#### v. *Vouching for witnesses*

The prosecutor "is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant." (*People v. Anderson* (1990) 52 Cal.3d 453, 479.) Thus a prosecutor is not permitted " 'to place the prestige of [his] office behind a witness by offering the impression that [he] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or

151

belief," [his] comments cannot be characterized as improper vouching. [Citations.]' [Citation.]" (*Ward, supra,* 36 Cal.4th at p. 215.)

Defendant contends the prosecutor vouched for the credibility of John Williams when he said the following, in rebuttal to defense counsel's argument about Mr. Williams's testimony (including that the prosecutors "knew that John Williams was lying" and that "John Williams is just simply delusional"): "[Defense counsel] went on and on [about John Williams]. And I think she said that John Williams was delusional. [¶] Please as we talk this morning I'm going to ask you a number of times to think back and remember witnesses and how they testified on the stand. John Williams is an elected official in Orange County. A long time public servant. At the time of the repossession of the car, he was a deputy marshal in Orange County. . . . [¶] I don't think anyone in this courtroom would argue with it, his dates were probably off by a year or so." After describing his testimony, the prosecutor continued: "You saw this man on the stand. You'll have to make that judgment. But I would submit to you that what he told you and how this went down and what [defendant] said about Mickey Thompson is absolutely true."

Once again, defense counsel posed no objection to the prosecutor's remarks at trial, so the claim of misconduct is forfeited. In any event, the prosecutor's statements were not improper vouching. Defendant says the prosecutor was "vouching about Williams' status as an elected official and a marshal," and "expressed his personal belief in Williams' credibility." But Mr. Williams testified that he was elected as the Orange County Public Administrator, and that he had been a deputy marshal, so the prosecutor's remarks about his status were " 'based on the "facts of [the] record . . . rather than any purported personal knowledge or belief," ' " so that comment " 'cannot be characterized as improper vouching.' " (*Ward, supra,* 36 Cal.4th at p. 215.)

As for the prosecutor's statement that he "would submit to you that what [Mr. Williams] told you . . . is absolutely true," the prosecutor preceded that statement with a description of his testimony and with the proviso that "[y]ou'll have to make that judgment." Considered in context, this was not improper vouching. (See *Ward, supra,*

152

36 Cal.4th at p. 216 [there was no improper vouching where the prosecutor, referring to a witness's testimony, said " 'The only thing I have ever told him is to tell the truth, nothing but the truth, and that's what he did for you' "; the prosecutor "was no more than expressing his view of and reasonable inferences from the totality of the evidence"]; see also *United States v. Necoechea* (9th Cir. 1993) 986 F.2d 1273, 1279 [prosecutor stated, " 'I submit to you, ladies and gentlemen, that she's not lying. I submit to you that she's telling the truth' "; the court concluded that "[t]hese 'I submit' statements do not constitute vouching," and "do not imply that the government is assuring [the witness's] veracity"].)

There was no misconduct here.

### vi. The claim of Griffin error

In *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*), the high court held that the Fifth Amendment forbids comment by the prosecution on the accused's silence. "Under the rule in *Griffin*, error is committed whenever the prosecutor or the court comments, either directly or indirectly, upon defendant's failure to testify in his defense. It is well established, however, that the rule prohibiting comment on defendant's silence does not extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 755; *People v. Lewis* (2001) 25 Cal.4th 610, 670 ["The prosecutor is permitted, however, to comment on the state of the evidence, 'including the failure of the defense to introduce material evidence or to call witnesses.' "].) As *People v. Murtishaw* (1981) 29 Cal.3d 733, 757, tells us, applying the *Griffin* principle, "federal courts have 'held that for the government to say, in summation to the jury, that certain evidence was "uncontradicted," when contradiction would have required the defendant to take the stand, drew attention to his failure to do so, and hence was unconstitutional.' [Citations.]" And "California decisions reach the same result." (*Ibid.*)

Defendant challenges, as *Griffin* error, the following comments in the prosecutor's argument. After pointing out that defendant "was positively identified by two independent witnesses three days before the murders doing surveillance right at the

153

perfect spot for ingress and egress in and out of Bradbury," the prosecutor said: "I expect that [defense counsel]'s going to stand up here and say, wait a minute, you can't believe the Stevenses identification. [Defendant] was never out there. He was never at that scene. [¶] Well, where is his alibi?" (At this point, defense counsel objected, the trial court overruled the objection, defense counsel cited *Griffin* error, and the trial court said that would be discussed later.) The prosecutor continued: "If someone -- let's see it's ten minutes -- that's seven minutes until 11:00 on December 18th, 2006. If someone said, hey, Mr. Jackson, you committed a crime on that day; or you were at such and such spot on that day. I would call every single person in this courtroom and subpoena them to court to say, no, at six minutes until 11:00 on December 18, 2006, he was standing on a swatch of carpet eight feet in front of me."

The prosecutor then described the subpoena power, and said: "The defense could have called any witness they wanted to to provide an alibi for [defendant]. One of the most important days of his life was March 16th, 1988. He found out that Mickey Thompson and Trudy Thompson had been killed. If you believe the defense, he found out for the first time. [¶] Of course the evidence suggests that he found out that his plan had worked. But even assuming that the defense is right and he didn't know anything, then why didn't they call an employee; a business partner; somebody to say, hey, that week before the murders [defendant] was with me. [¶] But you heard nothing from that. Why? Because [defendant] was in front of the Stevens' house three days before the murders."

After the argument, defense counsel asked the court to instruct the jury that the prosecutor's comment was misconduct, as it was "commenting on the defendant's refusal to testify by implication," and "[i]f [defendant] were to present an alibi, that would require him to testify." The court denied the request, saying, "this is a murky area," but "I don't view the statement commenting on the failure to call logical witnesses to testify as to [defendant's] whereabouts on the day . . . of the Stevenses' observation" as *Griffin* error. "[A] lot of cases . . . indicate that that is a fine line. I don't think the People have crossed that line."

154

We agree with the trial court. *People v. Bradford* (1997) 15 Cal.4th 1229 (*Bradford*) is instructive. In that case, the court observed that a prosecutor "may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Id.* at p. 1339.) In *Bradford*, "there were brief comments by the prosecution during closing argument noting the absence of evidence contradicting what was produced by the prosecution on several points, and the failure of the defense to introduce material evidence or any alibi witnesses. These comments, however, cannot fairly be interpreted as referring to defendant's failure to testify. Neither the general comment directed to the lack of defense evidence or testimony, nor the more particularized comments regarding . . . the absence of alibi for a particular time period, would have required defendant to take the stand." (*Ibid.*)

*People v. Vargas* (1973) 9 Cal.3d 470 (*Vargas*) also demonstrates the point. There, the court found *Griffin* error in the prosecutor's statement that " 'there is no denial at all that they were there [robbing Mr. Olness]' " (*Vargas*, at p. 476), and explained: "[T]he word 'denial' connotes a personal response by the accused himself. Any witness could 'explain' the facts, but only defendant himself could 'deny' his presence at the crime scene. Accordingly, the jury could have interpreted the prosecutor's remarks as commenting upon defendant's failure to take the stand and deny his guilt." (*Ibid.*) On the other hand, the court observed, in *dicta*, that another statement by the prosecutor was not *Griffin* error. "[D]uring the prosecutor's closing argument, the prosecutor agreed that defendants did not have to take the stand, but he inquired, 'Why didn't they have some witnesses to say where they were on the 29th, on the evening of the 29th. They had to be somewhere . . . .' " (*Vargas,* at p. 474.) As to this statement, the court said, "under the rule in [*People v. Bethea* (1971) 18 Cal.App.3d 930, 936], the prosecutor's initial comments . . . regarding the lack of alibi witnesses was not *Griffin* error." (*Id.* at p. 476, fn. 5.)

155

This case is no different from *Bradford* or *Vargas*. The prosecutor's comment, "Well, where is his alibi?" may not be plucked from its context and then construed as referring to defendant's failure to testify. As in *Bradford*, the prosecutor clearly referred to the absence of any alibi witnesses, not to the defendant's failure himself to testify that he was elsewhere. And as in *Bradford,* none of the prosecutor's "comments regarding . . . the absence of alibi for a particular time period, would have required defendant to take the stand." (*Bradford, supra,* 15 Cal.4th at p. 1339.)

Defendant insists the prosecutor's argument was "an attempt to shift the burden of proof to [defendant]" by inviting the jury to look to defendant for an explanation of where he was at the time. This claim has no merit. As *Bradford* tells us, "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Bradford, supra*, 15 Cal.4th at p. 1340.) There was no *Griffin* error.

**16. The Claim of Outrageous Government Misconduct**

Defendant's final contention, like his first, is a claim of outrageous governmental misconduct. This time, the claim is not based on the prosecutor's conduct relating to attorney-client privileged documents. Instead, defendant asserts, among other things, that the prosecutor "relied heavily upon false evidence created by [Los Angeles Sheriff's Department]'s investigators in order to arrest and convict [defendant]."

The "false evidence" consists of defendant's contention that Detective Lillienfeld repeatedly lied in sworn statements: in affidavits supporting the Orange County search and arrest warrants and the live lineup; in the grand jury proceedings; and at the Orange County preliminary hearing. The alleged lie was "that [defendant] owned a gun that was consistent with the weapons used in the Thompson murders." According to defendant, this "false evidence" was used to arrest and charge defendant in Orange County, "setting in motion the juggernaut that resulted in [defendant's] conviction." In other words, but for Detective Lillienfeld's "perjury," the prosecutors would have been unable to obtain

156

search or arrest warrants (and, if the jury had been informed of these "falsehoods," defendant would have obtained a different result at trial).

We reject defendant's claim of misconduct, both because it was forfeited and because it has no merit. We turn first to the facts of record relating to the claim of "false evidence" used to arrest and charge defendant.

### a. The "false evidence" claim

Defendant repeatedly accuses Detective Lillienfeld of "perjury," "lies," "manufactur[ing] evidence," and the like, based principally on the detective's search warrant affidavit of December 7, 2001, and other sworn testimony before the Orange County grand jury and at the April 2002 Orange County preliminary hearing, to the effect that a .9-millimeter Smith & Wesson firearm owned by defendant could have been the murder weapon.[49] These statements were, according to Detective Lillienfeld, mistaken, and, according to defendant, lies. The facts as revealed at trial were these.

In the December 2001 affidavit, Detective Lillienfeld averred that Dwight Van Horn, firearms examiner at the sheriff's crime lab, told him that the weapons used in the Thompson murders had "rifling characteristics of six right lands and grooves," and that the possible manufacturers included Smith & Wesson, "with three character model numbers." Federal firearm sales records indicated defendant had purchased a Smith & Wesson, model 469, in 1984, and the detective's affidavit stated that "[t]his pistol falls within the rifling characteristics of the murder weapon, according to Deputy Dwight Van Horn . . . ." Similarly, the detective testified to the grand jury that defendant's firearm could have been a murder weapon. These statements were, as the detective later testified in the trial court, incorrect.

---

[49]     We have denied defendant's request for judicial notice of the Orange County preliminary hearing transcript and Detective Lillienfeld's grand jury testimony. (See fn. 7, *ante*.) We refer to those documents only in the context of statements by counsel in the trial court record and Detective Lillienfeld's own references, during his trial testimony, to his testimony in Orange County.

At the trial, defendant called Detective Lillienfeld as a defense witness, and sought to impeach him with previous false statements. This was based on Dwight Van Horn's ballistics memorandum, prepared shortly after the murders. The memorandum indicated that certain guns (which included defendant's) were specifically *not* included in the universe of possible guns that could have been used as the murder weapon, while Detective Lillienfeld testified in Orange County (and averred in his affidavit) to the "exact opposite." The prosecutor objected, contending Detective Lillienfeld made a mistake and misinterpreted Mr. Van Horn's ballistics report.

Defense counsel contended (and continues to do so on appeal) the claim of mistake was "incredible" and that, "[b]ased largely on this falsehood, [defendant] was arrested for the Thompson murders . . . ." (No evidence is cited to support the claim that defendant's arrest was "[b]ased largely" on the detective's statements about the gun; the search warrant affidavit extends to some 54 pages.)

The trial court held an Evidence Code section 402 hearing to determine whether there was evidence indicating Detective Lillienfeld "committed a prior act involving moral turpitude," as such evidence would be relevant to challenge the detective's credibility. At the hearing, Detective Lillienfeld testified that in July 2001, the sheriff's department tested a Smith & Wesson three-digit model firearm, and the report showed "five lands and grooves with a right twist." Mr. Van Horn did not tell him that the murder weapon had six lands and grooves, and his impression from reading Mr. Van Horn's memorandum was "that a Smith & Wesson .9 millimeter pistol with a three-character model number was a potential murder weapon in this case." Detective Lillienfeld did not look into any database to determine whether a Smith & Wesson three-digit model number produced five or six lands and grooves.

The subject line of Mr. Van Horn's memorandum was: ".9 Millimeter Pistols to be Eliminated as Suspect Guns." The list included Smith & Wesson three-digit model numbers, and it also included Glocks, as well as weapons that could have been eliminated "just by virtue of sight, for instance, machine-type guns, machine-gun type Uzis, and Mack Tens." (A postscript to the memorandum indicated that "maybe we can eliminate

158

these [Uzis, Mack Tens, etc.] with a photo line-up.") Detective Lillienfeld was asked if he was aware that "bullets fired from a Glock look completely distinguishable from other firearms," and responded, "No." Detective Lillienfeld interpreted the subject line of the memorandum "to mean that the below list of guns should be brought to me I can – 'me,' meaning Dwight Van Horn, the ballistics expert. I can conduct ballistics exam on them and eliminate them as being potentially the murder weapon." Detective Lillienfeld agreed that "it sound[ed] like Mr. Van Horn was saying we can eliminate these guns [the Uzis, etc.] based on a photo line-up; we can eliminate these guns [the Smith & Wessons, etc.] based on ballistics," and that was how he was testifying when he said that "it appeared that these guns were in the possible universe of guns that needed to be eliminated as suspect weapons."

Detective Lillienfeld also testified that, when he spoke to Mr. Van Horn, "I asked him specifically about that memo you're holding and asked him if those were all possible guns. And the response I got was, yes, those are all possible guns that were used in this crime." Detective Lillienfeld said that no one advised him, before his testimony to the Orange County grand jury, "that the murder weapon was not a five land and groove." Further, he was not aware that the July 2001 test of a Smith & Wesson three-digit model "would apply to all three-digit Smith & Wesson models."

Detective Lillienfeld admitted testifying to the grand jury that the three-digit model Smith & Wesson registered to defendant could have been a murder weapon; that he put that information in subsequent affidavits; and that it was incorrect. He did not attempt to verify the information with Mr. Van Horn before testifying, and he did not attempt to check databases containing information on the general rifling characteristics of the guns. Detective Lillienfeld became aware of his mistake "I believe some time in 2001," when defendant's appellate attorney identified the error "through a series of litigation in court . . . ."

Detective Lillienfeld also testified that the July 2001 test was on a weapon registered to defendant. The detective testified at the Orange County preliminary hearing in 2002, and he knew before he testified "that the one – at least the one gun that [he] took

159

from [defendant] that was a three-digit model Smith & Wesson was not the murder weapon." He did not so state in his testimony at the Orange County preliminary hearing, but he was not asked that specific question. His understanding was that other three-digit models (other than the one tested) "could be in the universe of possible suspect guns."

After Detective Lillienfeld's testimony, defense counsel argued that the jury should decide "whether or not that was a lie or just negligence." The court ruled otherwise, observing that "I read [Mr. Van Horn's memorandum] the same way that the detective did," and "I would interpret that the same way." The court said, "I don't have the experience the detective does, but I certainly can read English," and concluded, "just so it's clear, I mean there is really nothing in the record to indicate that this witness committed an act of moral turpitude which would bear on his credibility based on what I heard."

### b. Other claims

In addition to the claim of perjury related to defendant's firearm, defendant recites, at length, other grievances about the investigation.

Defendant asserts Detective Lillienfeld and the prosecutors used Gail Moreau-Hunter's "demonstrably false" statement that defendant confessed to her in order to prosecute defendant. He makes unsupported claims that Detective Lillienfeld "falsely testified" at the Orange County preliminary hearing "that Gail Moreau-Hunter had not attempted suicide."

Defendant asserts that Detective Griggs's investigation was "derailed" by Collene Campbell's interference. (Ms. Campbell complained about Detective Griggs, and defendant's recitation is based on a memorandum Detective Griggs wrote about the investigation and Ms. Campbell's activities in connection with it. None of the facts defendant recites suggests the investigation was "derailed" by Ms. Campbell's activities.)

Defendant asserts that Detective Lillienfeld "permitted Campbell to direct his investigation." (Nothing is cited that supports this claim.)

160

He asserts without record authority that the Los Angeles District Attorney "attempted to inhibit all information that did not support the theory [defendant] was responsible for the Thompson murders."

He asserts that Detective Lillienfeld "usurped power" by presenting his case to the Orange County District Attorney after the Los Angeles District Attorney rejected it in 1998, and his actions were "ratified by the OCDA and later by the LADA," all of which "shock[s] the conscience and constitute[s] outrageous government misconduct."

### c. Forfeiture of the claim of outrageous government misconduct

Defendant forfeited his claim of investigatory misconduct by failing to make it before the trial court.

Defendant concedes the "lack of objection," but says it would have been futile to make an objection to Detective Lillienfeld's pretrial misconduct, because (1) the trial court denied his other motions to dismiss for misconduct (see pt. 1, *ante*), and (2) after the Evidence Code section 402 hearing just described, the trial court refused to permit defense counsel to impeach Detective Lillienfeld with his "false testimony." We do not agree the claim would have been futile.

Defendant's other motions were based on the seizure, retention and review of attorney-client privileged documents, not on the investigatory misconduct defendant now asserts. Moreover, defendant now makes claims of improper interference with the investigation, usurpation of power, and the like, in addition to the claims of "perjury" and "manufactured evidence." There is no excuse for the failure to make these claims to the trial court, which repeatedly showed its willingness to entertain defense objections and motions on all manner of claims.

The cases defendant cites to support his claim of futility show that futility is an appropriate basis for a failure to object to prosecutorial misconduct in extreme cases, where the misconduct is pervasive and the trial court does not act. (See, e.g., *Dykes, supra,* 46 Cal.4th at p. 775 [rejecting futility argument; unlike the case in *Hill*, *supra*, 17 Cal.4th 800, "the present case did not involve counsel experiencing—as did counsel in *Hill*—a 'constant barrage' of misstatements, demeaning sarcasm, and falsehoods, or

161

ongoing hostility on the part of the trial court, to appropriate, well-founded objections"].) This is obviously not such a case.

Further, the claims defendant makes are precisely the sort of claims that require fact finding and credibility determinations by the trial court. All the evidence defendant asserts in support of his claims was available at the time of trial. In short, defendant does not present a compelling case for excusing the forfeiture of his claims of investigatory misconduct.

### d. The merits

Defendant has forfeited his claim of outrageous government misconduct, but in any event it has no merit. We briefly address each of defendant's assertions (except for those already described, in subpart b., *ante*, as having no support in the record).

First, there is the claim of "perjury" in connection with defendant's firearm. As described above, the trial court heard Detective Lillienfeld's testimony on those points, and found "nothing in the record to indicate that this witness committed an act of moral turpitude which would bear on his credibility . . . ." We are bound by that determination. (See *Ochoa, supra,* 6 Cal.4th at p. 1206 ["we must . . . not substitute our evaluation of a witness's credibility for that of the fact finder"].) As our recitation above shows, substantial evidence supported the trial court's credibility determination.

Defendant insists it is "inherently improbable" that Detective Lillienfeld did not realize defendant's weapon could not have been the murder weapon, citing *People v. Headlee* (1941) 18 Cal.2d 266, 267 (appellate court may set aside a conviction where "the evidence relied upon by the prosecution is so improbable as to be incredible"). But "[t]o be improbable on its face the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed." (*Ibid.*; see *People v. Mayberry* (1975) 15 Cal.3d 143, 150 ["To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions."].) This is not such a case.

162

Next, defendant contends Detective Lillienfeld and the prosecutors used "demonstrably false" statements from Gail Moreau-Hunter (that defendant confessed to her), in order to prosecute defendant. (Ms. Hunter testified at the preliminary hearing – but not at trial – to the effect that defendant told her he hired two black teenagers to carry out the murders.) Defendant's idea of "demonstrably false" is not ours. Defendant relies on medical records not in evidence for the proposition that Ms. Moreau-Hunter was "delusional" and therefore her preliminary hearing testimony was "inherently improbable and demonstrably false." We will not make the leap from allegations (without evidentiary support) of severe mental illness to conclusions that testimony is "demonstrably false." Nor will we assume that the prosecutors knew Ms. Moreau-Hunter's statements were false when she testified at the preliminary hearing, as the record is devoid of any such evidence. And, of course, defendant could not have been prejudiced by the use of Ms. Moreau-Hunter's testimony at the preliminary hearing, as defendant was convicted at trial without it.

Next, defendant makes a convoluted argument that Detective Lillienfeld "usurped power," "engaged in forum-shopping," and acted as "a rogue officer proceeding under the political influence of a private citizen, Campbell" when he "expand[ed] his investigation into Orange County" and presented his case to the Orange County District Attorney after the Los Angeles District Attorney rejected it in 1998. This claim suffers from the same flaws as defendant's other claims of misconduct.

First, defendant cites no evidence whatever for the assertion that Detective Lillienfeld acted at the behest of Collene Campbell. Second, defendant cites Penal Code section 830.1, and other authorities that likewise have no pertinence, to support his claim that the detective "lacked authority to expand his investigation into Orange County." Section 830.1 provides just the opposite: it states, among other things, that a deputy sheriff is a peace officer and his authority extends "to any place in the state" as to any public offense committed "within the political subdivision that employs the peace officer . . . ." (Pen. Code, § 830.1, subd. (a)(1).) Third, defendant cites no authority on "forum-shopping" by a peace officer, and his recitation of the law on venue is simply

163

inapt; the venue issue was resolved long ago in defendant's favor. (Indeed, the Court of Appeal in that case mentioned defendant's earlier claims of conflict of interest in the Orange County district attorney's personal relationship with Mickey Thompson's sister, Collene Campbell, noting that it had allowed defendant "to pursue his assertion below that Orange County lacked any *disinterested* purpose in prosecution." (*Goodwin v. Superior Court, supra,* G031285, pp. 2-3.))

In short, defendant has made no showing that Detective Lillienfeld's conduct consisted of anything other than disinterested activity aimed at bringing the person responsible for the Thompson murders to account. The same is true of defendant's claim that prosecutors in both counties "ced[ed] essential prosecution functions to Campbell, and prosecut[ed] [defendant] based on Campbell's political power, influence and connections rather than untainted facts obtained in an unbiased manner." This is nothing but hyperbole, without support in any evidence.

Finally, we note again that "a showing of prejudice to defendant's right to a fair trial [is] required" to sustain a due process claim of outrageous government conduct, and "the absence of such a showing preclude[s] dismissal as a sanction for prosecutorial misconduct." (*Uribe, supra,* 199 Cal.App.4th at p. 861.) None of defendant's allegations supports the notion that he received anything other than a fair trial.

## 17. Cumulative Error

Defendant contends the cumulative effect of the various errors he asserts requires reversal. Because we have found no error that, either alone or in conjunction with others, prejudiced defendant, we necessarily conclude there was no cumulative error.

### DISPOSITION

The judgment is affirmed.


GRIMES, J.

We concur:


BIGELOW, P. J.                              RUBIN, J.

164